# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHANTELLE KREUTTER, derivatively on behalf of TELADOC HEALTH, INC., | |
| Plaintiff, | **C.A. No. 19-CV-5875 (GHW) (BCM)** |
| v. | |
| JASON GOREVIC, MARK HIRSCHHORN, HELEN DARLING, MARTIN R. FELSENTHAL, WILLIAM H. FRIST, MICHAEL GOLDSTEIN, THOMAS MAWHINNEY, THOMAS G. MCKINLEY, BRIAN MCANDREWS, ARNEEK MULTANI, JAMES OUTLAND, KENNETH H. PAULUS, DAVID SHEDLARZ, and DAVID B. SNOW, JR., | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| TELADOC HEALTH, INC., | |
| Nominal Defendants. | |

## VERIFIED SHAREHOLDER DERIVATIVE AMENDED COMPLAINT

## INTRODUCTION

Chantelle Kreutter ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Teladoc Health, Inc. ("Teladoc" or the "Company") files this Verified Shareholder Derivative Amended Complaint against Individual Defendants Jason Gorevic, Mark Hirschhorn, Helen Darling, Martin R. Felsenthal, William H. Frist, Michael Goldstein, Thomas Mawhinney, Thomas G. McKinley, Brian McAndrews, Arneek Multani, James Outland, Kenneth H. Paulus, David Shedlarz, and David Snow, Jr., (collectively, the "Individual Defendants," and together with

Teladoc, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Teladoc, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teladoc, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Teladoc directors and officers from at least March 3, 2016 through the present (the "Relevant Period").

2.      Teladoc is a virtual care solution company that connects people with medical practitioners. Teladoc was founded in 2002 with the goal of improving patient access, lowering healthcare costs, and improving healthcare quality. Teladoc went public in 2015.

3.      During the Relevant Period, the Individual Defendants caused the Company to represent that the company depends "…on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business."

Verified Shareholder Derivative Amended Complaint

4.      The Individual Defendants further caused the Company to assert that "Teladoc is committed to the highest standards of integrity and ethics in the way it conducts business" and that "the board adopted a Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and all other executive and senior officers."

5.      Despite this, the Individual Defendants allowed multiple violations of Teladoc's corporate governance policies to occur that injured the company. These violations included, but were not limited to, allowing an inappropriate relationship to ensue between an executive and a lower-level employee, allowing insider trading, and allowing widespread violations of the Company's Code of Conduct, including the harassment of Company employees and retaliation against a whistleblower. Further, the Individual Defendants failed to take meaningful actions in response to complaints from Company employees regarding the aforementioned violations.

6.      In October 2012, Defendant Mark Hirschhorn ("Hirschhorn") was appointed Teladoc's Executive Vice President and CFO. In late September 2016, he also became the Company's Chief Operating Officer ("COO").

7.      In May 2014, Defendant Hirschhorn began a sexual relationship with a low-level employee of Teladoc, Charece Griffin ("Griffin"). Defendant Hirschhorn's relationship with Griffin spanned the course of at least two years. Throughout the relationship, Griffin received several promotions for which she was unqualified, and also benefitted from trading stocks under Hirschhorn's guidance. In particular, whenever Griffin would receive a stock grant, Hirschhorn would advise her on when to sell her shares. Griffin bragged to her colleagues that Hirschhorn was "pretty good" at pinpointing opportunities to sell. Although Hirschhorn was married at the time, Griffin's and Hirschhorn's relationship was by no means a secret at the Company. Griffin often

Verified Shareholder Derivative Amended Complaint

spoke to her former co-workers about her and Defendant Hirschhorn's relationship. One employee reported that Hirschhorn actually gave Griffin large sums of money for her to use to trade Teladoc stock.

8.      Sometime prior to October 2016, Griffin's former co-workers submitted a number of complaints concerning Griffin's and Defendant Hirschhorn's relationship and concerning Griffin's accompanying stock trades to Amy McKay, Teladoc's Clinical Director and Griffin's boss at the time ("McKay"). McKay found the aforementioned behavior inappropriate, and, in October 2016, she reported it to Teladoc's Legal and Human Resource Departments ("HR") in a detailed memorandum that charted the timeline of Hirschhorn's and Griffin's relationship (the "McKay Report").

9.      Throughout October of 2016, several Teladoc employees received a number of harassing and threatening emails, which, among other things, mocked the employees' personal appearances, and implied that the employees might lose their jobs. The timing and substance of the emails led the employees to believe the threatening emails were related to their knowledge of Defendant Hirschhorn's and Griffin's relationship. The employees reported the emails to HR, and HR told them to file police reports. Police reports were ultimately filed on October 25, 2016, and October 30, 2016.[1]

10.      Soon thereafter, the Company's Legal Department hired an independent law firm to investigate the claims in the McKay Report. Despite that the claims were ultimately substantiated by the independent law firm, in late December 2016 Defendant Hirschhorn faced extremely minimal punishment, and he stayed on at the Company long after news spread of the

---

[1] Attached hereto as Exhibits A and B are police reports filed by Company employees in response to threatening and harassing emails they received at their Company email addresses. These police reports were obtained from an article published on *Seeking Alpha* on December 17, 2018 titled, "Police Reports Case Doubt on Teladoc's Response to SIRF Story."

Verified Shareholder Derivative Amended Complaint

scandal. In late 2017, Griffin quietly resigned from Teladoc. McKay, however, was terminated in October 2017.

11.     After McKay was fired, she was replaced by Suzanne Leary ("Leary"). Under Leary's watch, members of McKay's former department caused the Company to falsify certain documents related to credentialing doctors, which led the National Committee for Quality Assurance (the "NCQA") to conduct a lengthy audit of the Company.

12.     On December 5, 2018, an article was published by the Southern Investigative Reporting Foundation titled, "Teladoc Health: A CFO's 'Other Life' Worked Out Nicely (The Ex-Girlfriend & Her Boss? Not So Much)"[2] (the "Investigative Report"). The Investigative Report revealed the details of the violations referenced in paragraph 5 herein.

13.     On this news, the price per share of Teladoc stock fell over 6.5% from the previous day's closing price, dropping $4.00 to close at $55.81 on December 6, 2018.

14.     Less than two weeks after these details came to light, on or around December 17, 2018, Defendant Hirschhorn at last resigned from his positions with the Company with a handsome severance package that he was only entitled to because the Board caused the Company to deem that Hirschhorn resigned with "Good Reason."

15.     On May 15, 2019, at the conclusion of the NCQA audit, the NCQA downgraded Teladoc's accreditation status to "Under Corrective Action," pending a subsequent NCQA review to be held on November 18, 2019.

16.     During the Relevant Period, Defendant Hirschhorn (1) engaged in a sexual relationship with a subordinate; (2) caused this subordinate to receive several promotions for which

---

[2] *Teladoc Health: A CFO's "Other Life" Worked Out Nicely (The Ex-Girlfriend & Her Boss? Not So Much),* http://sirf-online.org/2018/12/05/teladoc-health-a-cfos-other-life-worked-out-nicely-for-himthe-ex-girlfriend-her-boss-not-so-much/# (last visited October 3, 2019).

Verified Shareholder Derivative Amended Complaint

she was unqualified, negatively impacting the Company's performance; and (3) engaged in insider trading with this subordinate by, *inter alia*, providing beneficial tips on when to trade Company stock (collectively, the "Inappropriate Activity"). The Individual Defendants permitted the Inappropriate Activity to occur by not adequately enforcing Teladoc's own purported employment and trading policies, including by failing to take meaningful action against complaints and reports concerning the Inappropriate Activity and firing a whistleblower ("Misconduct").

17.   In breach of their fiduciary duties, the Individual Defendants permitted the Inappropriate Activity, engaged and caused the Company to engage in the Misconduct, and failed to maintain adequate controls.

18.   During the Relevant Period, the Individual Defendants also breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*: (1) the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  During the Relevant Period, the Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

19.   The Individual Defendants further breached their fiduciary duty to the Company by causing the Company to pay Defendant Hirschhorn his Annual Bonus each year that he violated the Company's policies and to pay him a severance package despite that there was no basis for the Company's deeming his resignation with Good Reason.

20.     During the Relevant Period, the Individual Defendants additionally breached their fiduciary duties by causing the Company to fail to maintain internal controls.

21.     As a result of the Individual Defendants' misconduct, which has subjected Teladoc, its Chief Executive Officer ("CEO") and its former Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit filed in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the abuse of control, the gross mismanagement and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company has and will have to expend many millions of dollars.

22.     As a further result of the Individual Defendants' misconduct, the Company was subjected to an NCQA audit in connection with falsified credentialing documents, which led the NCQA to downgrade the Company's accreditation status to "Under Corrective Action." The Company will also have to compete against other virtual healthcare companies that are fully accredited.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in the misconduct, the substantial likelihood of the directors' liability in this derivative action, the CEO's and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Teladoc's Board of Directors (the "Board") cannot

consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

25.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Teladoc is headquartered in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of Teladoc common stock. Plaintiff has continuously held Teladoc common stock at all relevant times.

**Nominal Defendant Teladoc**

31.     Teladoc is a Delaware corporation with its principal executive offices at 2 Manhattanville Road, Suite 203, Purchase, New York 10577. Teladoc's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TDOC."

**Defendant Gorevic**

32.     Defendant Jason Gorevic ("Gorevic") has served as a Company director and Teladoc's CEO since June 2009. According to the Company's Schedule 14A filed with the SEC on April 19, 2019 (the "2019 Proxy Statement"), as of April 5, 2019, Defendant Gorevic beneficially owned 643,924 shares of the Company's common stock.[3] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Gorevic owned approximately $37.6 million worth of Teladoc stock.

33.     For the fiscal year ended December 31, 2018, Defendant Gorevic received $7,329,322 in compensation from the Company. This included $511,250 in salary, $3,071,818 in stock awards, $3,080,863 in option awards, $643,750 in Non-Equity Incentive Plan Compensation, and $21,641 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gorevic received $7,104,442 in compensation from the Company. This included $500,000 in salary, $1,525,00 in stock awards, $4,293,406 in option awards, $750,000 in Non-Equity Incentive Plan Compensation, and $36,036 in all other compensation. This is an approximate $6 million increase in compensation since the fiscal year ending in 2015.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gorevic made the following sales of Company stock:

---

[3] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units ("RSUs") as of April 5, 2019.

Verified Shareholder Derivative Amended Complaint

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 6/29/2016 | 5,000 | $ 15.01 | $ 75,050.00 |
| 7/15/2016 | 5,000 | $ 15.45 | $ 77,250.00 |
| 8/16/2016 | 40,000 | $ 17.92 | $ 716,800.00 |
| 1/24/2017 | 100,000 | $ 15.79 | $ 1,579,000.00 |
| 5/8/2017 | 15,000 | $ 23.11 | $ 346,650.00 |
| 5/22/2017 | 4,700 | $ 29.58 | $ 139,026.00 |
| 5/23/2017 | 9,700 | $ 29.56 | $ 286,732.00 |
| 5/25/2017 | 5,600 | $ 29.57 | $ 165,592.00 |
| 6/5/2017 | 13,389 | $ 32.89 | $ 440,364.21 |
| 6/6/2017 | 6,602 | $ 32.88 | $ 217,073.76 |
| 10/2/2017 | 20,000 | $ 33.47 | $ 669,400.00 |
| 11/2/2017 | 20,000 | $ 32.10 | $ 642,000.00 |
| 12/4/2017 | 100,000 | $ 32.99 | $ 3,299,000.00 |
| 3/12/2018 | 40,000 | $ 43.27 | $ 1,730,800.00 |
| 4/16/2018 | 25,000 | $ 41.36 | $ 1,034,000.00 |
| 5/15/2018 | 25,000 | $ 48.93 | $ 1,223,250.00 |
| 6/15/2018 | 25,000 | $ 60.21 | $ 1,505,250.00 |
| 7/16/2018 | 25,000 | $ 66.11 | $ 1,652,750.00 |
| 8/16/2018 | 25,000 | $ 71.66 | $ 1,791,500.00 |
| 9/17/2018 | 25,000 | $ 75.05 | $ 1,876,250.00 |
| 10/17/2018 | 25,000 | $ 70.29 | $ 1,757,250.00 |
| 11/19/2018 | 35,000 | $ 54.80 | $ 1,918,000.00 |

Thus, in total, before the fraud was exposed, he sold 594,991 Company shares on inside information, for which he received approximately $23 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

35.     The Company's 2019 Proxy Statement stated the following about Defendant Gorevic:

> Mr. Gorevic has been chief executive officer of Teladoc Health and a member of our Board since June 2009. Prior to joining Teladoc Health, Mr. Gorevic worked in various capacities at WellPoint, Inc. (now Anthem Inc.), including president of Empire BlueCross BlueShield and senior vice president and chief marketing and product officer. From 2002 to 2005, Mr. Gorevic was a member of Empire BlueCross BlueShield's leadership team, as chief sales and marketing officer. From July 2000 to December 2001, Mr. Gorevic served as chief executive officer of

9

Gemfinity, an electronic marketplace and purchasing aggregator that he founded. From July 1999 to July 2000, he served as general manager of business messaging at Mail.com, Inc., a provider of Internet messaging services, and from April 1998 to June 1999, he served as Mail.com's vice president of operations. From 1993 to 1998, Mr. Gorevic worked at Oxford Health Plans, Inc. and held a variety of positions in marketing, medical management and operations, as well as director of service strategy. Mr. Gorevic currently sits on the board of Doximity, an online social networking service for U.S. clinicians. Mr. Gorevic earned a B.A. in international relations from the University of Pennsylvania. Our Board has concluded that Mr. Gorevic should serve as a director because of his leadership role with Teladoc Health and because of his broad experience in the healthcare industry.

**Defendant Hirschhorn**

36.     Defendant Mark Hirschhorn ("Hirschhorn") served as Teladoc's Executive Vice President and CFO since October 2012 and as Teladoc's Chief Operating Officer ("COO") since September 2016. Effective January 1, 2019, Hirschhorn resigned employment with Teladoc. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant Hirschhorn beneficially owned 10,000 shares of the Company's common stock.[4]  Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Hirschhorn owned approximately $584,900 worth of Teladoc stock.

37.     For the fiscal year ended December 31, 2018, Defendant Hirschhorn received $5,578,104 in compensation from the Company. This included $411,625 in salary, $2,047,363 in stock awards, $2,618,788 in option awards, $478,688 in Non-Equity Incentive Plan Compensation, and $21,641 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hirschhorn received $3,271,044 in compensation from the Company. This included $370,000 in salary, $263,492 in bonus, $584,685 in stock awards, $1,813,127 in option awards, $203,704 in Non-Equity Incentive Plan Compensation, and $36,036 in all other compensation.

---

[4] These shares do not include the number of option shares owned by the Individual Defendants through stock options and RSUs as of April 5, 2019.

38.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hirschhorn made the following sales of company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 8/15/2016 | 30,000.00 | $ 17.83 | $ 534,900.00 |
| 10/17/2016 | 5,000.00 | $ 15.52 | $ 77,600.00 |
| 11/8/2016 | 700.00 | $ 17.50 | $ 12,250.00 |
| 11/10/2016 | 4,300.00 | $ 17.50 | $ 75,250.00 |
| 11/15/2016 | 5,000.00 | $ 16.82 | $ 84,100.00 |
| 11/16/2016 | 5,000.00 | $ 17.55 | $ 87,750.00 |
| 12/15/2016 | 5,000.00 | $ 16.60 | $ 83,000.00 |
| 1/9/2017 | 5,000.00 | $ 17.50 | $ 87,500.00 |
| 1/17/2017 | 10,000.00 | $ 17.84 | $ 178,400.00 |
| 1/26/2017 | 900.00 | $ 20.00 | $ 18,000.00 |
| 4/19/2017 | 59,100.00 | $ 25.46 | $ 1,504,686.00 |
| 5/17/2017 | 100,000.00 | $ 27.70 | $ 2,770,000.00 |
| 9/21/2017 | 15,900.00 | $ 31.46 | $ 500,214.00 |
| 9/22/2017 | 9,100.00 | $ 32.74 | $ 297,934.00 |
| 10/2/2017 | 10,000.00 | $ 34.04 | $ 340,400.00 |
| 10/16/2017 | 25,000.00 | $ 32.37 | $ 809,250.00 |
| 10/17/2017 | 10,000.00 | $ 34.03 | $ 340,300.00 |
| 11/15/2017 | 10,000.00 | $ 27.96 | $ 279,600.00 |
| 12/4/2017 | 30,000.00 | $ 32.99 | $ 989,700.00 |
| 2/28/2018 | 100,000.00 | $ 39.60 | $ 3,960,000.00 |
| 5/1/2018 | 40,000.00 | $ 42.67 | $ 1,706,800.00 |
| 5/2/2018 | 30,540.00 | $ 45.17 | $ 1,379,491.80 |
| 5/2/2018 | 29,460.00 | $ 45.17 | $ 1,330,708.20 |
| 7/10/2018 | 20,000.00 | $ 63.00 | $ 1,260,000.00 |
| 9/25/2018 | 35,000.00 | $ 80.37 | $ 2,812,950.00 |
| 11/2/2018 | 10,000.00 | $ 70.13 | $ 701,300.00 |
| 12/4/2018 | 10,000.00 | $ 64.96 | $ 649,600.00 |

Thus, in total, before the fraud was exposed, he sold 615,000 Company shares on inside information, for which he received approximately $22.8 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

11
Verified Shareholder Derivative Amended Complaint

39.     The Company's Schedule 14A filed with the SEC on April 20, 2018 (the "2018 Proxy Statement") stated the following about Defendant Hirschhorn:

> Mr. Hirschhorn became our Executive Vice President and Chief Financial Officer in October 2012, and took on the additional role of being our Chief Operating Officer in September 2016. Mr. Hirschhorn is an experienced senior financial and operations executive who has worked with numerous entrepreneurial ventures in a variety of different market segments. From April 2004 to October 2012, Mr. Hirschhorn served as Executive Vice President and Chief Financial Officer of RCS/Media Monitors, an international software technology company that serves the media and entertainment markets. From 2000 to 2003, Mr. Hirschhorn served as the Chief Financial Officer in a number of technology companies, including BT Radianz. From 1996 to 2000, he spent five years as the Vice President and Global Controller of RSL Communications, a publicly traded multinational telecommunications company, and as Chief Financial Officer of Deltathree Communications, a publicly traded RSL subsidiary and pioneer in VOIP technology. He started his professional career with Deloitte and spent nine years with the firm. Mr. Hirschhorn earned a B.A. from Rutgers University and an M.B.A. from Rutgers Business School. Mr. Hirschhorn is a CPA and a member of the American Institute of Certified Public Accountants.

**Defendant Darling**

40.     Defendant Helen Darling ("Darling") has served as a Company director since June 2016. She is also a member of the Quality of Care and Patient Safety Committee. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant Darling beneficially owned 918 shares of the Company's common stock.[5] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Darling owned approximately $53,693 worth of Teladoc stock.

41.     For the fiscal year ended December 31, 2018, Defendant Darling received $236,168 in compensation from the Company. This included $45,000 in fees earned or cash paid, $100,019 in stock awards, and $91,149 in option awards. For the fiscal year ended December 31, 2017,

---

[5] These shares do not include the number of option shares owned by the Individual Defendants through stock options and RSUs as of April 5, 2019.

Defendant Darling received $175,817 in compensation from the Company. This included $45,000 in fees earned or cash paid, $27,999 in stock awards and $102,818 in option awards.

42.     The Company's 2019 Proxy Statement stated the following about Defendant Darling:

Ms. Darling became a member of our Board in June 2016. Ms. Darling is currently Strategic Advisor on Health Benefits and Health Care to the National Business Group on Health, a national nonprofit, membership organization devoted exclusively to providing practical solutions to its employer-members' most important healthcare problems and representing large employers' perspectives on national health policy issues; from 2001 to May 1, 2014, she was president and CEO of this group. Ms. Darling is a board member and former chair of the National Quality Forum, an independent, nonprofit organization that brings together leaders and experts to improve healthcare quality and safety through measurement; from January 2016 until February 2017, she was interim president and CEO of this organization. Ms. Darling is a director of the congressionally created Reagan-Udall Foundation, which supports the mission of the FDA. Ms. Darling participates on the Committee on Performance Measurement of the National Committee for Quality Assurance (co-chair for 10 years), the Medical Advisory Panel, Center for Clinical Effectiveness, Blue Cross Blue Shield Association, Advisory Boards for the Peter G. Peterson Foundation and GE's healthymagination.

*Becker's Hospital Review* named Ms. Darling one of the 60 Most Powerful People in health care in 2016. For several years, she was named one of the "100 Most Influential People in Health Care," by *Modern Healthcare* and "One of the Top 25 Women in Health Care" She was given NCQA's Health Quality Leader Award (2012); the President's Award by the American College of Occupational and Environmental Medicine (2010); WorldatWork's Keystone Award, its highest honor for sustained contributions to the field of human resources and benefits (2009). She was given a lifetime appointment in 2003 as a National Associate of the National Academy of Sciences for her work for the Institute of Medicine.

Previously, Ms. Darling directed the purchasing of health benefits and disability at Xerox Corporation. She was a principal at William W. Mercer and practice leader at Watson Wyatt. Earlier in her career, she was Health LA for U.S. Senator David Durenberger, on the Health Subcommittee of the Senate Finance Committee. She directed three studies at the Institute of Medicine. Ms. Darling received a master's degree in demography/sociology and a bachelor of science degree, *cum laude*, from the University of Memphis. Our Board has concluded that Ms. Darling should serve as a director because of her executive leadership experience and her extensive background in the healthcare industry.

**Defendant Felsenthal**

43.     Defendant Martin R. Felsenthal ("Felsenthal") served as a Company director from November 2009 until his retirement on May 25, 2017. According to the Company's Schedule 14A filed with the SEC on April 6, 2017 (the "2017 Proxy Statement"), as of March 31, 2017, Defendant Felsenthal beneficially owned 10,860 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $25.00, Defendant Felsenthal owned approximately $271,500 worth of Teladoc stock.

44.     For the fiscal year ended December 31, 2017, Defendant Felsenthal received $18,024 in compensation from the Company. This included $18,024 in fees earned or cash paid.

45.     The Company's Schedule 14A filed with the SEC on April 15, 2016 (the "2016 Proxy Statement") stated the following about Defendant Felsenthal:

> Mr. Felsenthal became a member of our board of directors in November 2009. Since 1992, he has spent his career working exclusively with emerging growth health care services and health care software companies. Mr. Felsenthal was a partner of HLM Venture Partners, a venture capital firm, from 2007 to 2015. From 1997 to 2007, Mr. Felsenthal worked with Salix Ventures, a venture capital firm focused on health care services and health care software companies, and was a partner from 2000 to 2007. During the last five years, the boards on which Mr. Felsenthal has served as a director include the following: Change Healthcare Corporation, which was acquired by Emdeon; Aperio Technologies, which was acquired by Leica Biosystems; OnShift; ClearDATA Networks; and Vericare Management. Previously, he served as a director of companies including US RenalCare, Titan Health, PayperPath, and Vantage Oncology. In 2014, Mr. Felsenthal began working as an Advisor to the California Healthcare Foundation Health Innovation Fund, which supports innovative new businesses with the potential to lower the cost of care, improve access, and/or improve quality for underserved populations. Mr. Felsenthal earned a B.A. from Princeton University and an M.B.A. from the Stanford University Graduate School of Business. Our board of directors has concluded that Mr. Felsenthal should serve as a director because of his broad experience in the healthcare industry and his significant directorship experience.

---

[6] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of March 31, 2017.

Verified Shareholder Derivative Amended Complaint

**Defendant Frist**

46.     Defendant William H. Frist ("Frist") has served as a Company director since September 2014. Defendant Frist serves as the Chairman of the Quality of Care and Patient Safety Committee and also serves as a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant Frist beneficially owned 5,418 shares of the Company's common stock.[7] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Frist owned approximately $316,898  worth of Teladoc stock.

47.     For the fiscal year ended December 31, 2018, Defendant Frist received $245,168 in compensation from the Company. This included $54,000 in fees earned or cash paid, $100,019 in stock awards and $91,149 in option awards.

48.     The Company's 2019 Proxy Statement stated the following about Defendant Frist:

Dr. Frist became a member of our Board in September 2014. Since 2007, Dr. Frist has served as a partner in Cressey & Company, a private equity firm focused exclusively on investing in and building leading healthcare businesses. He is chairman of the Cressey Distinguished Executive Council. As a U.S. Senator, Dr. Frist represented Tennessee for 12 years where he served on both the Finance and HELP committees responsible for writing all health legislation. He served as U.S. Senate Majority Leader from 2003 to 2007. Prior to the Senate, Dr. Frist spent 20 years in clinical medicine, completing surgical training at Harvard's Massachusetts General Hospital and Stanford, and he subsequently founded the Vanderbilt Multi-Organ Transplant Center. Dr. Frist serves as an adjunct professor of Cardiac Surgery at Vanderbilt University. His previous board service includes Princeton University, the Smithsonian Institution and the Clinton Bush Haiti Fund. Dr. Frist currently serves as a director of the publicly held companies Select Medical and AECOM, and serves on the Select Medical and AECOM audit committees. In addition, he serves on the boards of Unitek, Aegis, MDSave, Cognosante, Accolade and Devoted Health. He previously served as a director of URS Corporation from November 2009 to 2014, and on the board of Third National Bank from 1990 to 1994. He is chairman of Hope Through Healing Hands, a nonprofit that focuses on maternal and child health, NashvilleHealth, a community initiative dedicated to improving the health and wellbeing of all Nashvillians, and SCORE, a collaborative

---

[7] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of April 5, 2019.

Verified Shareholder Derivative Amended Complaint

K–12 education reform organization. His current board services include the Robert Wood Johnson Foundation and Kaiser Family Foundation. He is a senior fellow at the Bipartisan Policy Center, where he is co-leader of the Health Project. Dr. Frist earned his B.A. from Princeton University and M.D. from Harvard Medical School. Our Board has concluded that Doctor Frist should serve as a director because of his significant directorship experience and his broad experience in the healthcare industry.

**Defendant Goldstein**

49.     Defendant Michael Goldstein ("Goldstein") has served as a Company director since February 2015. Defendant Goldstein serves as Chairman of the Nominating and Corporate Governance Committee and also serves as a member of the Audit Committee and the Quality of Care and Patient Safety Committee. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant Goldstein beneficially owned 918 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Goldstein owned approximately $53,693 worth of Teladoc stock.

50.     For the fiscal year ended December 31, 2018, Defendant Goldstein received $252,501 in compensation from the Company. This included $61,333 in fees earned or cash paid, $100,019 in stock awards, and $91,149 in option awards. For the fiscal year ended December 31, 2017, Defendant Goldstein received $188,051 in compensation from the Company. This included $57,234 in fees earned or cash paid, $27,999 in stock awards and $102,818 in option awards.

51.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Goldstein made the following sale of Company stock:

| Date | Number of shares | Price | Proceeds |
|---|---|---|---|
| 3/2/2018 | 66,574 | $        39.72 | $        2,644,319 |

---

[8] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of April 5, 2019.

Thus, in total, before the fraud was exposed, he sold 66,574 Company shares on inside information, for which he received approximately $2.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

52.     The Company's 2019 Proxy Statement stated the following about Defendant Goldstein:

> Mr. Goldstein became a member of our Board in February 2015. Mr. Goldstein was employed by Ernst & Young (and its predecessor firms) from 1963 to 1979, including six years as an audit partner. Mr. Goldstein served as chairman of Toys "R" Us, Inc. from 1998 to 2001, chief executive officer from 1999 to 2000, vice chairman and chief executive officer from 1994 to 1998 and chief financial officer from 1983 to 1994. Mr. Goldstein has been a director of BioScrip, Inc. since 2015. He is chairman of BioScrip's audit committee and a member of the governance, compliance and nominating committee and corporate strategy committee. Mr. Goldstein is on the boards of two non-public companies: RiHappy, the largest Brazilian toy retailer; and Bank Leumi-USA. He is also a global senior advisor of Jefferies, Inc. Mr. Goldstein serves on the board of Rosie's Theater Kids. He is chairman of the Northside Center for Child Development. Mr. Goldstein is a *magna cum laude* graduate of Queens College with a B.S. in economics. Mr. Goldstein was the recipient of the Haskins Gold Medal for achieving the highest score in the CPA examination in the State of New York. Our Board believes Mr. Goldstein is qualified to serve as a director due to his experience and governance leadership roles on the boards of various other public companies, as well as his extensive background in finance, both as an audit partner and as a finance executive and chief executive officer of a large public corporation.

**Defendant Mawhinney**

53.     Defendant Thomas Mawhinney ("Mawhinney") served as a Company director from September 2014 until May 31, 2018. According to the 2018 Proxy Statement, as of April 6, 2018, Defendant Mawhinney beneficially owned 11,087 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on April 6,

---

[9] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of April 6, 2018.

Verified Shareholder Derivative Amended Complaint

2018 was $39.15, Defendant Mawhinney owned approximately $434,056 worth of Teladoc stock. He also served as a member of the Audit Committee.

54.     For the fiscal year ended December 31, 2018, Defendant Mawhinney received $20,833 in total compensation. This included $20,833 in fees earned or cash paid. For the fiscal year ended December 31, 2017, Defendant Mawhinney received $179,289 in compensation from the Company. This included $48,472 in salary, $27,999 in stock awards and $102,818 in option awards.

55.     The Company's 2017 Proxy Statement stated the following about Mawhinney:

Mr. Mawhinney became a member of our board of directors in September 2014. He is currently a General Partner of Icon Ventures, a technology venture capital firm, having joined the firm in 2003. Before joining Icon, Mr. Mawhinney was with Canaan Partners, an early stage venture capital firm with $2 billion under management, from 2001 to 2003. As an entrepreneur, Mr. Mawhinney co-founded and spent five years as President and Chief Operating Officer of North Systems, a venture-backed software company. Prior to his time with North Systems, he developed his skills as a technology investor and entrepreneur working as a Senior Associate at Summer Partners. Mr. Mawhinney is on the boards of directors of, or otherwise actively involved with, Awarepoint, Bill.com, Huddle, Ionic Security, KIXEYE, Reputation.com, Xambala, Yodle, Area1 Securit, Synack and Zephyr Health. Mr. Mawhinney graduated with honors, earning a B.A. from Harvard University and received his M.B.A. from the Stanford University Graduate School of Business. Our board of directors has concluded that Mr. Mawhinney should serve as a director because of his significant directorship experience and his broad experience in the technology industry.

**Defendant McAndrews**

56.     Defendant Brian McAndrews ("McAndrews") has served as a Company director since September 2017. He also served as a member of the Audit Committee and a member of the Compensation Committee.

Verified Shareholder Derivative Amended Complaint

57.     For the fiscal year ended December 31, 2018, Defendant McAndrews received $248,668 in compensation from the Company. This included $57,500 in fees earned or cash paid and $100,019 in stock awards and $91,149 in option awards.

58.     The Company's 2019 Proxy Statement stated the following about Defendant McAndrews:

> Mr. McAndrews became a member of our Board in September 2017. As the former chief executive officer, president and chairman of Pandora Media, he has a depth of knowledge in data, analytics and artificial intelligence ("**AI**"). Mr. McAndrews currently sits on the board of Amplero, a recognized leader in leveraging AI marketing to maximize customer lifetime value and loyalty. He also served as president and CEO of aQuantive, Inc., a top ten global digital marketing services and adtech company that was acquired by Microsoft. Mr. McAndrews has spent a significant portion of his career driving growth and innovation for leading advertising and content companies. For nearly a decade he held positions of increasing responsibility at ABC, Inc., leaving as executive vice president and general manager of ABC Sports. He was named one of "The Power 100" by Billboard Magazine in 2016 and 2015, as well as one of the 30 most influential executives in the advertising, marketing and media world by Adweek in 2008. Mr. McAndrews currently sits on the boards of the publicly held companies The New York Times (since June 2012, currently chairman of the technology and innovation committee), Grubhub (since April 2014, currently chairman of the board) and Frontdoor (since October 2018). Previously, he served on these public companies' boards: Pandora Media, from September 2013 through March 2016; Clearwire, from February 2009 through September 2013; and Fisher Communications, from October 2006 through August 2013. He also sits on the boards of The Wine Group, PicMonkey and The United Way of King County. He holds an M.B.A. from Stanford Graduate School of Business and a Bachelor of Arts from Harvard College. Our Board has concluded that Mr. McAndrews should serve as a director because of his experience on the boards of various other public companies, his prior service as CEO of aQuantive, Inc. and his extensive background in the advertising, marketing and media industries.

### Defendant McKinley

59.     Defendant Thomas G. McKinley ("McKinley") has served as a Company director since November 2009. He also serves as Chairman of the Compensation Committee. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant McKinley beneficially owned 3,616

shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant McKinley owned approximately $211,499 worth of Teladoc stock.

60.     For the fiscal year ended December 31, 2018, Defendant McKinley received $246,168 in compensation from the Company. This included $55,000 in fees earned or cash paid, $100,019 in stock awards and $91,149 in option awards.

61.     The Company's 2019 Proxy Statement stated the following about Defendant McKinley:

> Mr. McKinley became a member of our Board in November 2009. Mr. McKinley is a general partner and the west coast representative for Cardinal Partners, a venture-capital firm focused exclusively on healthcare investing. Prior to joining Cardinal, Mr. McKinley was the co-founder and co-managing partner of Partech International. Mr. McKinley has over 35 years of investment experience. Mr. McKinley currently serves on the board of directors of lifeIMAGE, a cloud-based medical imaging sharing platform for hospitals, physicians and patients, and of Sapphire Digital (formerly Vitals, Inc.). In addition, Mr. McKinley is the founding CEO and director of Cardinal Analytx, a software start-up spun out of Stanford University that was created to identify and target high-cost patients for early medical interventions. Mr. McKinley earned an undergraduate degree in economics from Harvard University, an M.S. in accounting from New York University and an M.B.A. from the Stanford University Graduate School of Business. Our Board has concluded that Mr. McKinley should serve as a director because of his significant directorship experience and his broad experience in the healthcare and technology industries.

**Defendant Multani**

62.     Defendant Arneek Multani ("Multani") has served as a Company director since 2008. He also serves as a member of the Compensation Committee and a member of the Audit Committee. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant Multani

---

[10] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of April 5, 2019.

beneficially owned 918 shares of the Company's common stock.[11] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Multani owned approximately $53,693 worth of Teladoc stock.

63.     For the fiscal year ended December 31, 2018, Defendant Multani received $248,668 in compensation from the Company. This included $57,500 in fees earned or cash paid, $100,019 in stock awards and $91,149 in option awards.

64. The Company's 2019 Proxy stated the following about Defendant Multani:

Mr. Multani became a member of our Board in 2008. Mr. Multani is a managing director of Trident Capital, where he leads the firm's healthcare IT practice, and is a co-founder and managing director of TC Growth, a growth-equity firm spun out of Trident Capital in 2015. Prior to joining Trident in 2002, Mr. Multani was an associate at McCown De Leeuw, a private equity firm specializing in leveraged buy-outs, where he focused on investing in the health and fitness industries. He started his career as an analyst at Morgan Stanley & Co. in the media and telecommunications area of the mergers and acquisitions group. Mr. Multani currently sits on the board of directors of Imagine Health, Arrohealth and HealthMEDX. His past directorships and observer-ships include Acclaris, Profex and Resolution Health. Mr. Multani earned a B.S. in economics from Wharton School of Business and a B.A.S. in systems engineering from the Moore School of Engineering at the University of Pennsylvania. He earned his M.B.A. from the Stanford University Graduate School of Business. Our Board has concluded that Mr. Multani should serve as a director because of his broad experience in the healthcare industry and his significant core business skills, including financial and strategic planning.

**Defendant Outland**

65.     Defendant James Outland ("Outland") served as a Company director from May 2006 until his retirement on May 25, 2017. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Outland beneficially owned 49,986 shares of the Company's common stock.[12] Given that the price per share of the Company's common stock at the close of trading on

---

[11] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of April 5, 2019.

[12] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of March 31, 2017.

March 31, 2017 was $25.00, Defendant Outland owned approximately $1.25 million worth of Teladoc stock.

66.    For the fiscal year ended December 31, 2017, Defendant Outland received $20,027 in compensation from the Company. This included $20,027 in fees earned or cash paid.

67.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Outland made the following sales of Company Stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 6/29/2016 | 10,000 | $    15.00 | $    150,000.00 |
| 8/2/2016 | 10,000 | $    18.00 | $    180,000.00 |

Thus, in total, before the fraud was exposed, he sold 20,000 Company shares on inside information, for which he received approximately $330,000. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

68. The Company's 2016 Proxy Statement stated the following about Defendant Outland:

Mr. Outland became a member of our board of directors in May 2006. Mr. Outland is a founding partner of New Capital Partners, a private-equity firm that invests in high-growth companies. Mr. Outland has over 25 years of private equity, mergers and acquisitions and business development leadership experience in both entrepreneurial business ventures and well-established corporations. Prior to co-founding New Capital Partners, Mr. Outland served in various key roles in the healthcare industry and as an officer of UnitedHealth Group after its acquisition of Complete Health Services. Mr. Outland currently serves as chairman of the board of the private companies Repay Holdings, MDnetSolutions, Medsurant Holdings and P&R Dental. More than five years ago, Mr. Outland served as the Chief Executive Officer for Senior Whole Health during its first years of operation, in addition to his role there as Chairman of the Board. Mr. Outland is active in the Birmingham community and serves on the Board of Trustees for the Birmingham Museum of Art, and as a board member of Innovation Depot and Children's Harbor, Inc. Mr. Outland earned a B.A. in political science and a B.F.A. in advertising from Southern Methodist University.

Our board of directors has concluded that Mr. Outland should serve as a director because of his broad experience in the healthcare industry and his significant core business skills, including financial and strategic planning.

**Defendant Paulus**

69.     Defendant Kenneth H. Paulus ("Paulus") has served as a Company director since 2017. He is also a member of the Nominating and Corporate Governance Committee and a member of the Quality of Care and Patient Safety Committee.

70.     According to the 2019 Proxy Statement, for the fiscal year ended December 31, 2018, Defendant Paulus received $240,168 in compensation from the Company. This included $49,000 in fees earned or cash paid, $100,019 in stock awards and $91,149 in option awards.

71.     The Company's 2019 Proxy Statement stated the following about Defendant Paulus:

> Mr. Paulus became a member of our Board in February 2017. Mr. Paulus is the CEO of Prime Therapeutics LLC, a provider of pharmacy benefit management solutions. From 2009 to 2014, Mr. Paulus was president and CEO of Allina Health, one of the nation's largest not-for-profit integrated delivery systems. Prior to his appointment as CEO, he served as president and chief operating officer of Allina Health. Before joining Allina, Mr. Paulus was the president and CEO of Atrius Health System, one of the largest integrated physician organizations in New England and a teaching and research affiliate of Harvard Medical School. He also served as the chief operating officer of Boston-based Partners Community Health Care, a teaching affiliate of Harvard Medical School that includes Massachusetts General Hospital and Brigham and Women's Hospital. Mr. Paulus currently serves on the boards of Healthgrades, Ally Align Health and Breg. Previously he sat on the boards of publicly held companies: Cogentix (2014 and 2015) and Team Health (2015 and 2016). Mr. Paulus received his Master of Healthcare Administration and Management from the University of Minnesota, and a Bachelor of Arts in biology from Augustana College. Our Board has concluded that Mr. Paulus should serve as a director because of his background serving in leadership roles in the healthcare industry.

**Defendant Shedlarz**

72.     Defendant David Shedlarz ("Shedlarz") has served as a Company director since 2016. He also serves as Chairman of the Audit Committee and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant Shedlarz beneficially owned 918  shares of the Company's common stock.[13] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Shedlarz owned approximately $53,693 worth of Teladoc stock.

73.     For the fiscal year ended December 31, 2018, Defendant Shedlarz received $258,668 in compensation from the Company. This included $67,500 in fees earned or cash paid, $100,019 in stock awards, and $91,149 in option awards.

74.     The Company's 2019 Proxy Statement stated the following about Defendant Shedlarz:

> Mr. Shedlarz became a member of our Board in September 2016. He is the former vice chairman, executive vice president and chief financial officer of Pfizer, Inc., having had worldwide responsibility for the company's former Medical Technology Group. During his 31-year tenure at Pfizer, Mr. Shedlarz played a key role in shaping the strategic direction that drove the company's impressive growth and helped establish it as an industry leader and innovator. Among his senior leadership roles were that of executive vice president beginning in 1999, and then vice chairman in 2005, serving until his retirement in 2007. Mr. Shedlarz sits on the boards of The Hershey Company and Pitney Bowes Inc. (both public companies), and the Teacher Insurance and Annuity Association. He holds a Master of Business Administration in finance and accounting from New York University, Leonard N. Stern School of Business, and a Bachelor of Science in economics and mathematics from Oakland/Michigan State University. Our Board has concluded that Mr. Shedlarz should serve as a director because of his deep experience in public company finance, his experience as a director of large public companies and his prior service as the chief financial officer of one of the world's leading pharmaceutical corporations.

---

[13] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of April 5, 2019.

**Defendant Snow**

75.      Defendant David B. Snow, Jr. ("Snow") has served as a company director since February 2014 and Chairman of the Company's board since December 2014. He also serves as a member of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. According to the 2019 Proxy Statement, as of April 5, 2019, Defendant Snow beneficially owned 94,355 shares of the Company's common stock.[14] Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $58.49, Defendant Snow owned approximately $5.5 million worth of Teladoc stock.

76.      For the fiscal year ended December 31, 2018, Defendant Snow received $274,335 in compensation from the Company. This includes $83,167 in fees earned or cash paid, $100,019 in stock awards, and $91,149 in option awards.

77.      The Company's 2019 Proxy Statement stated the following about Defendant Snow:

Mr. Snow became a member of our Board in February 2014; he became chairman of our Board in December 2014. Since February 2014, Mr. Snow has served as chairman and chief executive officer of Cedar Gate Technologies, Inc., a provider of analytic and information technology services to doctor and hospital organizations entering risk-based reimbursement arrangements with insurers. Until April 2012, Mr. Snow was chairman and chief executive officer of Medco Health Solutions, Inc., a Fortune 50 public company and leading pharmacy benefit manager. His current board service includes Pitney Bowes, Inc. (since 2006, a public company). He formerly served as a director of Medco Health Solutions, Inc. and as a director of CareCentrix (2014 through 2018). In addition to his experience as the chairman and chief executive officer of a publicly traded company, Mr. Snow has a strong background in operations, having served in leadership positions at several companies, including WellChoice (Empire Blue Cross Blue Shield) and Oxford Health Plans. Mr. Snow earned a B.S. in economics from Bates College and a master's degree in health care administration from Duke University. Our Board has concluded that Mr. Snow should serve as a director because of his broad experience in the healthcare industry and his significant core business skills, including financial and strategic planning.

---

[14] These shares do not include the number of option shares owned by the Individual Defendants through stock options and restricted stock units RSUs as of April 5, 2019.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

78.     By reason of their positions as officers and/or directors and fiduciaries of Teladoc and because of their ability to control the business and corporate affairs of Teladoc, the Individual Defendants owed Teladoc and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Teladoc in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Teladoc and its shareholders so as to benefit all shareholders equally.

79.     Each director and officer of the Company owes to Teladoc and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

80.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Teladoc, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

81.     To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

82.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Teladoc, the absence of good faith on their

part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Teladoc's Board at all relevant times.

83.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC including all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

84.    To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Teladoc were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Teladoc's own Code of Business Conduct and Ethics;

(b)       conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)       remain informed as to how Teladoc conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)       establish and maintain systematic and accurate records and reports of the business and internal affairs of Teladoc and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)       maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Teladoc's operations would comply with all applicable laws and Teladoc's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)       exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)       refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)       examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

85.    Each of the Individual Defendants further owed to Teladoc and the shareholders the duty of loyalty requiring that each favor Teladoc's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

86.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Teladoc and were at all times acting within the course and scope of such agency.

87.    Because of their advisory, executive, managerial, and directorial positions with Teladoc, each of the Individual Defendants had access to adverse, non-public information about the Company.

88.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Teladoc.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

89.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

90.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations

of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a) of the Exchange Act.

91.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Teladoc, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

92.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

93.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Teladoc and was at all times acting within the course and scope of such agency.

## **TELADOC'S CODE OF CONDUCT**

94.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") states that "[i]t applies to all individuals who work for, or on behalf of, Teladoc Health, including directors and officers; full, part-time, and temporary employees; and contract employees

("Employees")" The Code of Conduct further states, "[a]ll Employees are expected to read, understand, and comply with the Code."

95.    The Code of Conduct provides that the Company engages in honest, fair, and accurate sales practices:

> The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely, and understandable disclosures.

96.    The Code of Conduct provides that the Company has a duty to accurately record and report data to shareholders and regulators, stating specifically:

> Teladoc Health's records must meet the highest standards of accuracy and completeness. You must make open and full disclosure to, and cooperate fully with, outside accountants in connection with any audit or review of Teladoc Health's financial statements. Teladoc Health relies on you to come forward if you feel that you are being pressured to prepare, alter, conceal, or destroy documents in violation of Company policy. In addition, you must report to the Legal Department if you have reason to believe that any of our books and records are being maintained in an inaccurate or incomplete manner, or if you have reason to believe that someone has made a misleading, incomplete, or false statement in connection with an investigation, audit, examination, or filing with a government agency or regulatory body.

97.    In the section titled "Harassment" the Code of Conduct provides that:

> We will not tolerate any form of discrimination or harassment relating to age, ancestry, color, religious creed (including religious dress and grooming practices), disability, marital status, medical condition, genetic information, military and veteran status, national origin (including language use restrictions), race, sex (which includes pregnancy, childbirth, breastfeeding, and medical conditions related to pregnancy, childbirth, or breastfeeding), gender, gender identity, gender expression, sexual orientation, and any other characteristic protected under applicable law (collectively "Protected Status").

> This zero-tolerance policy applies to the actions of all Employees, contractors, and consultants toward another colleague, guest, customer, etc.

>  Harassment is verbal, physical, or visual conduct that denigrates or shows hostility or aversion toward an individual because of a Protected Status, and that:

1. Creates an intimidating, hostile, or offensive working environment
2. Unreasonably interferes with an Employee's work performance
3. Otherwise adversely affects an Employee's employment opportunities

98.     This section goes on to list some examples of harassment, one of the examples being: "Bullying behavior, including threats, intimidation, coercion, ridicule, insults, belittling, etc."

99.     In the section titled "Sexual Harassment" the Code of Conduct provides that:

Teladoc Health does not tolerate sexual harassment and takes allegations seriously. We will respond promptly to complaints of sexual harassment and when it is determined that such inappropriate conduct has occurred, we will act promptly to eliminate the conduct and impose such corrective action as is necessary, up to and including dismissal.

100.     In the section titled "Personal Relationships" the Code of Conduct provides that:

Teladoc strives to provide a work environment that is collegial, respectful, and productive and avoids any actual or perceived conflicts of interest derived from personal romantic relationships in the workplace. This applies to romantic relationship regardless of the sexual orientation of the Employees involved and it applies equally to same-sex and opposite-sex relationships.

An Employee who is involved in a personal romantic relationship with another Employee may not occupy a position where there is authority, power, or control over the other individual in the relationship.

Authority, power, or control exists:

1. In direct supervisory relationships, and/or
2. In relationships in which one Employee has the direct or indirect ability to influence the other Employee's compensation, benefits, work conditions, performance evaluations, daily tasks, etc.

Romantic personal relationships between two Employees where authority, power, or control exists must be reported to Human Resources. It is the Employee in the position of authority, power, or control who is responsible for reporting such a relationship. Failure to report subjects such Employee to disciplinary action up to and including termination of employment. Once notified, Human Resources will work with all parties involved to make acceptable alternative arrangements to avoid a violation of this policy.

Verified Shareholder Derivative Amended Complaint

101.   The Code of Conduct further contains a section outlining the Company's whistleblower and "strict" non-retaliation policies, which states in relevant part:

> Teladoc Health adheres to a strict non-retaliation policy. We will not tolerate harassment, retaliation, or any kind of discrimination or adverse action against an Employee who:
> - Makes a good-faith complaint or report about suspected Company or Employee violations of this Code, applicable laws, or Teladoc Health's policies
> - Provides information (or causes information to be provided) or assists in an investigation
> - Testifies or participates in a proceeding relating to violations of law Any Employee who reports a violation will be treated with dignity and respect. Retaliation against anyone who reports an issue, provides information, or otherwise assists in a compliance investigation will, in itself, be treated as a violation of this Code. Any Employee found to have retaliated against another Employee in violation of this policy will be subject to disciplinary action, up to and including termination.

102.   The Code of Conduct section titled "Disciplinary Action" provides that:

> Teladoc Health is a public company, which means using non-public Company information to trade in securities, or providing a family member, friend, or any other person with a "tip," is illegal. All such non-public information should be considered inside information and should never be used for personal gain. You are required to familiarize yourself and comply with Teladoc Health's Insider Trading Compliance Policy, copies of which are distributed to all Employees, officers, and directors and are available from the Legal Department. You should contact the Legal Department with any questions about your ability to buy or sell securities.

103.   The Code of Conduct section titled "The Board of Directors" provides that:

> The Code will be strictly enforced throughout the Company and violations will be dealt with immediately, including subjecting persons to corrective and/or disciplinary action such as dismissal or removal from office. Employees who fail to comply with this Code of Business Conduct or to cooperate with any compliance investigation will be subject to disciplinary action. Employees who direct, approve, or condone violations of this Code, or have knowledge of a violation and do not act promptly to report and correct it, will be subject to disciplinary action. Disciplinary action may include termination of employment. Violations of the Code that involve illegal behavior will be reported to the appropriate government authorities for enforcement proceedings.

104.     The Individual Defendants violated the Code of Conduct by permitting the Inappropriate Activity and permitting and causing the Misconduct in violation of applicable U.S. laws and permitting and causing the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement and violations of Sections 14(a).

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

105.     Teladoc is a company that offers 24 hours a day, seven days a week, virtual care solutions that are capable of reaching 130 countries. Teladoc's services range from simple to complex. The Company's services involve general medical, mental health and complex care. Teladoc is a global leader in its field.

106.     To use Teladoc's services, a user must first request a visit with a Teladoc doctor via Teladoc's website, phone, or mobile app. Teladoc then uses its wide-range of U.S. board certified physicians to put the user into contact with a physician who best fits the user's needs.

107.     Teladoc currently has a network of over 3,100 healthcare professionals who are prepared to provide users with more convenient and less expensive access to medical care.

108.     During the Relevant Period, the Company was accredited by the NCQA, an independent, nonprofit healthcare-oriented organization that manages accreditation programs for individuals and organizations in the healthcare industry. The Company's accreditation status is vital to its ability to attract and retain skilled medical professionals, and to maintain its contracts with health insurance organizations, both of which are material to the Company's financial condition.

Verified Shareholder Derivative Amended Complaint

**The Inappropriate Activity**

109.    During the Relevant Period, the Individual Defendants engaged in and/or permitted the Inappropriate Activity. The Individual Defendants allowed multiple violations of Teladoc's corporate governance policies to occur that injured the company. These violations included, but were not limited to, allowing an inappropriate relationship to ensue between an executive and a lower-level employee, allowing insider trading, allowing widespread violations of the Company's Code of Conduct, and allowing the harassment of the Company's employees. Further, the Individual Defendants engaged in and caused the Company to engage in the Misconduct by failing and allowing the Company to fail to take meaningful action in response to complaints regarding the aforementioned violations and to take wrongful action in response. The Inappropriate Activity and the Misconduct resulted in an investigation by a law firm engaged by the Company, as well as a decline in the value of the Company.

110.    Defendant Hirschhorn served as Teladoc's Executive Vice President and CFO since October 2012 and as Teladoc's COO since September 2016.

111.    According to the Investigative Report, beginning at least in May of 2014, Defendant Hirschhorn engaged in a sexual relationship with Griffin, a low-level employee of Teladoc. Griffin was many levels below Defendant Hirschhorn. Griffin was around 30 years old and was a single mother of two children with no college education. She began working at the Company in 2014 out of the Company's Lewisville, Texas office. Defendant Hirschhorn, on the other hand, was married with a family, 54 years old, and was one of the Company's top employees. He worked out of the Company's New York office, but often visited the Texas offices. For the fiscal year ended December 31, 2018, Defendant Hirschhorn received $5,578,104 in compensation from the Company.

Verified Shareholder Derivative Amended Complaint

112.    Griffin publicly discussed her and Defendant Hirschhorn's relationship with her colleagues. Defendant Hirschhorn had on occasion sent flowers to Griffin's office desk.

113.    A number of former Teladoc employees who are cited in the Second Amended Consolidated Class Action Complaint in the Securities Class Action ("Securities Class Action Second Amended Complaint") corroborate certain details about Defendant Hirschhorn's and Griffin's relationship during this period. For instance, one former employee, a Physician Recruiter, recalled that beginning at least in 2015, personnel at the Company's Lewisville office openly discussed Defendant Hirschhorn's and Griffin's relationship. Another former employee, a Provider Relations Manager and Corporate Recruiter, disclosed that Defendant Hirschhorn's and Griffin's relationship lasted between two and two and a half years.

114.    Over the course of Defendant Hirschhorn's and Griffin's relationship, Griffin's salary grew to around $125,000, and she received a series of promotions. These promotions were given to Griffin over colleagues with more experience and better qualifications. As an illustration of Griffin's rapid rise in status and pay during her relationship with Defendant Hirschhorn, in February 2017, Griffin was able to upgrade her car from a seven-year-old Kia to a late-model Mercedes.

115.    If Griffin's colleagues were not already made uncomfortable by Defendant Hirschhorn's and Griffin's relationship, this quickly changed when Griffin told her colleagues that Defendant Hirschhorn provided her tips on when to trade Company stock. Griffin claimed that Defendant Hirschhorn was "pretty good" at it. According to the former Physician Recruiter cited to in the Securities Class Action Second Amended Complaint, Griffin once stated that Defendant Hirschhorn had given her $10,000 with which to buy stocks.

116.     During this period of time, a number of employees reported Defendant Hirschhorn's and Griffin's relationship, as well as the insider trading in which the two had engaged, to Pina Tripodi and Theresa Kirk-Fowler, the Company's Director and Associate Director of Human Resources, respectively.

117.     McKay, who was Clinical Director and Vice-President of the Payor Relations Unit, as well as Griffin's boss, also became aware of Defendant Hirschhorn's and Griffin's relationship during this period. Like Griffin's former colleagues, McKay felt that Defendant Hirschhorn advising Griffin on when to trade Company stocks crossed the line and was very inappropriate. According to the former Physician Recruiter cited to in the Securities Class Action Second Amended Complaint, McKay, too, reported Defendant Hirschhorn's and Griffin's relationship to Tripodi and Kirk-Fowler.

118.     The former Physician Recruiter reported, according to the Securities Class Action Second Amended Complaint, that, among other things, McKay's department was responsible for recruiting and credentialing the medical professionals with whom the Company contracted. Proper credentialing is vital to the Company's accreditation status, which is subject to review by the NCQA.

119.     In October of 2016, McKay drafted the McKay Report, an eight-page document that detailed Defendant Hirschhorn's and Griffin's relationship and pointed out inappropriate behavior, such as the trading of Company stocks based on Defendant Hirschhorn's tips. McKay sent the report to both Legal and HR Departments at Teladoc.

120.     About a month later, the Legal Department at Teladoc responded to the McKay Report by hiring an outside law firm to independently review the claims made in the McKay Report and determine whether they were substantiated.

121.     Moreover, a former Credentialing Coordinator cited to in the Securities Class Action Second Amended Complaint, who worked at the Company's Lewisville office, revealed that Adam Vandervoort, the Company's Chief Legal Officer, had come to the Lewisville office McKay worked at in order to interview McKay, indicating that the McKay Report had indeed been received by the Company's senior management.

122.     In October of 2016, several Teladoc employees filed police reports regarding threatening and harassing emails that they were receiving at their Company email addresses. According to the former Physician Recruiter, McKay was among these employees. One of the police reports also states that the employee who filed the report was a clinical director at Teladoc who was formerly Griffin's boss, supporting the conclusion that McKay had indeed filed that report. *See* Exhibit B at 4. The employees believed that the emails were sent to them because of their knowledge of Griffin's and Defendant Hirschhorn's relationship. When asked who the employees believed sent the emails, one of the employees gave Griffin's name. *See id*. The employees stated that they first went to Teladoc's HR Department to report the threatening emails, but HR told them to file a police report. *See* Exhibit A at 2. One of the employees felt that the Company's HR Department wanted to "sweep under the rug" anything having to do with Defendant Hirschhorn's and Griffin's relationship. *See id.* at 4.

123.     One of the police reports contains the following statements made by a Teladoc employee:

> I was threatened at work through a fake email address. Several other employees received emails. This was very upsetting to me and I feel harassed, and stalked and bullied. I went to HR and they suggested that if I feel this way to report it to Lewisville PD. We have an employee that formerly worked in my department and it is very possible that she is doing this. I have attached her [email]. I do not take threatening of my job lightly."

*Id.* at 2.

Verified Shareholder Derivative Amended Complaint

124.     Another police report made by a Company employee describes an incident that occurred on October 2, 2016. In the report, the employee states, "I have been receiving harassing emails to my office regarding my personal appearance, car [etc.] … There have been 7 emails in less than a month." Exhibit B at 3.

125.     Importantly, while the Inappropriate Activity was ongoing, Defendant Hirschhorn was promoted to COO of Teladoc on September 28, 2016. According to an article published on December 17, 2018 on *Seeking Alpha* titled, "Police Reports Cast Doubt on Teladoc's Response to SIRF Story,"[15] (the "Police Reports Article"), Defendant Gorevic would later state that the other Individual Defendants did not know about Defendant Hirschhorn's and Griffin's relationship until after Defendant Hirschhorn was promoted to COO. Yet, after reporting Defendant Hirschhorn's and Griffin's relationship to HR, Company employees began receiving the threatening and harassing emails at least as early as October 2, 2016. *See* Exhibit B at 5. Because the threatening and harassing emails were likely instigated by the complaints made to Teladoc's HR Department regarding Defendant Hirschhorn's and Griffin's relationship, those complaints were almost certainly made before Defendant Hirschhorn was promoted on September 28, 2016. This suggests that the Individual Defendants were aware of Defendant Hirschhorn's and Griffin's relationship prior to Defendant Hirschhorn's promotion to COO, and yet they refused to meaningfully investigate and address Defendant Hirschhorn's misconduct at that time.

126.     In November 2016, about a month after the independent law firm was hired to investigate the claims in the McKay Report, McKay found out that the law firm was able to substantiate the claims. McKay further heard that action would be taken to address the McKay

---

[15]     Police   Reports   Cast   Doubt   on   Teladoc's   Response   to   SIRF Story,file:///R:/Teladoc%20Health%20Inc/Evidence/Police%20Reports%20Cast%20Doubt%20On%20Teladoc's%20Response%20To%20SIRF%20Story%20-%20The%20Friendly%20Bear%20_%20Seeking%20Alpha.pdf   (last visited October 3, 2019).

Verified Shareholder Derivative Amended Complaint

Report claims. Counsel retained by McKay would later state that Hirschhorn's behavior was "a violation of a bunch of [the Company's] own employee conduct clauses … I am not sure why they tolerated the CFO doing that."

127.    On December 27, 2016, Defendant Hirschhorn's employment contract was amended with two added provisions. One merely forbade him from violating the Code of Conduct—an obvious duty which he was not likely excused from previously, and the other provision suspended his awarded shares from vesting for one year.

128.    Defendant Hirschhorn remained with the Company until early 2019, whereas Griffin quietly resigned from Teladoc in later 2017. According to two former employees referenced in the Investigative Report, after spending months protesting the Company's handling of Defendant Hirschhorn's behavior to the Company's HR and Legal Departments, McKay was fired in October of 2017.

129.    According to the former Physician Recruiter, after McKay was fired, the Company replaced her with Leary, who was not qualified to run McKay's department and had no experience with credentialing doctors.

130.    The former Credentialing Coordinator cited to in the Securities Class Action Second Amended Complaint stated that Leary did not understand how to properly credential doctors. The former Credentialing Coordinator further revealed that during this period, a member of Leary's team distributed an email discussing his intention to forge initials to be used in connection with certain credentialing documents, in order to pass an NCQA audit. The former Credentialing Coordinator forwarded this email to the Company's legal counsel. As a result, the former Credentialing Coordinator was stripped of most job responsibilities, and subsequently left the Company.

131. Shortly thereafter, the NCQA became aware that Company employees had falsified credentialing documents, and it began an extensive audit of the Company.

**False and Misleading Statements**

*March 3, 2016 Form 10-K*

132. On March 3, 2016, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2015 on a Form 10-K (the "2015 10-K), which was signed by Individual Defendants Gorevic, Hirschhorn, Felsenthal, Frist, Goldstein, Mawhinney, McKinley, Multani, Outland and Snow.

133. The 2015 10-K detailed under the section "Risk Factors," the reliability and skillfulness of Teladoc's "key" executives, and stated in pertinent part:

> ***We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business.***
>
> Our success depends largely upon the continued services of our key executive officers. These executive officers are at-will employees and therefore they may terminate employment with us at any time with no advance notice. We maintain "key person" insurance in the amount of $4.0 million for Jason Gorevic, our Chief Executive Officer, but not for any of our other executive officers or any of our other key employees. We also rely on our leadership team in the areas of research and development, marketing, services and general and administrative functions. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.
>
> To continue to execute our growth strategy, we also must attract and retain highly skilled personnel. Competition is intense for qualified professionals. We may not be successful in continuing to attract and retain qualified personnel…
>
> …Failure to attract new personnel or failure to retain and motivate our current personnel, could have a material adverse effect on our business, financial condition and results of operations.

134.    Also detailed under "Risk Factors" in the 2015 10-K, was a section that highlighted that expected costliness of potential lawsuits brought against the Company, it stated in pertinent part:

> ***Any future litigation against us could be costly and time-consuming to defend***
>
> We may become subject, from time to time, to…or employment claims made by our current or former associates. Litigation may result in substantial costs and may divert management's attention and resources, which may substantially harm our business, financial condition and results of operations. Insurance may not cover such claims, may not provide sufficient payments to cover all of the costs to resolve one or more such claims and may not continue to be available on terms acceptable to us. A claim brought against us that is uninsured or underinsured could result in unanticipated costs, thereby reducing our revenue and leading analysts or potential investors to reduce their expectations of our performance, which could reduce the market price of our stock.

135.    Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gorevic and Hirschhorn attesting to the accuracy of the 2015 10-K.

136.    These statements were false and misleading because the Individual Defendants willfully or recklessly failed to disclose and caused the Company to fail to disclose, *inter alia*: (1) the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The aforementioned statements, made by the Individual Defendants, spoke highly to the skillfulness and competence of the executives while, the Individual Defendants actually, or constructively, knew about the violations of the Company policy that were occurring. Further, the Individual Defendants failed to disclose the violations of the Company policy that were occurring.

Verified Shareholder Derivative Amended Complaint

*April 15, 2016 Proxy Statement*

137.    The Company filed its 2016 Proxy Statement with the SEC on April 15, 2016. Defendants Gorevic, Felsenthal, Frist, Goldstein, Mawhinney, McKinley, Multrani, Outland and Snow solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[16]

138.    The 2016 Proxy Statement stated, regarding the Company's Code of Conduct, that, "Teladoc is committed to the highest standards of integrity and ethics in the way it conducts business." The 2016 Proxy stated that in 2015, the Board adopted a Code of Business Conduct and Ethics ("2015 Code of Conduct") and further stated that, the 2015 Code of Conduct "applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and all other executive and senior officers" and it "establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest." The 2016 Proxy Statement further stated, that under the 2015 Code of Conduct, "each of our directors and employees is required to report suspected or actual violations.  In addition, we have adopted separate procedures concerning the receipt and investigation of complaints relating to accounting or audit matters."

139.    Section 1 of the 2015 Code of Conduct[17] stated, in part:

> We must strive to foster a culture of honesty and accountability.  Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government and the public, including our

---

[16] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

[17] *See* Teladoc, Inc. Code of Business Conduct and Ethics adopted June 17, 2015.

Verified Shareholder Derivative Amended Complaint

shareholders.  All of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior.  Even well-intentioned actions that violate the law or this Code may result in negative consequences for the Company and for the individuals involved.

140.    Section 5 of the 2015 Code of Conduct titled, "Conflicts of Interest", began with:

Our employees, officers and directors have an obligation to act in the best interest of the Company.  All employees, officers and directors should avoid situations that present a potential or actual conflict between their interest and the interest of the Company.

141.    Section 5 outlined a "conflict of interest" as:

… when a person's private interest interferes in any way, or even appears to interfere, with the interest of the Company, including its subsidiaries and affiliates.  A conflict of interest can arise when an employee, officer or director takes an action or has an interest that may make it difficult for him or her to perform his or her work objectively and effectively….

142.    Section 3 of the 2015 Code of Conduct specifically noted the illegality of sharing insider information and stated:

Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip", is illegal.  All such non-public information should be considered inside information and should never be used for personal gain.  You are required to familiarize yourself and comply with the Company's policy against insider trading, copies of which are distributed to all employees, officers and directors and are available from the Legal Group…

143.    In addition, Section 12 of the 2015 Code of Conduct stated:

The Company's policies for recruitment, advancement and retention of employees forbid discrimination on the basis of any criteria prohibited by law, including but not limited to race, sex and age.  Our policies are designed to ensure that employees are treated, and treat each other, fairly and with respect and dignity.  In keeping with this objective, conduct involving discrimination or harassment of others will not be tolerated.  All employees are required to comply with the Company's policy on equal opportunity, non-discrimination and fair employment, copies of which were distributed and are available from the Legal Department.

144.    These statements were false and misleading because the Individual Defendants willfully or recklessly failed to disclose and caused the Company to fail to disclose, *inter alia*: (1)

the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. Hirschhorn's and Griffin's relationship violated many parts of the 2015 Code of Conduct. Specifically, Griffin received multiple promotions in contradiction to the fairness referenced in Section 12 of the 2015 Code of Conduct. The conduct by Hirschhorn violated the Company policy as well, specifically, the aforementioned Section 3 addressing insider information. The Individual Defendants failed to disclose these violations.

### *March 1, 2017 Form 10-K and Earnings Call*

145.    On March 1, 2017, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Individual Defendants Gorevic, Hirschhorn, Darling, Frist, Goldstein, McKinley, Multani, Outland, Shedlarz and Snow.

146.    The 2016 10-K "Risk Factors" section was substantively the same to the aforementioned 2015 10-K "Risk Factors" section.

147.    Attached to the 2016 10-K were SOX certifications signed by Defendants Gorevic and Hirschhorn attesting to the accuracy of the 2016 10-K.

148.    During an earnings call on March 1, 2017, Defendant Gorevic stated that Teladoc is "continuing to enhance [its] overall corporate governance program."

149.    These statements were false and misleading because the Individual Defendants willfully or recklessly failed to disclose and caused the Company to fail to disclose, *inter alia*: (1) the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. Given the previous employee complaints, police reports,

Verified Shareholder Derivative Amended Complaint

and substantiation following investigation, Defendant Gorevic was aware of Hirschhorn's conduct and failed to disclose it.

### April 6, 2017 Proxy Statement

150.    The Company filed its 2017 Proxy Statement with the SEC on April 6, 2017. Defendants Gorevic, Darling, Felsenthal, Frist, Goldstein, Mawhinney, McKinley, Multani, Outland, Shedlarz and Snow solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions. [18]

151.    The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all directors, officers and employees" which is available on the company website. The 2017 Proxy Statement purports that the purpose of such a code is "is to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics." The 2017 Proxy Statement goes on to state "Our Code of Business Conduct and Ethics establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."

152.    The 2017 Proxy Statement's referenced Code of Conduct during this time, upon information and belief, contained the same, or substantially similar, statements as aforementioned in the 2015 Code of Conduct referenced above.

---

[18] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

153.   The 2017 Proxy Statement also called for a shareholder vote to approve the amendment and restatement of the "Teladoc, Inc. 2015 Incentive Award Plan" (the "2015 Incentive Award Plan") which provided for the grant of stock and cash-based performance awards for officers and directors, including Defendant Hirschhorn. The misrepresentations and omissions set forth herein were material to shareholders in voting on this matter.

154.   These statements were false and misleading because the Individual Defendants willfully or recklessly failed to disclose and caused the Company to fail to disclose, *inter alia*: (1) the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants, again, failed to disclose violations of the Code of Conduct and failed to disclose that Hirschhorn, due to his behavior and violations of the Code of Conduct, was at risk of losing his job. The relevant part of the Code of Conduct stating, "The Code will be strictly enforced throughout the Company and violations will be dealt with immediately, including subjecting persons to corrective and/or disciplinary action such as dismissal or removal from office."

### *February 27, 2018 Form 10-K*

155.   On February 27, 2018, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017, on a Form 10-K (the "2017 10-K"), which was signed by Individual Defendants Gorevic, Darling, Frist, Goldstein, Hirschhorn, Mawhinney, McAndrews, McKinley, Multani, Paulus, Shedlarz and Snow.

156.   The 2017 10-K "Risk Factors" section was substantively the same to the aforementioned 2015 10-K "Risk Factors" section.

157.    Attached to the 2017 10-K were SOX certifications signed by Defendants Gorevic and Hirschhorn attesting to the accuracy of the 2017 10-K.

158.    These statements were false and misleading because the Individual Defendants willfully or recklessly failed to disclose and caused the Company to fail to disclose, *inter alia*: (1) the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants, again, failed to disclose violations of the Code of Conduct and failed to disclose that Hirschhorn, due to his behavior and violations of the Code of Conduct, was at risk of losing his job.

### April 20, 2018 Proxy Statement

159.    The Company filed its 2018 Proxy Statement with the SEC on April 20, 2018. Defendants Gorevic, Darling, Felsenthal, Frist, Goldstein, Mawhinney, McAndrews, McKinley, Multani, Outland, Paulus, Shedlarz and Snow solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[19]

160.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all directors, officers and employees" which is available on the company website. According to the 2018 Proxy Statement , the purpose of such a code is "is to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics." The 2018 Proxy Statement further stated, "Our Code of Business Conduct and Ethics establishes our policies

---

[19] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

and expectations with respect to a wide range of business conduct, including the preparation and

maintenance of our financial and accounting information, our compliance with laws and possible

conflicts of interest."

161.    The Company's Code of Conduct, upon information and belief, contained the same,

or substantially similar, statements as aforementioned in the 2015 Code of Conduct referenced in

above.

162.    Further, the 2018 Proxy Statement outlined Teladoc's Insider Trading Compliance

Policy. The policy stated:

> We maintain an Insider Trading Compliance Policy that applies to all securities
> issued by Teladoc. Company officers, directors and employees are prohibited from
> engaging in hedging transactions, including purchasing Teladoc stock on margin or
> engaging in transactions in puts, calls or other derivative securities designed to
> hedge or offset any decrease in the market value of Teladoc's equity securities.

163.    The 2018 Proxy Statement further stated, in part, regarding "The Role of

Shareholder Say-on-Pay Vote", "This proposal, commonly known as a "say-on-pay" proposal,

gives our stockholders the opportunity to express their views on our named executive officers'

compensation." The Individual Defendants also purported to employ "performance-based

compensation" elements, including equity awards designed to "strongly links pay to performance."

However, with regard to the compensation, the 2018 Proxy statement was false and misleading

because it failed to disclose that the shares and value of Teladoc was artificially inflated. Thus,

making the executive compensation undeserved and excessive and the shareholders unable to

make an informed vote.

164.    These statements were false and misleading because the Individual Defendants

willfully or recklessly failed to disclose and caused the Company to fail to disclose, *inter alia*: (1)

the Inappropriate Activity; (2) the Misconduct; and (3) that the Company failed to maintain

internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants, again, failed to disclose violations of the Code of Conduct and failed to disclose that Hirschhorn, due to his behavior and violations of the Code of Conduct, was at risk of losing his job.

## The Truth Emerges

165.    On December 5, 2018, the Investigative Report was published by the Southern Investigative Reporting Foundation, revealing to the public, for the first time, the Inappropriate Activity. The Investigative Report stated, in relevant part:

> In a nutshell, for a little over two years Teladoc Health's chief financial officer Mark Hirschhorn, 54, was in an affair with Charece Griffin, now 30, and an employee many levels below him on the company's organizational chart.

> At the end of it, the powerful, high-profile executive stayed with nearly nary a consequence, while his girlfriend — and her boss — hit the road.

166.    The Investigative Report provided a timeline of Griffin's and Hirschhorn's relationship, which detailed how Griffin's colleagues came to find out about the relationship. The Investigative Report stated, "Griffin, according to her former colleagues, openly discussed her relationship with Hirschhorn. And if those coworkers initially harbored doubts about whether their CFO was really rendezvousing with Griffin, they were put to rest when Hirschhorn sent flowers to her desk after some of his Lewisville visits."

167.    Further, the Investigative Report revealed that Griffin's colleagues not only found out about her relationship with Hirschhorn through Griffin, but that Griffin also disclosed to her colleagues that Hirschhorn would give her tips on when to sell her Company stock. Specifically, the Investigative Report stated that "Griffin told [her colleagues] she and Hirschhorn liked to trade Teladoc Health's stock together. More accurately, after Griffin received a stock grant, Hirschhorn

would tell her when he thought there were good opportunities to sell some shares. His track record, she proudly told colleagues, was pretty good."

168.    Amy McKay, the Investigative Report states, was "shocked at the risk Hirschhorn has incurred" and "trading your employer's stock based on tips from your boyfriend–and the company's CFO—was the last straw …" Thus, after finding out about the inside trading, McKay drafted an eight-page document that "was a timeline of the relationship—and an enumeration of things that she and her subordinates felt were most problematic about it …" which was then submitted to both the Legal and HR Departments.

169.    Though McKay was "pleasantly surprised" to hear that the Legal Department hired an outside law firm to "conduct an independent review of her claims[,]" which were soon after substantiated by the firm, she was "shocked" to discover the only action taken against Hirschhorn was an amended employment contract. The Investigative Report, further highlighted, "Aside from a slight change in the lightly read legal boilerplate, Hirschhorn remained unscathed, with no other public or private sanction."

170.    The same day, in response to the Investigative Report, Teladoc issued a press release which stated:

> We take workplace conduct matters very seriously. The SIRF report contains several factual inaccuracies. When we were made aware of the allegations against Mark Hirschhorn in 2016, we engaged an outside law firm to investigate the claims. That investigation found violations solely of our workplace relationship policy, and our board of directors took swift and appropriate disciplinary action to address the violations. This matter was handled in a prompt, thorough and fair manner. We are deeply committed to ensuring a safe, respectful work environment where all individuals are treated fairly and equally. [20]

---

[20] *Teladoc Health Refutes SIRF Report Claims*, https://s21.q4cdn.com/672268105/files/doc_news/Teladoc-Health-Refutes-SIRF-Report-Claims.pdf (last visited October 3, 2019).

Verified Shareholder Derivative Amended Complaint

171.    When news of the Investigative Report reached the public, the Company's price per share dropped from the previous trading day's closing price of $59.81 on December 4, 2018, to a closing price of $55.81 on December 6, 2018, a decline of almost 6.7%.

172.    The Investigative Report prompted further details about the Inappropriate Activity to emerge, including on police reports that were filed by at least two Company employees in 2016. The reports, provided in the Police Reports Article, detailed the harassing emails employees received as follows:

From: Arnold Benedict <arnold.benedict@dr.com>
To:                      @teladoc.com>
Cc:
Date: Sun, 2 Oct 2016 19:56:58 +0000
Subject: telehealth on teledoc
you might wanna see if your doc will adjust your meds, they making you look tired and that busted pair green jeans aint working either, plus you need to get them extensions tightened up in the back you can totally tell whats real and whats fake

---------------------------------------------------------------

Exhibit B at 5.

From: Bernie Clinton [mailto:bernie.clinton@mail.com]
Sent: Sunday, October 16, 2016 5:39 PM
To:                      @teladoc.com>
Subject: Teledoc recruiting candidate

Trust that little voice in the back of your head.
You probably feel it a little in your stomach too.
Wondering if the job took was a good decision because the person thats gonna be your boss just seems distant.  Weird.
You cant put your finger on it but something feels funny.
Do people like her.  Does she have a good reputation.  Not really.
What about the people that work for her.  Happy.  Motivated.  Doesnt seem like it.
What about the people that used to work for her.
What do they say.  Or what do they not say.
Maybe your experience will be different.  Chances not good.

Keep your resume sharp.  You have good contacts.

52

Verified Shareholder Derivative Amended Complaint

*Id.*

173.    The police reports stated that the employees first received the emails in October

2016 and reported them to HR. The HR Department suggested that the employees go to the police.

The police reports stated the following:



Exhibit A at 4.

Verified Shareholder Derivative Amended Complaint

I called(_____' and spoke to her on the phone about this incident. (____ explained to me that she is a Director of Administration at Teledoc, a medical company. She has been the director for about 8 years now and she has the ability to both hire and fire people from the company. When I asked if ____ had any suspicion of who is sending these emails, she immediately gave me a name:

Charece Griffin

____ explained that Charece used to work for her, but she was transferred from( ____ department to another department. After the transfer, the emails started up. ____ stated that Charece has had several incidents involving HR, but is still currently working for the company. ____ went on to give reasons why she believes it's Charece. ____took two of her co-workers to lunch one day. When they returned from lunch, she saw Charece standing outside in the parking lot. Charece saw( get out of her car and saw the two co-workers that she was with. After this incident, ____ received an email from the suspect, citing this incident and detailing who( was going to lunch with. Additionally, the two co-workers received emails from the suspect as well.

( ___ stated that she attempted to attach the emails when filing the online report. I looked in Laserfiche but couldn't find any attachments. I asked( to forward the emails to me, which she did.

____ added that since Charece has been transferred, she has become very angry. ____ alluded to an incident that ____ has had with HR, but she stated that she couldn't disclose the details of the incident to me. ____ added that Charece has been emailing other people in( ____ ,department, saying they should be looking for a new job.

____ stated that she would email me Charece's phone number so that I could contact her.

Exhibit B at 4.

174.    The Police Reports Article further provided an excerpt from a December 6, 2018 Credit Suisse note, which attributed the following representations to Defendant Gorevic concerning the allegations made in the Investigative Report:

> ▪ **CEO Claims that the SIRF Article Mischaracterizes the Penalty on Mr. Hirschhorn.** Mr. Gorevic also notes that the article mischaracterizes the magnitude of penalty levied on Mr. Hirschhorn. For instance, in addition to the delaying vesting of shares by a year, Mr. Hirschhorn also forfeited his entire bonus for 2016 (a combined value of $4.4 mln). Mr. Gorevic also dismisses the allegation that the employment of Amy McKay, Ms. Griffin's supervisor, was terminated for objecting to Mr. Hirschhorn's relationship with Ms. Griffin. According to Mr. Gorevic, Ms. McKay voluntarily left the firm as the company was undergoing a restructuring process which required its employees (including Ms. McKay) in Dallas to relocate to Boston. Finally, TDOC's CEO notes that Mr. Hirschhorn was given the COO title prior to the allegations surfacing and not after as the article suggests.

175.    The timing of the harassing emails and ensuing police reports in October of 2016 suggest that employees reported Griffin's and Hirschhorn's relationship to HR prior to October of

2016, indicating that the Individual Defendants were aware of Hirschhorn's relationship with Griffin when Hirschhorn was promoted to COO on September 28, 2016. Yet, according to the Police Reports Article, after the Investigative Report was published, Defendant Gorevic falsely stated to analyst firms, including Credit Suisse and Leerink, that Teladoc was unaware of Hirschhorn's and Griffin's relationship at the time of Hirschhorn's promotion to COO, and that McKay left Teladoc voluntarily out of a desire not to relocate to Teladoc's Boston office, when in reality she had been fired for reporting the Inappropriate Activity.

176.    On February 27, 2019, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2018, on a Form 10-K (the "2018 10-K"). Notably, the 2018 10-K omitted language that had appeared in all of the Company's prior 10-Ks referencing the Company's NCQA accreditation status. In prior 10-Ks, the Company had stated the following about its accreditation status, in the section titled, "Our Competitive Strengths":

> We were the first to deliver nationwide access to board certified physicians 24 hours a day, seven days a week, 365 days a year and establish over 100 proprietary Evidence Based clinical guidelines specifically designed for the virtual delivery of care. In addition, we are the first telehealth company to have received certification by the National Committee for Quality Assurance, or the NCQA, an independent, not for profit, healthcare oriented organization founded in 1990 dedicated to improving healthcare quality and verifying adherence to national standards of excellence in the provision of healthcare for our physician credentialing processes. We have implemented the highest credentialing requirements resolutions and implemented ongoing quality review processes, ensuring quality interactions and outcomes.

177.    On April 10, 2019, an article was published on Seeking Alpha, titled, "Teladoc's Credentialing Issues Highlight Broader Internal Control Questions," which remarked on the 2018

10-K's peculiar omission of language referencing the Company's NCQA accreditation.[21] The

article stated, in relevant part:

> When companies make drastic changes to the language in their securities filings
> without explanation, investors should take notice. For example, in December 2016
> Teladoc quietly amended its former CFO's employment agreement. Two years
> later, the market discovered these subtle amendments were likely tied to his
> improper workplace conduct. The latest change in Teladoc's financial disclosures
> that has gone unnoticed - and that could have even more draconian consequences
> for Teladoc - pertains to the company's NCQA credential - a status that has
> significant reputational significance to Teladoc.
>
> Notably missing from Teladoc's most recent 10-K was a bullet point on page 6 of
> the prior year 10-K under Our Competitive Strengths, titled "High Quality Provider
> Network". In fact, you will not even find that term if you search through the FY18
> Teladoc 10-K. The NCQA is a non-profit that is a well-established and regarded
> body that provides quality assessments for healthcare related organizations.
> According to NCQA (p8), plans certified by their organization cover ~70% of
> Americans enrolled in healthcare plans.

178.    The article also commented on the relevance of the Inappropriate Activity and

Misconduct to the Company's accreditation status, stating:

> The former CFO's surreptitious departure last year may now be forgotten but is
> likely still haunting Teladoc. We mention his departure because it is *highly
> relevant* to the company's NCQA credential. Something the market seems to have
> missed is that SIRF claimed that between 20-30% of the division that reported to
> the Clinical Director resigned in protest at some point in late 2017. The Clinical
> Director role at Teladoc oversaw credentialing. In light of the unexplained 10-K
> language pull, **investors, therefore, deserve to know whether the former CFO's
> prior workplace conduct has had any impact on the company's credentialing
> division.** In case there is any uncertainty as to whether the individuals mentioned
> in the SIRF story touched on NCQA credentialing, we point investors to this
> document that makes it clear Teladoc NCQA certification fell within the division
> run by the manager referenced in both the SIRF story and the aforementioned
> document.

(Emphasis in original).

---

[21]    *Teladoc's    Credentialing    Issues    Highlight    Broader    Internal    Control    Questions,*
https://seekingalpha.com/article/4253595-teladocs-credentialing-issues-highlight-broader-internal-control-questions
(last visited October 3, 2019).

179.    On May 15, 2019, as a result of the NCQA audit into the Company's credentialing activities, the Company was placed on "Under Corrective Action," which is a temporary accreditation status pending a subsequent NCQA review to be held on November 18, 2019. Without accreditation status from the NCQA, the Company could potentially lose its contracts with health insurance companies, as well as the medical professionals the Company employs and credentials.

180.    The next day, on May 16, 2019, an article was published on *Seeking Alpha*, titled, "Teladoc: Significant Near-Term Contract Risk After NCQA Corrective Action Debacle."[22] The article discussed the Company's "Under Corrective Action" status, stating, in relevant part:

> Recent developments at Teladoc (TDOC) relating to its credentialing status lead us to believe that the company is likely to see significant contract losses in upcoming months. We believe the market does not understand the weight of recent NCQA developments, in part because the sell side a) only started analyzing Teladoc's NCQA issues after our first report, and b) has largely relied on management's representations as it pertains to NCQA. While the market took yesterday's Corrective Action announcement in stride, ***we note that Teladoc is now significantly disadvantaged versus its competitors. Teladoc once proudly stated that it was "first telehealth company to receive NCQA Certification".*** Today, Teladoc is the only major telehealth company that has been placed on NCQA Corrective Action Status.

(Emphasis added).

181.    As of October 4, 2019, the NCQA's website displayed the following graphic in its "Report Card" on Teladoc:

---

[22]    *Teladoc: Significant Near-Term Contract Risk After NCQA Corrective Action Debacle*, https://seekingalpha.com/article/4264578-teladoc-significant-near-term-contract-risk-ncqa-corrective-action-debacle (last visited October 3, 2019).

Verified Shareholder Derivative Amended Complaint



**EVALUATION PRODUCT:**   Accreditation in Credentialing

**STATUS:**   Accredited - 2 years

**STATUS MODIFIER:**   Under Corrective Action

**EXPIRATION:**   05/14/21

**DATE OF NEXT REVIEW:**   11/18/19

182.     On or around December 17, 2018, Defendant Hirschhorn at last resigned from his positions with the Company with a handsome severance package that he was only entitled to because the Board caused the Company to deem that Hirschhorn resigned with "Good Reason."

183.     The Separation and Release of Claims Agreement states:

In consideration for the Employee's execution, non-revocation of, and compliance with this Agreement, including the waiver and release of claims in Section 4, the Employer agrees to provide the post-termination payments and benefits (the "Severance") that are required by Employer under the Executive Employment Agreement, dated as of June 17, 2015, by and between the Employer and the Employee, as amended December 27, 2016 (the "Employment Agreement"), subject to the terms and conditions set forth therein. Employer acknowledges, confirms and agrees that Employee will be deemed to have resigned from his employment with the Employer with "Good Reason" (as that term is defined in the Employment Agreement), subject generally to the applicable terms and conditions of the Employment Agreement and shall provide all benefits outlined in Section 5(b)(i) of the Employment Agreement. Employer further acknowledges and agrees that the discretionary portion of Employee's 2018 Target Bonus (as that term is defined in the Employment Agreement) will be set at 100% achievement, and Employee acknowledges and agrees that he will be eligible to receive the same 2018 Target Bonus as if Employee had remained actively employed through the date that 2018 bonuses are paid by Employer. The Parties acknowledge and agree that the Severance shall not be made or begin before the Effective Date of this Agreement. Employer represents and confirms that each equity incentive award

previously disclosed publicly pursuant to applicable federal securities disclosure requirements remains (to the extent dictated by the terms of such award) in full force and effect, in accordance with its terms and those of the applicable plan and award documents, as of the date hereof.

184.     The Employment Agreement defines Good Reason:

Good Reason.  For purposes of this Agreement, "Good Reason" shall mean one or more of the following, without Executive's consent: (A) there is a material reduction in Executive's Base Salary (except where there is a general reduction applicable to the management team generally); (B) there is a material reduction in Executive's overall responsibilities or authority, or scope of duties (except as described below in this Section d(iii)); (C) Executive is required by the Company to relocate his principal place of employment outside of outside of the New York City metropolitan area; or (D) any material breach by the Company of this Agreement. It is understood that Executive must assert any termination for Good Reason by written notice to the Company no later than forty-five (45) days following the date on which arises the event or events giving the Executive the right to assert such a termination, and the Company must have an opportunity within thirty (30) days following delivery of such notice to cure the Good Reason condition.  In no instance will a resignation by Executive be deemed to be for Good Reason if it is made more than twelve (12) months following the initial occurrence of any of the events that otherwise would constitute Good Reason hereunder.  The foregoing notwithstanding, in no event shall any change (including, for the avoidance of doubt, any reduction in Executive's responsibilities, duties and/or authority) or action or inaction incident to a future separation by the Company of the roles of Chief Operating Officer and Chief Financial Officer in which Executive retains one or other title and attendant responsibilities constitute "Good Reason" hereunder."

185.     None of the bases for his resigning with Good Reason occurred.

186.     Pursuant to the Separation and Release of Claims Agreement, the Board caused the

Company to Hirschhorn to receive "all benefits outlined in Section 5(b)(i) of the Employment

Agreement." Section 5(b)(i) states:

Termination Absent Change of Control. Except as provided in Section 5(b)(ii), if Executive's employment hereunder is terminated by the Company without Cause or if Executive resigns for Good Reason, then Executive shall be entitled to receive the following severance benefits: (i) severance pay in the form of continuation of Executive's Base Salary in effect on the effective date of termination or resignation, as applicable, for a period of 12 months, to be paid periodically in accordance with the Company's normal payroll practices and subject to standard payroll deductions and withholdings; (ii) the Bonus earned for the prior year (if not previously paid),

(iii) all unvested equity or equity-based awards granted to Executive under any equity compensation plans of the Company that were scheduled to vest within 6 months after the date of Executive's termination or resignation shall immediately become vested as to time, with any such awards that are subject to performance-based vesting conditions remaining eligible to vest to the extent such performance conditions are satisfied during that 6 month period (provided that nothing herein shall operate to extend the term, if any, of an award beyond the final expiration date provided in the applicable award agreement or prohibit the award from being treated in substantially the same manner as awards held by the Company's other senior executives in the context of a Change of Control or other corporate transaction); (iv) the Company shall continue Executive's group life insurance coverage (provided that Executive shall reimburse the Company for any incremental cost of continuing such group life insurance coverage) in effect on the termination or resignation date for a period of twelve (12) months following Executive's termination or resignation; and (v) if Executive timely elects continued medical, dental or vision coverage under one or more of the Company's group medical, dental or vision plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), then the Company shall directly pay, or reimburse Executive for, the COBRA premiums for Executive and Executive's covered dependents under such plans during the period commencing on Executive's termination or resignation and ending upon the earliest of (A) 12 months following Executive's termination or resignation, (B) the date that Executive and/or Executive's covered dependents become no longer eligible for COBRA and (C) the date Executive becomes eligible to receive such coverage from a subsequent employer (and Executive agrees to promptly notify the Company of such eligibility).  Notwithstanding the foregoing, if the Company determines that it cannot provide the benefit required by clause (iv) of the immediately preceding sentence without potentially violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act) or incurring an excise tax, the Company shall in lieu thereof provide to Executive a taxable monthly payment in an amount equal to the monthly COBRA premium that Executive would be required to pay to continue Executive's and Executive's covered dependents' group health coverage in effect on the date of termination or resignation, which amount shall be based on the premium for the first month of COBRA coverage, shall be made regardless of whether Executive elects COBRA continuation coverage and shall commence in the month following the month in which the date of termination or resignation occurs and end on the earliest of (X) 12 months following Executive's termination or resignation, (Y) the date that Executive and/or Executive's covered dependents become no longer eligible for COBRA or (Z) the date Executive becomes eligible to receive healthcare coverage from a subsequent employer (and Executive agrees to promptly notify the Company of such eligibility).

187. Thus, the Board caused the Company to pay Hirschhorn a substantial severance despite that there was no basis for it to deem his resignation with Good Reason, costing the Company substantially.

188. The Employment Agreement states about Hirschhorn's Annual Bonus:

Annual Bonus.  Executive will be eligible for discretionary annual bonuses in an amount determined by the Board (or the Compensation Committee thereof) in its sole and absolute discretion (each, a "Bonus"), informed by the achievement of annual performance objectives determined by the Board (or the Compensation Committee thereof), and subject to Executive's not having materially violated any published employee policy of the Company and otherwise remaining an employee of the Company in good standing during all relevant periods.  For purposes of determining Executive's annual bonus under applicable incentive programs of the Company, the target bonus for Executive shall be sixty-five percent (65%) of Executive's gross base salary wages for the applicable year, unless the Board (or the Compensation Committee thereof) determines, in its sole and absolute discretion, such other target amount to be appropriate.  For purposes of clarity:  in all cases, the amount of any Bonus shall be at the sole and absolute discretion of the Board (or the Compensation Committee thereof)."

189. For each year that Hirschhorn violated the Company's Code of Conduct by engaging in the Inappropriate Activity, he was not entitled to his Annual Bonus, but the Board abdicated its duty by causing the Company to pay it to him anyway, costing the Company substantially.

## **DAMAGES TO TELADOC**

190. As a direct and proximate result of the Individual Defendants' conduct, Teladoc has lost and expended, and will lose and expend, many millions of dollars.

191. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action, and other lawsuits filed against the Company, its CEO, and its former CFO and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192.    Such expenditures include, but are not limited to, the cost of defending investigations of the Inappropriate Activity and Misconduct and for fines paid in connection thereto.

193.    Additionally, these expenditures include, but are not limited to, the excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company and whose compensation was excessive.  These expenditures include, but are not limited to, the Annual Bonuses and Severance paid to Hirschhorn.

194.    Such losses include, but are not limited to, the Company's loss of its NCQA accreditation status, and its downgrade to "Under Corrective Action" status until at least November 18, 2019, which puts the Company at risk of losing its contracts with health insurance companies and medical professionals, which are material to the Company's business and financial condition. The Company will also have to compete against other virtual healthcare companies that are fully accredited.

195.    As a direct and proximate result of the Individual Defendants' conduct, Teladoc has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

196.    Plaintiff brings this action derivatively and for the benefit of Teladoc to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Teladoc, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

197.    Teladoc is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

198.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Teladoc. Plaintiff will adequately and fairly represent the interests of Teladoc in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

199.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

200.    A pre-suit demand on the Board of Teladoc is futile and, therefore, excused. At the time of the filing of this action, the Board consists of the following eleven individuals: Defendants Gorevic, Darling, Frist, Goldstein, McAndrews, McKinley, Multani, Paulus, Shedlarz, Snow (the "Director-Defendants"), and non-defendant Mark D. Smith (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors who were on the Board at the time this action was commenced.

201.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to permit the Inappropriate Activity and permit and cause the Misconduct and permit and cause the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material

Verified Shareholder Derivative Amended Complaint

facts, while two of them engaged in insider sales based on material non-public information, netting proceeds of over $25.9 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

202.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. That fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

203.    Demand is excused as to the Director-Defendants because they breached their fiduciary duty to the Company – for which they face a substantial likelihood of liability -- by causing the Company to pay Defendant Hirschhorn his Annual Bonus each year that he violated the Company's policies and to pay him a severance package despite that there was no basis for the Company's deeming his resignation with Good Reason and because they approved the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery. Indeed, the foregoing conduct as well as other conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

204.    Moreover, the Director-Defendants caused the 2017 Proxy Statement to call for a shareholder vote to approve the amendment and restatement of the 2015 Incentive Award Plan, which provided for the grant of stock and cash-based performance awards for officers and directors, including Defendant Hirschhorn. The misrepresentations and omissions set forth herein

were material to shareholders in voting on this matter who would not have approved Defendant Hirschhorn's incentive award plan, had they been informed about the Inappropriate Activity and/or the Misconduct. As a result of shareholder approval of the 2015 Incentive Award Plan, Defendant Hirschhorn undeservedly received approximately $2,397,812 in performance-based stock and option awards during the fiscal year ended December 31, 2017, and approximately $4,794,290 in performance-based stock and option awards during the fiscal year ended December 31, 2018. For this reason too, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

205.   Demand is also excused as to the Director-Defendants because they were fully aware of the Inappropriate Activity during the Relevant Period, as evidenced by the fact that Company employees, including McKay, made reports to the Company's HR Department in 2016 concerning the Inappropriate Activity. Furthermore, the Company's Legal Department hired an independent law firm during the Relevant Period to investigate the claims in the McKay Report, which the firm ultimately found to be accurate. Even more tellingly, according to the Former Credentialing Coordinator, the Company's Chief Legal Officer interviewed McKay during the Relevant Period in connection with the McKay Report, indicating that the McKay Report had indeed been received by the Company's senior management, including the Director-Defendants. Nonetheless, the Director-Defendants caused the Company to disseminate the false and misleading statements described herein, and caused Defendant Hirschhorn to be promoted to COO on September 28, 2016. Moreover, the Director-Defendants approved the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

206.     Additional reasons that demand on Defendant Gorevic is futile follow. Defendant Gorevic has served as the Company's President, CEO, and as a member of the Board since 2009. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Gorevic with his principal occupation, and he receives handsome compensation, including $7,329,322 during the fiscal year ended December 31, 2018. This is a $6,356,650 increase from the $972,672 in compensation he received only three years earlier in 2015. Defendant Gorevic was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the statements he made during the earnings call on March 1, 2017, as well as those made in the 2015, 2016 and 2017 10-Ks, all of which he signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the the Inappropriate Activity (which Gorevic permitted despite being aware of it) and the Company's engagement in the Misconduct (including Gorevic's approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Gorevic is a defendant in the Securities Class Action. His insider sales before the fraud was exposed, which yielded at least $23 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Gorevic breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

Verified Shareholder Derivative Amended Complaint

207.    Additional reasons that demand on Defendant Darling is futile follow. Defendant Darling has served as a Company director since 2016 and serves as a member of the Quality of Care and Patient Safety Committee. Defendant Darling receives handsome compensation, including $236,168 during the fiscal year ended December 31, 2018 As a Company director, she conducted little, if any, oversight of the Inappropriate Activity (which Darling permitted despite being aware of it) and the Company's engagement in the Misconduct (including Darling's approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Darling signed, and thus personally made, the false and misleading statements in the 2016 and 2017 10-Ks. Furthermore, she could not impartially consider a demand to take action against herself for causing the Company to award her excessive and unjust compensation. For these reasons, too, Defendant Darling breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

208.    Additional reasons that demand on Defendant Frist is futile follow. Defendant Frist has served as a Company director since 2014. He also serves as the Chairman of the Quality of Care and Patient Safety Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Frist receives handsome compensation, including $245,168 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Inappropriate Activity (which Frist permitted despite being aware of it) and the Company's engagement in the Misconduct (including Frist's approval of the decisions to fire

McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Frist signed, and thus personally made, the false and misleading statements in the 2015, 2016 and 2017 10-Ks. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Frist breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Goldstein is futile follow. Defendant Goldstein has served as a Company director since 2015. He also serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and a member of the Quality of Care and Patient Safety Committee. Defendant Goldstein receives handsome compensation, including $252,501 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Inappropriate Activity (which Goldstein permitted despite being aware of it) and the Company's engagement in the Misconduct (including Goldstein's approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Goldstein signed, and thus personally made, the false and misleading statements in the 2015, 2016 and 2017

10-Ks. His insider sale before the fraud was exposed, which yielded at least $2.6 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Goldstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant McAndrews is futile follow. Defendant McAndrews has served as a Company director since 2017. He also serves as a member of the Compensation Committee and as a member of the Audit Committee. Defendant McAndrews receives handsome compensation, including $248,668 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Inappropriate Activity (which McAndrews permitted despite being aware of it) and the Company's engagement in the Misconduct (including McAndrews' approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McAndrews signed, and thus personally made, the false and misleading statements in the 2017 10-K. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant McAndrews breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on the Defendant McKinley is futile follow. Defendant McKinley has served as a Company director since 2009. He also serves as Chairman of the Compensation Committee. Defendant McKinley receives handsome compensation, including $246,168 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Inappropriate Activity (which McKinley permitted despite being aware of it) and the Company's engagement in the Misconduct (including McKinley's approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKinley signed, and thus personally made, the false and misleading statements in the 2015, 2016 and 2017 10-Ks. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant McKinley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Multani is futile follow. Defendant Multani served as a Company director since 2008. He also serves as a member of the Compensation Committee and as a member of the Audit Committee. Defendant Multani receives handsome compensation, including $248,668 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Inappropriate Activity (which Multani permitted despite being aware of it) and the Company's engagement in the Misconduct (including Multani's approval of the decisions to fire McKay for complaining about

the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Multani signed, and thus personally made, the false and misleading statements in the 2015, 2016 and 2017 10-Ks. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Multani breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Paulus is futile follow. Defendant Paulus served as a Company director since 2017. He also serves as a member of the Quality of Care and Patient Safety Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Paulus receives handsome compensation, including $240,168 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Inappropriate Activity (which Paulus permitted despite being aware of it) and the Company's engagement in the Misconduct (including Paulus's approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Paulus signed, and thus personally made, the false and misleading statements in the 2017 10-K. Furthermore, he could not impartially consider a demand

Verified Shareholder Derivative Amended Complaint

to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Paulus breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Shedlarz is futile follow. Defendant Shedlarz served as a Company director since 2016. He also serves as Chairman of the Audit Committee and as a member of the Compensation Committee. Defendant Shedlarz receives handsome compensation, including $258,668 during the fiscal year ended December 31, 2018. As a Company director, he conducted little, if any, oversight of the Inappropriate Activity (which Shedlarz permitted despite being aware of it) and the Company's engagement in the Misconduct (including Shedlarz's approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Shedlarz signed, and thus personally made, the false and misleading statements in the 2016 and 2017 10-Ks. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Shedlardz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Snow is futile follow. Defendant Snow served as a Company director and Chairman of the Board since 2014. He also serves as a

member of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Snow receives handsome compensation, including $274,335 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Inappropriate Activity (which Snow permitted despite being aware of it) and the Company's engagement in the Misconduct (including Snow's approval of the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery) and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Snow signed, and thus personally made, the false and misleading statements in the 2015, 2016 and 2017 10-Ks. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Snow breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on the Board is futile follow.

217.    As described above, two of the Director-Defendants directly engaged in insider trading, in violation of federal law. Defendants Gorevic and Goldstein collectively received proceeds of over $25.9 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

218.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. Several of the Director-Defendants have longstanding

business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Snow was the Chairman and CEO of Medco Health Solutions, Inc. from 2003 through 2013, a company where Defendant Goldstein served as a director from 2003 through 2012, and as lead director from 2005 through 2012. Additionally, Defendants Snow and Shedlarz have served together on the board of Pitney Bowes Inc. since 2006 and 2001, respectively.

219.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

220.   Teladoc has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Teladoc any part of the damages Teladoc suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

221.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

222.    The acts complained of herein constitute violations of fiduciary duties owed by Teladoc officers and directors, and these acts are incapable of ratification.

223.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Teladoc. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Teladoc, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

224.    If there is no directors' and officers' liability insurance, then the Directors will not cause Teladoc to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

225.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

226.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

228.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

229.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

230.   Under the direction and watch of the Directors serving on the Board during the issuance of the 2016, 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

231.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "say-on-pay" and "performance-based compensation," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated. Thus, making the executive compensation undeserved and excessive and the shareholders unable to make informed votes in the Proxy Statements.

232.   The Individual Defendants caused the 2017 Proxy Statement to call for a shareholder vote to approve the amendment and restatement of the 2015 Incentive Award Plan, which amendment provided for the grant of stock and cash-based performance awards for officers and directors, including Defendant Hirschhorn.

233.   The Company filed with the SEC on April 26, 2018 Additional definitive proxy soliciting materials and Rule 14(a)(12) material, which set forth an overview of its proposed amendment and restatement of the 2015 Incentive Award Plan:

- The Company filed with the SEC on April 26, 2017 Additional definitive proxy soliciting materials and Rule 14(a)(12) material. It stated that the vote to approve

the amendment to the 2015 Incentive Award Plain would: Immediately increase the number of shares available for issuance under the plan by 800,000

- Remove the 1,876,722 share fixed limit on the pre-existing automatic annual increase in shares available for issuance under the plan (so that the automatic annual increase will be 5% of shares outstanding on the final day of the immediately preceding calendar year or such smaller amount as the Board of Directors determines)

- Sunset the automatic annual share increase four years earlier than currently provided in the plan (in January 2021 instead of in January 2025)

- Prohibit repricing options and stock appreciation rights issued under the plan without stockholder approval

- Approve the material terms of the plan to satisfy the stockholder approval requirements of Internal Revenue Code Section 162(m) and allow us to grant "qualified performance-based compensation" under the plan

234.   The misrepresentations and omissions set forth herein were material to shareholders in voting on the amendment and restatement of the 2015 Incentive Award Plan the amendment and restatement of the 2015 Incentive Award Plan who would not have approved Defendant Hirschhorn's incentive award plan, had they been informed about the Inappropriate Activity and/or the Misconduct. As a result of shareholder approval of the 2015 Incentive Award Plan, Defendant Hirschhorn undeservedly received approximately $2,397,812 in performance-based stock and option awards during the fiscal year ended December 31, 2017, and approximately $4,794,290 in performance-based stock and option awards during the fiscal year ended December 31, 2018.

235.    The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging in or permitting the Inappropriate Activity, issuing false and misleading statements to the investing public, and insider trading, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

236.    The Proxy Statements further falsely asserted that adequate reporting systems existed for violations of the Company's Code of Conduct, despite the ongoing Inappropriate Activity.

237.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Inappropriate Activity.

238.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, the approval of executive compensation, and with respect to the 2017 Proxy Statement, approval of the Company's amended and restated 2015 Incentive Award Plan.

239.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Gorevic, Darling, Felsenthal, Frist, Goldstein, Mawhinney, McAndrews, McKinley,

Multani, Outland, Paulus, Shedlarz and Snow, which allowed them to continue breaching their fiduciary duties to Teladoc.

240.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

241.    Plaintiff on behalf of Teladoc has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

242.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Teladoc's business and affairs.

244.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

245.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Teladoc.

246.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

247.    The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the Inappropriate Activity in violation of U.S. law.

248.    The Individual Defendants further breached their fiduciary duties by causing themselves to receive excessive compensation from the Company given their misconduct.

249.    In yet further breach of their fiduciary duties owed to Teladoc, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the Inappropriate Activity; (2)  the Misconduct; and (3) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

250.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

251.    In breach of their fiduciary duties, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

252.    The Individual Defendants also breached their fiduciary duty to the Company by causing the Company to pay Defendant Hirschhorn his Annual Bonus each year that he violated the Company's policies and to pay him a severance package despite that there was no basis for the Company's deeming his resignation with Good Reason and because they approved the decisions to fire McKay for complaining about the Inappropriate Activity and to demote the former Credentialing Coordinator for complaining about McKay's replacement's forgery.

253.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

254.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

255.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

256.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Teladoc has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

257.    Plaintiff on behalf of Teladoc has no adequate remedy at law.

Verified Shareholder Derivative Amended Complaint

## **THIRD CLAIM**

### **Against Individual Defendants for Unjust Enrichment**

258.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Teladoc.

260.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Teladoc that was tied to the performance or artificially inflated valuation of Teladoc, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

261.     The Individual Defendants were also unjustly enriched by causing themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct.

262.     Defendant Hirschhorn was unjustly enriched due to being paid by the Company his Annual Bonus each year that he violated the Company's policies and to being paid his severance package despite that there was no basis for the Company's deeming his resignation with Good Reason.

263.     Plaintiff, as a shareholder and a representative of Teladoc, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or

valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

264.     Plaintiff on behalf of Teladoc has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

265.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Teladoc, for which they are legally responsible.

267.     As a direct and proximate result of the Individual Defendants' abuse of control, Teladoc has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Teladoc has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

268.     Plaintiff on behalf of Teladoc has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

269.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Teladoc in a manner consistent with the operations of a publicly-held corporation.

Verified Shareholder Derivative Amended Complaint

271.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Teladoc has sustained and will continue to sustain significant damages.

272.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

273.   Plaintiff on behalf of Teladoc has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

274.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

276.   Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct, thereby wasting the Company's assets.

277.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

278.   Plaintiff on behalf of Teladoc has no adequate remedy at law.

## PRAYER FOR RELIEF

279.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Teladoc, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Teladoc;

(c)   Determining and awarding to Teladoc the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Teladoc and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Teladoc and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Teladoc to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Teladoc restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 16, 2019                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Chantelle Kreutter, am a plaintiff in the within action.  I have reviewed the allegations made in this consolidated shareholder derivative amended complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 9th day of October, 2019.

Chantelle Kreutter