UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MISTY PICKETT and CHANTELLE KREUTTER, Derivatively on Behalf of TELADOC HEALTH, INC., <br><br>                          Plaintiffs, <br><br>      v. <br><br> JASON GOREVIC, ADAM C. VANDERVOORT, DAVID B. SNOW, JR., ARNEEK MULTANI, THOMAS G. MCKINLEY, WILLIAM H. FRIST, MICHAEL GOLDSTEIN, HELEN DARLING, DAVID SHEDLARZ, KENNETH H. PAULUS, BRIAN MCANDREWS, MARK D. SMITH, MARK HIRSCHHORN, JAMES OUTLAND, MARTIN R. FELSENTHAL, DANA G. MEAD, JR., and THOMAS MAWHINNEY, <br><br>                     Defendants, <br><br>    -and- <br><br> TELADOC HEALTH, INC., a Delaware Corporation, <br><br>                 Nominal Defendant. | Case No. 1:19-cv-5875-GHW-BCM <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

     Plaintiffs, by their attorneys, submit this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs, which are based on personal knowledge. This complaint is also based on the investigation of plaintiffs' counsel, which included, among other things, documents obtained pursuant to title 8, section 220 of the Delaware General Corporation Law Code (the "Section 220 Documents"), all of which are expressly incorporated by reference herein, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant Teladoc Health, Inc. ("Teladoc" or the "Company") to hold certain of its officers and directors accountable for violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment.  These wrongs resulted in hundreds of millions of dollars in damages to Teladoc's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Teladoc to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Teladoc is a multinational telemedicine healthcare company that promotes itself as "the largest and most trusted global leader of comprehensive virtual healthcare services."  Teladoc was founded in 2002 and held its initial public offering ("IPO") in 2015.  In connection with the IPO, Teladoc's Board of Directors (the "Board") adopted a Code of Business Conduct and Ethics (the "Code"), the terms of which are specifically incorporated and referred to in public filings such as Teladoc's 2016, 2017, and 2018 Proxy Statements.  The Code stresses that Teladoc's "reputation for integrity, professionalism, and fairness" is one of its "most valuable assets."  Accordingly, the Code imposes an obligation on the Individual Defendants (as defined herein) "to avoid even the appearance of improper behavior" while prohibiting them from committing any "illegal or unethical act."

3.      In violation of specific provisions of the Code and breach of his duties, defendant Mark Hirschhorn ("Hirschhorn"), the Company's former Chief Operating Officer ("COO") and Chief Financial Officer ("CFO") embarked on an extramarital sexual relationship with a low-level Company employee, Charece Griffin ("Griffin").  In contrast to defendant Hirschhorn's positions

of privilege, power, and fiduciary responsibility, Griffin is twenty years his junior and a single mother without the benefit of a college education.

4.     Defendant Hirschhorn allowed the relationship to become well known at Teladoc, going so far as to send Griffin flowers to her desk.  For Griffin, maintaining the affair came with financial benefits.  In addition to opening the doors for Griffin to receive promotions for which she was unqualified, defendant Hirschhorn also fed her insider trading tips.  The inappropriate relationship between employees on the far opposite ends of the Company's organizational chart created chaos and hostility.  In around September 2016, Griffin's supervisor, to whom various colleagues had complained, sent an eight-page report detailing the relationship to the Company's Human Resources and Legal departments.  The Code requires that these complaints had to be reported to the Board: "Any concerns about violations of laws, rules, regulations or this Code by the CEO, any senior financial officer, any senior officer or director should be reported promptly to the Chief Legal Officer, and the Chief Legal Officer shall notify the Nominating and Corporate Governance Committee of such violation."  The Board never received the report and never investigated its claims.

5.     The Board would, however, come to learn in November 2016 that the Company was facing allegations by Griffin stemming from defendant Hirschhorn's misconduct, presumably raised by her lawyer.  If Griffin went forward with filing a lawsuit, defendant Hirschhorn's improprieties faced public exposure.  In response to Griffin's allegations, the Officer Defendants (as defined herein) hired outside counsel without Board approval to quickly resolve the matter and sweep it under the rug.  Outside counsel confirmed the relationship, and, incidentally, defendant Hirschhorn's violations of the Code.  Rather than engaging outside counsel to conduct a full investigation into defendant Hirschhorn and enhancing Teladoc's internal controls, the Board

knowingly turned a blind eye, essentially doing nothing and continuing to defer to the Officer Defendants.  Moreover, despite knowledge of defendant Hirschhorn's unethical conduct, the Board decided to leave defendant Hirschhorn in power, protect him over the Company, and conceal his wrongdoing from stockholders.

6.      From March 3, 2016 to December 5, 2018, the Individual Defendants issued a series of false and misleading statements of material fact.  In particular, while concealing defendant Hirschhorn's wrongdoing and Code violations, these fiduciaries purported that Teladoc embodies "the highest standards of integrity and ethics in the way it conducts business."  The Individual Defendants also highlighted Teladoc's adoption of the Code, conveying it applied to all employees, officers, and directors while failing to disclose defendant Hirschhorn's various violations of its provisions.

7.      On December 5, 2018, the Southern Investigative Research Foundation ("SIRF") published a report titled "Teladoc Health: A CFO's 'Other Life' Worked Out Nicely (The Ex-Girlfriend and Her Boss? Not So Much)" (the "SIRF Report").  The SIRF Report revealed that defendant Hirschhorn had an affair with a subordinate and that the Individual Defendants were well aware of his wrongful conduct but essentially did nothing about it.

8.      In the wake of the SIRF Report, Teladoc's market capitalization plunged more than 12%, or $7.47 per share, on December 10, 2018, to close at $52.34 per share compared to closing at $59.81 per share on December 14, 2018, erasing $523.6 million in market capitalization.

9.      Further, as a direct result of this unlawful course of conduct, Teladoc is now the subject of a consolidated federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York on behalf of investors who purchased Teladoc's shares at artificially inflated rates (the "Securities Class Action").  The Securities Class Action seeks claims

against the Company and defendants Hirschhorn and Jason Gorevic ("Gorevic"), alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

10.     The Company's fiduciaries, however, did not fare nearly as poorly as the Company. Certain of the Individual Defendants collectively unloaded over $60 million worth of their Teladoc holdings while it was trading at artificially inflated rates.  Certain of the Individual Defendants also collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Teladoc's actual performance while under their stewardship.

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court also has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13.     This Court also has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Teladoc maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion

of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Teladoc, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

15.     Plaintiff Misty Pickett was a stockholder of Teladoc at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Teladoc stockholder.  Plaintiff is a citizen of Florida.

16.     Plaintiff Chantelle Kreutter was a stockholder of Teladoc at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Teladoc stockholder.  Plaintiff is a citizen of Colorado.

**Nominal Defendant**

17.     Nominal defendant Teladoc is a Delaware corporation with principal executive offices located at 2 Manhattanville Road, Suite 203, Purchase, New York.  Accordingly, Teladoc is a citizen of Delaware and New York.  Teladoc is a provider of virtual healthcare services on a business-to-business basis.  Teladoc has five consumer brands: Teladoc, Advance Medical, Best Doctors, BetterHelp, and HealthiestYou.  As of December 31, 2019, the Company had over 2,400 full time employees.

**Defendants**

18.     Defendant Gorevic is Teladoc's Chief Executive Officer ("CEO") and a director and has been since June 2009.  Defendant Gorevic is named as a defendant in the related Securities

Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Gorevic knowingly, recklessly, or with gross negligence: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iii) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (iv) violated the Code and other Company policies. While in possession of material, nonpublic information concerning Teladoc's true business health, defendant Gorevic sold 594,991 shares of his stock for $23,142,987.97 in proceeds. Teladoc paid defendant Gorevic the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $511,250 | $3,071,818 | $3,080,863 | $643,750 | $21,641 | $7,329,322 |
| 2017 | $500,000 | $1,525,000 | $4,293,406 | $750,000 | $36,036 | $7,104,442 |
| 2016 | $500,000 | - | $2,668,669 | $400,000 | $37,902 | $3,606,571 |

Defendant Gorevic is a citizen of New York.

19.     Defendant Adam C. Vandervoort ("Vandervoort") is Teladoc's Chief Legal Officer and Secretary and has been since February 2015. Defendant Vandervoort knowingly, recklessly, or with gross negligence: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iii) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (iv) violated the Code and other Company policies. While in possession of material, nonpublic information concerning Teladoc's true business health, defendant Vandervoort

sold 200,243 shares of his stock for $7,543,955.14 in proceeds.   Teladoc paid defendant

Vandervoort the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $331,032 | - | $433,148 | $1,013,560 | $188,019 | $21,641 | $1,987,400 |
| 2017 | $318,270 | $126,334 | $388,221 | $737,222 | $108,890 | $25,236 | $1,704,173 |
| 2016 | $309,000 | - | - | $243,051 | $101,846 | $25,236 | $679,133 |

Defendant Vandervoort is a citizen of Connecticut.

20.     Defendant David B. Snow, Jr. ("Snow") is Teladoc's Chairman of the Board and

has been since December 2014 and a director and has been since February 2014.  Defendant Snow

is a member of Teladoc's Nominating and Corporate Governance Committee and has been since

at least April 2016, and was the Chair of that committee from at least April 2016 to at least April

2018.  Defendant Snow was a member of Teladoc's Audit Committee in at least April 2016.

Defendant Snow knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to

ensure that Teladoc had adequate internal controls, risk management procedures, and other policies

to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in

the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite

knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn

notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to

make improper statements in its public filings, including its Proxy Statements; and (v) violated the

Code and other Company policies.  Teladoc paid defendant Snow the following compensation as

a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|------------------------------|--------------|---------------|-------|
| 2018 | $83,167 | $100,019 | $91,149 | $274,335 |
| 2017 | $80,764 | $27,999 | $102,818 | $211,581 |
| 2016 | $77,500 | $125,332 | - | $202,832 |

Defendant Snow is a citizen of Connecticut.

21.    Defendant Arneek Multani ("Multani") is a Teladoc director and has been since April 2008.  Defendant Multani is a member of Teladoc's Audit Committee and has been since at least April 2018.  Defendant Multani was also a member of the Compensation Committee from 2016 to 2018. Defendant Multani knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies.   While in possession of material, nonpublic information concerning Teladoc's true business health, defendant Multani sold 250,000 shares of his stock for $3,947,500 in proceeds.   Teladoc paid defendant Multani the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $57,500 | $100,019 | $91,149 | $248,668 |
| 2017 | $50,995 | $27,999 | $102,818 | $181,812 |
| 2016 | $45,000 | $125,332 | - | $170,332 |

Defendant Multani is a citizen of California.

22.    Defendant Thomas G. McKinley ("McKinley") is a Teladoc director and has been since November 2009 and Chairman of the Compensation Committee from 2016 to 2018. Defendant McKinley knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in

the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies. Teladoc paid defendant McKinley the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $55,000 | $100,019 | $91,149 | $246,168 |
| 2017 | $50,000 | $27,999 | $102,818 | $180,817 |
| 2016 | $50,000 | $125,332 | - | $175,332 |

Defendant McKinley is a citizen of California.

23.     Defendant William H. Frist ("Frist") is a Teladoc director and has been since September 2014. Defendant Frist is a member of Teladoc's Nominating and Corporate Governance Committee and has been since at least April 2016. Defendant Frist was also Chairman of the Quality of Care and Patient Safety Committee from at least 2016. The Board Committee on Quality of Care and Patient Safety was directly responsible for credentialing, a critical issue at Teladoc. The Quality of Care and Patient Safety Committee is governed by a written charter adopted in April 2016. The Quality of Care and Patient Safety Committee assists the Board in fulfilling its oversight responsibilities relating to the review of the Company's policies and procedures relating to the delivery of quality medical care to its members. The Quality of Care and Patient Safety Committee maintains communication between the Board and the senior officers with management responsibility for medical care and reviews matters concerning or relating to the quality of medical care delivered to its members, efforts to advance the quality of medical care provided, and patient safety. Defendant Frist knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management

procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies.  Teladoc paid defendant Frist the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $54,000 | $100,019 | $91,149 | $245,168 |
| 2017 | $53,000 | $27,999 | $102,818 | $183,817 |
| 2016 | $52,250 | $125,332 | - | $177,582 |

Defendant Frist is a citizen of Tennessee.

24.     Defendant Michael Goldstein ("Goldstein") is a Teladoc director and has been since February 2015.  Defendant Goldstein is a member of Teladoc's Audit Committee and has been since at least April 2016, and was also Chairman of the Audit Committee in at least April 2016. Defendant Goldstein is also a member of Teladoc's Nominating and Corporate Governance Committee and has been since at least at least April 2016.  Defendant Goldstein was also a member of the Quality of Care and Patient Safety Committee. Defendant Goldstein knowingly, in bad faith, or in conscious disregard for his duties:  (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies.

While in possession of material, nonpublic information concerning Teladoc's true business health, defendant Goldstein sold 66,574 shares of his stock for $2,644,319.28 in proceeds.  Teladoc paid defendant Goldstein the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $61,333 | $100,019 | $91,149 | $252,501 |
| 2017 | $57,234 | $27,999 | $102,818 | $188,051 |
| 2016 | $62,250 | $125,332 | - | $187,582 |

Defendant Goldstein is a citizen of New York.

25.     Defendant Helen Darling ("Darling") is a Teladoc director and has been since June 2016.  Defendant Darling was on the Quality of Care and Patient Safety Committee while simultaneously the Co-Chair of the Committee on Performance Measurement for the National Committee for Quality Assurance ("NCQA") for ten years, with direct access to knowledge of Teladoc's NCQA audit from at least 2017.  Defendant Darling knowingly, in bad faith, or in conscious disregard for her duties:  (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies. Teladoc paid defendant Darling the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $45,000 | $100,019 | $91,149 | $236,168 |
| 2017 | $45,000 | $27,999 | $102,818 | $175,817 |
| 2016 | $12,363 | $202,831 | - | $215,194 |

Defendant Darling is a citizen of the District of Columbia.

26.     Defendant David Shedlarz ("Shedlarz") is a Teladoc director and has been since September 2016.  Defendant Shedlarz is the Chairman of the Audit Committee and a member of that committee and has been since at least April 2017.  Defendant Shedlarz knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies. Teladoc paid defendant Shedlarz the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $67,500 | $100,019 | $91,149 | $258,668 |
| 2017 | $63,473 | $27,999 | $102,818 | $194,290 |
| 2016 | $1,345 | $209,479 | - | $210,824 |

Defendant Shedlarz is a citizen of South Carolina.

27.     Defendant Kenneth H. Paulus ("Paulus") is a Teladoc director and has been since February 2017.  Defendant Paulus is a member of Teladoc's Nominating and Corporate Governance Committee and has been since at least April 2017.  Defendant Paulus was also a member of the Quality of Care and Patient Safety Committee since at least 2017.  Defendant Paulus knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge

thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies.  Teladoc paid defendant Paulus the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $49,000 | $100,019 | $91,149 | $240,168 |
| 2017 | $40,000 | - | $217,147 | $257,147 |

Defendant Paulus is a citizen of Minnesota.

28.     Defendant Brian McAndrews ("McAndrews") is a Teladoc director and has been since September 2017.  Defendant McAndrews is a member of Teladoc's Audit Committee and has been since September 2017.  Defendant McAndrews was also a member of the Compensation Committee. Defendant McAndrews knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies.  Teladoc paid defendant McAndrews the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $57,500 | $100,019 | $91,149 | $248,668 |
| 2017 | $15,693 | - | $204,183 | $219,876 |

Defendant McAndrews is a citizen of California.

29.     Defendant Mark D. Smith ("Smith") is a Teladoc director and has been since October 2018.  Defendant Smith knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies.  Teladoc paid defendant Smith the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $10,417 | - | $248,252 | $258,669 |

Defendant Smith is a citizen of California.

30.     Defendant Hirschhorn was Teladoc's Executive Vice President and CFO from October 2012 to January 2019.  He was also Teladoc's COO from September 2016 to January 2019.  Defendant Hirschhorn is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Hirschhorn knowingly, recklessly, or with gross negligence: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iii) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (iv) violated the Code and other Company

policies. While in possession of material, nonpublic information concerning Teladoc's true business health, defendant Hirschhorn sold 615,000 shares of his stock for $22,873,284 in proceeds. Teladoc paid defendant Hirschhorn the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $411,625 | - | $2,047,363 | $2,618,788 | $478,688 | $21,641 | $5,578,105 |
| 2017 | $370,000 | $263,492 | $584,685 | $1,813,127 | $203,704 | $36,036 | $3,271,044 |
| 2016 | $350,435 | - | - | $819,776 | - | $37,902 | $1,208,113 |

Defendant Hirschhorn is a citizen of New Jersey.

31.    Defendant James Outland ("Outland") was a Teladoc director from May 2006 to May 2017. Defendant Outland was a member of Teladoc's Audit Committee from at least April 2016 to at least April 2017. Defendant Outland knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies. Teladoc paid defendant Outland the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|-------------|------------------------------|--------------|-------|
| 2017 | $20,027 | - | $20,027 |
| 2016 | $50,000 | $125,332 | $175,332 |

Defendant Outland is a citizen of Alabama.

32.    Defendant Martin R. Felsenthal ("Felsenthal") was a Teladoc director from November 2009 to May 2017. Defendant Felsenthal was also a member of the Quality of Care

and Patient Safety Committee in 2016 through his tenure as a director.  Defendant Felsenthal knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies.  Teladoc paid defendant Felsenthal the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $18,024 | - | $18,024 |
| 2016 | $45,750 | $125,332 | $171,082 |

Defendant Felsenthal is a citizen of California.

33.     Defendant Dana G. Mead, Jr. ("Mead") was a Teladoc director from August 2011 to December 2016.  Defendant Mead was a member of the Quality of Care and Patient Committee in 2016.  Defendant Mead knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy

Statements; and (v) violated the Code and other Company policies. Teladoc paid defendant Mead the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $45,000 | $125,332 | - | $170,332 |

Defendant Mead is a citizen of California.

34.     Defendant Thomas Mawhinney ("Mawhinney") was a Teladoc director from September 2014 to May 2018. Defendant Mawhinney was a member of Teladoc's Audit Committee from at least April 2017 to at least April 2018. Defendant Mawhinney knowingly, in bad faith, or in conscious disregard for his duties: (i) failed to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failed to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowed excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) made or allowed the Company to make improper statements in its public filings, including its Proxy Statements; and (v) violated the Code and other Company policies. Teladoc paid defendant Mawhinney the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $20,833 | - | - | $20,833 |
| 2017 | $48,472 | $27,999 | $102,818 | $179,289 |
| 2016 | $40,750 | $125,332 | - | $166,082 |

Defendant Mawhinney is a citizen of California.

35.     The defendants identified in ¶¶18-19, 30 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶18, 20-29, 31-34 are referred to herein as the "Director Defendants." The defendants identified in ¶¶20-21, 24, 26, 28, 31, 34 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶18-19, 21, 24, 30 are

referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶18-34 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

36.      By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Teladoc and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Teladoc in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Teladoc and not in furtherance of their personal interest or benefit.

37.      To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Teladoc were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)      ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(c)      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the

highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     refrain from engaging in acts of self-dealing to enrich themselves at the expense of the Company and its investors;

(e)     monitor and remain informed as to how Teladoc conducted its operations, including imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Teladoc's Code Imposes Additional Obligations on the Individual Defendants**

38.     On June 17, 2015, the Board adopted the Code.  The Code states that all Teladoc employees, officers, and directors, including the Individual Defendants, "must conduct themselves according to the language and spirit of this Code and seek to ***avoid even the appearance of improper behavior***," adding that "[e]ven well-intentioned actions that violate the law or this Code may result in negative consequences for the Company."  The Code further stresses that Teladoc's "***reputation for integrity, professionalism and fairness,*" is "[o]ne of [the] Company's most valuable assets***."   Among other things, the Code prohibits the Individual Defendants from committing any "illegal ***or unethical*** act."

39.     **Insider Trading**.  The Code also contains a provision on insider trading, specifically reminding that the use of "non-public, Company information to trade in securities, or providing a family member, friend or any other person with a 'tip', is illegal."  The Code adds that "[a]ll such non-public information should be considered inside information and should never be used for personal gain."

40.    **Conflicts of Interest**.   The Code reminds the Individual Defendants that "employees, officers and directors have an obligation to act in the best interest of the Company." To that end, the Code placed an expectation on the Individual Defendants to avoid actual and potential conflicts between their interest and the interest of Teladoc.  Conflicts of interest, as defined by the Code, occur "when a person's private interest interferes in any way, ***or even appears to interfere***, with the interest of the Company."  A conflict of interest arises "when an employee, officer or director takes an action or has an interest that may make it difficult for him or her to perform his or her work objectively and effectively" or when he or she "receives improper personal benefits as a result of [their] position in the Company."  To avoid conflicts of interest, the Code imposes an obligation on employees and officers to disclose "to the Chief Legal Officer any material transaction or relationship that reasonably could be expected to give rise to such a conflict. The Chief Legal Officer, in turn, was required to "notify the Nominating and Corporate Governance Committee of any such disclosure."

41.    **Equal Opportunity, Nondiscrimination and Fair Employment**.  The Code states that Teladoc's "policies for recruitment, advancement and retention of employees forbid discrimination on the basis of any criteria prohibited by law, including but not limited to race, sex and age" and are "designed to ensure that employees are treated, and treat each other, fairly and with respect and dignity."  Consistent with this objective, the Code states that "conduct involving discrimination or harassment of others will not be tolerated.  All employees are required to comply with the Company's policy on equal opportunity, non-discrimination and fair employment[.]"

42.    **Obligation to Report Violations of the Code or Unethical Behavior**. The Code stresses the importance of complying with its provisions while warning that it "***will be strictly enforced*** throughout the Company and violations will be dealt with immediately, including

subjecting persons to corrective and/or disciplinary action such as dismissal or removal from office."  The Code encourages the reporting of any suspected violations, but makes clear that violations, or even any concern about violations, on the part of the CEO, CFO, or any director, are more serious.  "Any concerns about violations of law, rules, regulations or this Code by the CEO, any senior financial officer, any senior officer or director should be reported promptly to the Chief Legal Officer, and the Chief Legal Officer shall notify the Nominating and Corporate Governance Committee of such violation."  Teladoc states that it intends to "thoroughly investigate any good faith reports or violations," "will not tolerate any kind of retaliation," and that the Code needs "to be applied equally to everyone it covers."

43.     **Waivers**. Importantly, the Code states: "Any waivers of the provisions of this Code for executive officers or directors may only be granted by the Board of Directors and will be promptly disclosed to the Company's shareholders."

**Additional Duties of the Audit Committee Defendants**

44.     Under the Teladoc Board's Audit Committee Charter, the Audit Committee Defendants, defendants Snow, Multani, Goldstein, Shedlarz, McAndrews, Outland, and Mawhinney, owe and/or owed specific additional duties to Teladoc.  According to the Audit Committee Charter in effect during relevant times, among other things, the Audit Committee is responsible for assisting the Board in overseeing: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications; and (iv) the performance of the Company's internal audit function and independent auditor.

45.     In overseeing the Company's financial reporting processes on behalf of the Board and the integrity of the Company's financial statements, the Audit Committee Charter states the

Audit Committee "must review and discuss" Teladoc's annual and quarterly financial statements with management and the independent auditor, "including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'" The Audit Committee Charter also tasks the Audit Committee with "discuss[ing] the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies."

46.     Moreover, the Audit Committee's Charter provides that "[t]he Committee must discuss the Company's policies with respect to risk assessment and risk management." In addition, the Charter states "[t]he Committee must review and oversee the Company's compliance with risk management policies and procedures, including, but not limited to, the Company's Code of Business Conduct and Ethics."

**Breaches of Duties**

47.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Teladoc, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

48.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing the Company to allow unfaithful and disloyal executives to remain fiduciaries, overcompensate its fiduciaries, and disseminate a series of false and misleading statements and omissions. These improper practices wasted the Company's assets and caused Teladoc to incur substantial damage.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Teladoc, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Teladoc has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Teladoc, regarding the Individual Defendants' management of Teladoc's operations; (ii) facilitate the Insider Selling Defendants' illicit sale of over $60 million worth of  their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Teladoc and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

53.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### REQUIRED DISCLOSURES UNDER SEC REGULATION S-K AND THE BOARD'S ADOPTION OF THE CODE

56.     In 2003, the SEC announced the implementation of section 406 of the Sarbanes-Oxley Act of 2002 ("SOX"), which directs the SEC to establish rules requiring a company to make certain disclosures concerning its code of ethics.  In introducing the rules, the SEC stated the "strength of the U.S. financial markets depends on investor confidence," and that "misdeeds by

corporate executives, independent auditors, and other market participants [can and has] undermined that confidence."

57.    Item 406 of SEC Regulation S-K requires publicly listed companies like Teladoc to "[d]isclose whether [it] has adopted a code of ethics that applies to [its] principle executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions."  17 C.F.R. §229.406(a).  Item 406 defines a code of ethics as "written standards that are reasonably designed to deter wrongdoing and to promote" the following:

> (1) Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> (2) Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant;
>
> (3) Compliance with applicable governmental laws, rules and regulations;
>
> (4) The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code; and
>
> (5) Accountability for adherence to the code.

17 C.F.R. §229.406(b).

58.    Item 406 further requires companies to make immediate disclosure of any waiver or implicit waiver of the provisions of the code that apply to its CEO, CFO, or principal accounting officer on Form 8-K or on its website.  *See* §229.406(b); Item 5.05 of Form 8-K.  The SEC defines waiver as the approval of "a material departure from a provision of the code," and implicit waiver as the "failure to take action within a reasonable time period regarding a material departure from a provision of the code."  The disclosure must "briefly describe the nature of the waiver, the name of the person to whom the waiver was granted, and the date of the waiver."

59.    The Company became subject to the disclosure requirements of SEC Regulation S-K, including the code disclosure requirements of Item 406, when it held its IPO in July 2015.  In

connection with the IPO, the Board adopted the Code, detailed above.  The Company's Registration Statement on Form S-1 filed with the SEC on May 29, 2015 (the "Registration Statement") stated the Code will "be effective upon the closing of this offering."  The Registration Statement further assured that Teladoc will "post on [its] website all disclosures that are required by law or the listing standards ... concerning any amendments to, or waivers from, any provision of the [C]ode."  The Code stresses that Teladoc's reputation is one of its "most valuable assets" and expressly prohibits unethical acts and "even [creating] the appearance of improper behavior."

### DEFENDANT HIRSCHHORN VIOLATES THE CODE BY ENGAGING IN AN INAPPROPRIATE SEXUAL RELATIONSHIP WITH A SUBORDINATE

60.     Beginning in around 2014, defendant Hirschhorn—Teladoc's Executive Vice President and CFO—embarked on an extramarital sexual relationship with a low-level Company employee, Griffin.  Griffin, a single mother twenty years younger than defendant Hirschhorn, worked in Teladoc's Lewisville, Texas, office, close to the Dallas office frequently visited by defendant Hirschhorn.  He pursued the relationship until the end of 2016.  During that time, defendant Hirschhorn supplied Griffin with insider sales tips, and Griffin received promotions over more qualified candidates.  Their affair was openly discussed by Griffin and widely known in the Lewisville department.  It led to disruptive conflict and hostility within the Lewisville office and, when it became public, significant harm to the Company.

**Defendant Hirschhorn Pursued the Relationship in Breach of His Duties and in Violation of the Code and His Employment Agreement**

61.     On June 18, 2015, the day after the Board adopted the Code, Teladoc filed an amendment to the Registration Statement with the SEC on Form S-1/A, which described the material provisions of defendant Hirschhorn's Executive Employment Agreement (the "Employment Agreement") and included the agreement as an exhibit.  In particular, the Form S-1/A stated the Employment Agreement permitted the Company to terminate defendant Hirschhorn

for "Cause" if he: (i) breached his fiduciary duty of loyalty or willfully breach his duty of care; (ii) engaged in "***willful misconduct or gross negligence which … causes or reasonably could cause … material harm to the Company's standing, condition or reputation***"; or (iii) material violation of [the Code] or written policies concerning harassment or discrimination.  The Registration Statement and amendments were signed by defendant Hirschhorn, as well as defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Outland, Felsenthal, Mead, and Mawhinney.

62.     Defendant Hirschhorn's actions created a toxic work environment at Teladoc's Lewisville, Texas, department.  First, he allowed his two-and-a-half-year relationship to become widely known at Teladoc, going so far as to send flowers to Griffin's desk.  Second, this open relationship led to claims of favoritism, as Griffin received promotions for which she was unqualified and other, more qualified employees were passed over during the course of their two-and-a-half-year relationship.

63.     Worse, Griffin openly bragged to her colleagues that defendant Hirschhorn was feeding her inside tips about the Company and that they liked to trade Teladoc's stock together.  In one instance, Griffin told a coworker that defendant Hirschhorn would inform her when there were good opportunities to sell shares she received through a stock grant.  She boasted about how this turned out favorably for her, touting that defendant Hirschhorn was "pretty good" at pinpointing opportunities.

64.     In light of the above, there is no dispute that defendant Hirschhorn willfully violated the Code.  Nor can there be any dispute that such a relationship "reasonably could cause material harm" to the Company's standing, condition, or reputation.  Finally, at a minimum, defendant Hirschhorn willfully breached his duty of care to the Company through his actions.

**The Company Provides No Assistance or Protection as the Lewisville Whistleblowers Are Attacked and Threatened**

65.     Griffin's colleagues reported the improper relationship and stock tips to Amy McKay ("McKay"), Griffin's supervisor and the Company's Clinical Director in the Lewisville, Texas, department.  McKay, already long aware of the relationship, drafted an eight-page report detailing defendant Hirschhorn and Griffin's affair and the improper trading allegations (the "Lewisville Report").  By September 2016, McKay sent the Lewisville Report to Teladoc's Human Resources and Legal departments.[1]

66.     Under the reporting protocols of the Code, the Lewisville Report would have made its way to Teladoc's Chief Legal Officer and Secretary, defendant Vandervoort.  Despite the serious allegations, and defendant Hirschhorn's impending promotion to COO, defendant Vandervoort never provided the Board with the Lewisville Report.[2]

67.     Teladoc's management allowed a retaliation campaign to commence against Teladoc employees with knowledge of the inappropriate sexual relationship.  In particular, employees located in the Lewisville, Texas, department began receiving threatening e-mails sent to their corporate Teladoc e-mail address from an anonymous sender.  These employees forwarded the e-mails to the Company's Human Resources department.  The department failed to take any

---

[1] The SIRF Report claims that McKay sent the Lewisville Report in October 2016.  Plaintiff Misty Pickett disagrees for the reasons set forth herein.  Plaintiff, through her counsel, also detailed the basis for this belief to defendants.  Plaintiff's counsel further told defendants that plaintiff was willing to include the exact date of the report in this Complaint if the Company provided her the Lewisville Report.  Defendants did not respond to this request.

[2] Teladoc agreed to provide plaintiff Misty Pickett with the materials the Board received concerning "[a]ny investigation into [defendant] Hirschhorn's alleged violations of the Company's [Code]."  The Lewisville Report was not contained in any of these materials.

action beyond advising the harassed employees to file police reports if their concerns were serious enough, which the employees did.

68.     On October 25, 2016, Susan Stogner ("Stogner"), a Physician Recruiter, submitted a report to the Lewisville Police Department stating that she, and several other employees, have been receiving threatening e-mails sent to their Teladoc e-mail address, writing that she felt "harassed, and stalked and bullied."[3]  Stogner stated in the report that she had already taken her concerns to Human Resources and suspected that there is "an employee that formerly worked in [her] department that [is possibly] doing this."  In particular, Stogner stated:

> I was threatened at work through a fake email address.  Several other employees received emails.  This was very upsetting to me and I feel harassed, and stalked and bullied.  I went to HR and they suggested that if I feel this way to report it to Lewisville PD.  We have an employee that formerly worked in my department and that its [sic] very possible that she is doing this.  I have attached her emial [sic].  I do not take threatening of my job lightly.

69.     As an example, the police report includes an e-mail that Stogner received on October 9, 2016.  The e-mail accuses Stogner of talking to competitors and threatening that "[Human Resources] [will] hear[] about this tomorrow."  According to the police report, Stogner told the interviewing police officer that she "***feels that her company knows who the sender is, but that the sender is 'sleeping with' one of the supervisors, so the company is just going to 'sweep this under the rug***.'"  Although she refused to provide the name of the suspected sender, the next employee to file a police report readily revealed that she suspected it was Griffin.

70.     On October 30, 2016, McKay submitted a report to the Lewisville Police Department.[4]  McKay reported she had received seven harassing e-mails regarding her appearance

---

[3] The October 25, 2016 police report is attached hereto as Exhibit A.

[4] The October 30, 3016 police report is attached here to as Exhibit B.

and car in less than one month and that any staff member associated with her also received negative e-mails.  One e-mail, sent on Sunday, October 2, 2016, stated: "you might wanna see if your doc will adjust your meds, they making you look tired and that busted pair green jeans aint working either."

71.     The police report includes the notes of the detective's phone call with McKay. When asked, McKay stated that she believed Griffin was the sender of the e-mails.  In particular, the detective noted:

> I called Amy McKay and spoke to her on the phone about this incident.  Amy explained to me that she is a Director of Administration at Teladoc, a medical company.  She has been the director for about 8 years now and she has the ability to both hire and fire people from the company.  When I asked if Amy had any suspicion of who is sending these emails, she immediately gave me a name:
>
> Charece Griffin.

72.     McKay revealed that Griffin used to work for her, but was transferred to another department within Teladoc.  She stated the e-mails began after the transfer and since then, Griffin "has become very angry."   Importantly, McKay stated that Griffin "has had several incidents involving [Human Resources]," indicating that the Company's Human Resources department had long been aware of the inappropriate relationship, regardless of the Lewisville Report.  McKay also "alluded to an incident that [she] has had with [Human Resources], but she stated that she couldn't disclose the details of the incident," thus indicating that she had already raised her concerns about the inappropriate relationship between defendant Hirschhorn and Griffin to Teladoc.

73.     Stogner and McKay thus link the harassing e-mails to their knowledge of the inappropriate relationship and suggest the e-mails were prompted by reporting Griffin and defendant Hirschhorn to Human Resources and Griffin's subsequent transfer to another

department.  When the employees reported the harassing e-mails to Human Resources, the Company demonstrated an unwillingness to act on the underlying allegations, showing that it had already known about the allegations and decided to do nothing, with Human Resources simply telling the employees to take their concerns to the police.  By October, 2016, Stogner formed the belief "***that her company knows who the sender is, but that the sender is 'sleeping with' one of the supervisors, so the company is just going to 'sweep this under the rug*.'"**  Given that the harassing e-mails began no later than Sunday, October 2, 2016, it is reasonable to infer that the Lewisville Report or similar reports of misconduct were received by Teladoc's Human Resources and Legal departments no later than September 2016.  It is therefore reasonable to infer that defendant Vandervoort and the Company's management were put on notice of defendant Hirschhorn's inappropriate conduct before September 23, 2016, when Teladoc promoted defendant Hirschhorn to COO.

74.    On November 2, 2016, the detective called Griffin.  In their conversation, Griffin pleaded ignorance to the e-mails.  She did, however, report that she was transferred, and "stated that the transfer was actually a pay increase, and not a demotion."  Then, on November 7, 2016, the detective "received a phone from a lawyer, Andrew Dunlap" ("Dunlap").  The detective's notes reveal that Dunlap "stated that he was calling on behalf of Charece [Griffin]," asked a number of questions regarding the police report, and "told [the detective] that [the detective] wasn't allowed to speak to his client (Charece) anymore."  Thus, by November 7, 2016, Griffin had already retained an attorney.  Yet, the Board still had not been alerted about defendant Hirschhorn's wrongdoing.

**The Company Quietly Executes a Settlement Agreement with Griffin**

75.     The police reports, coupled with the SIRF Report, reveal that the Company was forced to pay a settlement to Griffin as a result of defendant Hirschhorn's improprieties at some point around December 2016.  Dunlap, an attorney in the Dallas, Texas, area who represents employees bringing sexual harassment and discrimination cases, helped Griffin secure the settlement.  According to the SIRF Report, Dunlap was able to confirm Griffin's relationship with defendant Hirschhorn, although the terms of the settlement prohibit Dunlap from discussing his client's case in detail.  Dunlap is quoted in the SIRF Report stating that, "[a] settlement was the best combination of fairness and closure open to [Griffin]."  He added that "filing a suit and going to trial could have meant a great deal of expense and stress for Griffin, and with the Dallas-Fort Worth area's tradition of cultural conservativism and a history of racial division, he felt there was 'a lot of risk' in asking a jury to side with a black woman who had been in an extramarital relationship with a rich white man."

76.     Dunlap reported that he was still stunned by the lack of accountability defendant Hirschhorn faced while commenting on the circumstances surrounding the settlement agreement. Outside counsel who represented the Company in the settlement, he revealed, was a woman at the law firm Proskauer Rose LLP ("Proskauer Rose").  Dunlap is quoted in the SIRF Report stating that, "[a]fter the agreement was signed and I was on my way out of the room, [Teladoc Health's] outside counsel at Proskauer Rose told me that Hirschhorn was definitely going to 'feel punished,'" adding that "I took that to mean the company was angry about his conduct and judgment.  I didn't think she meant there would be nothing."

77.     In addition, the SIRF Report relayed that Dunlap was able to confirm the allegations of improper trading.  In particular, the report stated that "[t]he aspect of the Griffin and Hirschhorn

matter that Dunlap is able to talk more freely about, primarily because he says it wasn't covered in the settlement agreement, is the trading in Teladoc Health's stock."  Dunlap is quoted remarking that "[m]y own work led me to conclude that at the very least, this was a violation of [various of Teladoc's] own employee conduct clauses," adding that, "I'm not sure why they tolerated the CFO doing that."  Not only was defendant Hirschhorn not punished, he was promoted, as detailed herein.

### THE DIRECTOR DEFENDANTS FAIL TO EXERCISE INDEPENDENT OVERSIGHT AND KNOWINGLY ACT AGAINST TELADOC'S BEST INTEREST

78.     Rather than exercising independent oversight over Teladoc's management and Code compliance, the Board instead deferred to the Company's executives.  The Board continued to rely on the Officer Defendants even after becoming aware that defendant Hirschhorn had in fact engaged in an inappropriate sexual relationship in violation of the Code.  However, the Director Defendants never undertook a full investigation into defendant Hirschhorn's conduct and failed to take any steps to enhance their internal controls.  In addition, despite knowledge of his unethical conduct, the Board decided to leave defendant Hirschhorn in power, protect him over the Company, and conceal his wrongdoing from stockholders in violation of the Code and Item 406 of SEC Regulation S-K.

**The Board Fails to Provide Meaningful Oversight and Instead Defers to Management**

79.     Although the Board had implemented a Code and had some systems of control, they failed to oversee compliance with the Code and otherwise failed to monitor or ensure the adequacy of those controls.  Further, in light of the defendant Hirschhorn's actions, and defendant Vandervoort's delay in providing the Board an update on Hirschhorn's wrongdoing, it was unreasonable for the Board to continue to rely upon them.

80.     As an initial matter, the Section 220 Documents demonstrate that, to the Board, the Code and any other systems of control it needed to implement in connection with the IPO were

mere formalities.  The Code, governance procedures, and internal controls in general were rarely, if ever, discussed by the Board.  Moreover, while the Board externally touted the Company's "highest standards of integrity and ethics," it had internally set different standards and expectations for the Company's executives, showing them no oversight while also abdicating their responsibilities to them.  As a result and through the Board's failure to oversee Teladoc's management, defendant Hirschhorn was able to embark on an inappropriate affair with a subordinate that was well known at Teladoc and lasted for over two years before the Director Defendants had even heard any mention of it.

81.     By September 2016, McKay had sent the Lewisville Report to the Company's Legal department detailing defendant Hirschhorn's wrongdoing.  This report detailing wrongdoing by an executive officer would have gone to defendant Vandervoort.  Yet, the Company moved forward with its plans to promote defendant Hirschhorn.  In particular, on September 28, 2016, the Company issued a press release announcing that defendant Hirschhorn "has been appointed to the newly created role of [COO], while continuing to serve as the company's [CFO]."  Defendant Gorevic is quoted in the press release boasting that defendant Hirschhorn "is a seasoned and trusted member of our executive team who consistently delivers results."  In connection with the promotion, defendant Hirschhorn's base salary increased from $345,050 to $370,000, and he received a grant of 40,000 employee stock options.

82.     By the time the Board finally heard any mention of defendant Hirschhorn's misconduct, at least a month and half had gone by since defendant Vandervoort had received the Lewisville Report.  At that point, the Company was already facing a lawsuit with Griffin stemming from defendant Hirschhorn's conduct and its employees were being targeted for their knowledge

of his wrongdoing.  Yet, the Board still did not review the Lewisville Report and only focused on Griffin's allegations, which, based on her lawyer's statements, did not include insider trading.

83.     On November 11, 2016, at 5:00 p.m., the Board convened for a special, telephonic meeting.   TELADOC-PICKETT00000001.[5]   The meeting was attended by defendants Vandervoort, Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Outland, Felsenthal, Mead, and Mawhinney.  *Id.*  Also in attendance were Kathleen McKenna ("McKenna") of Proskauer Rose and Brendan Cullen ("Cullen") of Sullivan & Cromwell LLP ("Sullivan & Cromwell"), law firms designated as "counsel to the Company."  *Id.*  The minutes state that during the meeting, "[t]he Board discussed a confidential matter with the Company's attorneys and received legal advice regarding same."  *Id.*  The Board discussed nothing else and received no materials in connection with the meeting, which adjourned an hour and a half later, "at approximately 6:30 p.m."  *Id.*  Defendant Vandervoort, as the Company's Secretary, submitted and signed the minutes.  *Id.*  In light of the Company's agreement to produce Board documents concerning defendant Hirschhorn's relationship with Griffin and any investigation into his violations of the Code, this "confidential matter" concerned those topics.

84.     The minutes, coupled with the SIRF Report and police reports discussed above, reveal that the meeting was called to discuss Griffin's allegations against defendant Hirschhorn. Four days before the meeting, Dunlap called the detective at the Lewisville Police Department on Griffin's behalf and identified himself as her attorney.  Proskauer Rose was the Company's outside counsel who ultimately settled the claims with Griffin.  During the meeting, the Board was thus

---

[5] All references to "TELADOC-PICKETT_____" are from Teladoc's production of the Section 220 Documents provided to plaintiff Misty Pickett.

apprised of Griffin's claims against the Company, including the inappropriate relationship with defendant Hirschhorn.

85.     The minutes of the hour and a half telephonic meeting—for which the Board received no materials—make no mention of the Lewisville Report, let alone any investigation. Instead, the minutes suggest that, without any oversight or input from the Board, defendants Vandervoort and potentially Gorevic had already retained outside counsel for the purpose of coming up with a legal strategy in response to Griffin's claims.  This incidentally included an investigation into whether Griffin's alleged relationship with defendant Hirschhorn could be substantiated.  Although defendant Hirschhorn's affair was enough to trigger a broad and thorough investigation into defendant Hirschhorn's conduct, there is nothing to suggest that the Board asked outside counsel to initiate one.  Instead, the Board deferred to defendants Vandervoort and Gorevic.

86.     Further, the Board did not consider which outside counsel to handle Griffin's allegations against defendant Hirschhorn.  Proskauer Rose and Sullivan & Cromwell were already at the first meeting the Board considered the allegations.  According to the Company's website, defendant Vandervoort previously practiced law with Sullivan & Cromwell.  There were no documents produced reflecting the Board's consideration of which counsel to hire, including any conflicts, such as whether counsel had previously done work at defendant Hirschhorn's direction. Again, the Board's deferral to the Officer Defendants to handle allegations into one of their own is unreasonable.

87.     Despite the importance of the allegations against one of the Company's top executives, it took almost a month for the Board to meet again.  On Saturday, December 3, 2016, at 10:00 a.m., the Board convened for another special, telephonic meeting.   TELADOC-

PICKETT00000002.   The meeting was attended by defendants Vandervoort, Gorevic, Snow, Multani, McKinley, Goldstein, Darling, Shedlarz, Felsenthal, Mead, and Mawhinney.  *Id.*  Also in attendance were McKenna of Proskauer Rose and Cullen and Scott Miller ("Miller") of Sullivan & Cromwell.  *Id.*  The minutes are identical to the previous meeting, stating that during the meeting, "[t]he Board discussed a confidential matter with the Company's attorneys and received legal advice regarding same."  *Id.*  The Board discussed nothing else and again received no materials in connection with the meeting, which adjourned "at approximately 12:00 p.m."  *Id.*

88.    The "legal advice" provided by Proskauer Rose, the Company's counsel who settled with Griffin, thus concerned Griffin's allegations against defendant Hirschhorn or the status resolving the resulting claims against Teladoc.   Again, the minutes make no mention of an investigation into defendant Hirschhorn, nor do any Board records from 2016.  Yet, when the SIRF Report became public on December 5, 2018, the Company claimed that it had conducted an investigation in 2016.   In particular, the Company stated: When we were made aware of the allegations against [defendant] Hirschhorn in 2016, we engaged an outside law firm to investigate the claims.   That investigation found violations solely of our workplace relationship policy."  However, the Individual Defendants did not retain outside counsel to investigate defendant Hirschhorn's conduct, as the press release suggests.   They retained outside counsel to deal with Griffin, which incidentally included a probe into whether her allegations were supported.   Further, if any such investigation occurred, the Board received no materials regarding the investigation, there are no materials showing that the Board empowered any group with investigative powers, and the minutes make no discussion of an actual investigation.

89.    The only mention of an "investigation" in the Section 220 Documents occurred two years after the wrongdoing, when the public finally (but predictably) learned about defendant

Hirschhorn's wrongdoing.  In particular, the minutes of a Board meeting held on December 11, 2018, stated that "[defendant] Vandervoort and outside counsel reviewed *the 2016 investigation of allegations made by counsel for Ms. Charece Griffin*."  TELADOC-PICKETT0000003.  Yet, again, the Board received no materials about this investigation.

90.     Regardless, there is no dispute that outside counsel substantiated Griffin's allegations concerning the improper relationship to the Board.  The Board thus knew that defendant Hirschhorn had violated the Code, breached his duties to the Company, and that his conduct had already cost Teladoc the expenses of outside counsel and a settlement payment to Griffin.  The substantiation of her allegations against defendant Hirschhorn should have triggered an actual investigation into whether he had engaged in any other wrongdoing.  But the Board failed to take any further investigation, including into the broader allegations about insider trading.

91.     The Board was well aware that defendant Hirschhorn's lack of ethics and confirmed romance with a subordinate was a risk to the Company, the integrity of its public filings, and its reputation.  Defendant Hirschhorn's Employment Agreement dated June 17, 2015, allowed Teladoc to terminate defendant Hirschhorn "for Cause" if he breached his fiduciary duties to the Company or violated the Code.  Under the Employment Agreement, termination for cause protected Teladoc from paying any further compensation or severance pay to defendant Hirschhorn beyond his last day of employment, allowing Teladoc to retain any unvested shares or bonus payments he earned for the year.

92.     At least two grounds existed for Teladoc to terminate defendant Hirschhorn for cause.  Beyond merely violating the Company's Code, defendant Hirschhorn's long-standing and well-known affair with a subordinate also constituted a breach of the duty of loyalty.  Contrary to the circumstances contemplated by the Employment Agreement and specifically designed to

protect Teladoc's interests, however, the Individual Defendants decided against terminating defendant Hirschhorn for cause.  In fact, these fiduciaries decided to not terminate defendant Hirschhorn at all.  Instead, they allowed one of Teladoc's top executives to remain in his role despite his widely known (and substantiated) romance with a low-level employee who bragged about receiving insider-selling tips from him.  Effectively, these fiduciaries decided to place a ticking time-bomb under Teladoc's reputation, stamp out employee morale, and set the wrong tone at the top.

**The Individual Defendants Consciously Act Against Teladoc's Interest by Protecting Defendant Hirschhorn over the Company**

93.     The Board knew that defendant Hirschhorn's lack of ethics posed a serious risk to the Company and had already become a liability and tarnished its reputation.  Moreover, even if the improper affair between defendant Hirschhorn and Griffin ended, it was still widely known at the Company that it had occurred.  Teladoc's continued association with defendant Hirschhorn therefore endangered its "reputation for integrity, professionalism and fairness," which the Board stressed was one of the Company's "most valuable assets."  The Director Defendants thus consciously acted against Teladoc's best interest by allowing defendant Hirschhorn to remain in his executive roles—which included his promotion to COO—and by protecting him over the Company.

94.     Less than two weeks after they learned about his Code violations and despite his demonstrated lack of ethics, the members of the Board invited defendant Hirschhorn to their regularly scheduled meeting and made him responsible for preparing the proxy statement for the upcoming stockholders' meeting.  On December 14, 2016, the Nominating and Corporate Governance Committee held a regular meeting, which was attended by defendants Vandervoort, Gorevic, Snow, Frist, and Goldstein.  TELADOC-PICKETT00000273.  During the meeting, the

Committee unanimously approved resolutions relating to the 2017 Annual Meeting of Stockholders. *Id.* These resolutions included naming defendants Hirschhorn and Vandervoort "designated officers" and appointing them "as a proxy for the Company's solicitation of votes at the Annual Meeting." TELADOC-PICKETT00000275. The Committee also adopted a resolution that "authorized, empowered and directed" defendants Hirschhorn and Vandervoort "to prepare a proxy statement and such other proxy materials relating to the Annual Meeting, as may be required by the Company's by-laws and applicable federal securities and state corporate laws and regulations." *Id.* The meeting lasted for one hour. TELADOC-PICKETT00000273-74.

95. The following day, on December 15, 2016, the Board held a regular meeting attended by defendants Hirschhorn, Gorevic, Vandervoort, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Outland, Felsenthal, Mead, and Mawhinney. TELADOC-PICKETT00000269. During the meeting, defendant Snow summarized the previous day's proceedings and the Board approved and adopted the same resolutions. TELADOC-PICKETT00000269-70.

96. Despite knowledge of his Code violations, the Board thus decided that defendant Hirschhorn would remain Teladoc's CFO and COO while continuing to defer to him, charging him with various responsibilities, all without first subjecting him to corrective or disciplinary action pursuant to the Code's requirements.

97. On December 27, 2016, despite knowing of his violations of the Code, the Individual Defendants caused Teladoc to enter into an Amended Executive Employment Agreement with defendant Hirschhorn (the "Amended Employment Agreement"). The Amended Employment Agreement adds that defendant Hirschhorn will serve as the Company's COO in addition to serving as its CFO, formally establishing his new role despite his previous breaches

and wrongful conduct.  In addition, the Amended Employment Agreement conditioned defendant Hirschhorn's annual bonus on complying with the Company's published employee policies. However, defendant Hirschhorn was never exempted from the Company's stated policies and, in fact, could have been terminated for cause if he violated them.  Therefore, this provision was mere window dressing.  Moreover, since the provision only applied to future behavior, defendant Hirschhorn received a clean slate despite the Board knowing that his violations of the Code remained a risk to the Company particularly when the foreseeable and inevitable truth came out.

98.     Indeed, subsequent to his undeserved promotion, defendant Hirschhorn's misconduct continued to damage the Company.  The Board allowed fraud and dysfunction in the essential credentialing department, an adverse accreditation review, and defendant Hirschhorn's insider trading.

99.     Thus, the Board wrongfully approved defendant Hirschhorn's annual bonus for 2017 and 2018 during the remainder of his employment.

100.     The Employment Agreement, in relevant part, prohibited payment of those annual bonuses, stating:

> Annual Bonus.  Executive will be eligible for discretionary annual bonuses in an amount determined by the Board (or the Compensation Committee thereof) in its sole and absolute discretion (each, a "Bonus"), informed by the achievement of annual performance objectives determined by the Board (or the Compensation Committee thereof), ***and subject to Executive's not having materially violated any published employee policy of the Company and otherwise remaining an employee of the Company in good standing during all relevant periods….***

101.     Hirschhorn was thus not entitled to his annual bonus each year he violated the Code. The Board abdicated its duty by approving it.

**The Individual Defendants Cause Teladoc to Enter into a Separation Agreement with Defendant Hirschhorn at the Company's Expense**

102.    On December 11, 2018, six days after the SIRF Report revealed defendant Hirschhorn's Code violations and the Individual Defendants' failed response, the Board held a meeting attended by defendants Gorevic, Vandervoort, Hirschhorn, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith.    TELADOC-PICKETT00000003.    Also present for the meeting, at the invitation of the Board, were representatives from Sullivan & Cromwell, counsel to the Board, and Proskauer Rose, counsel to the Company.  *Id.*  During the meeting, "[defendant] Vandervoort and outside counsel reviewed the 2016 investigation of allegations made by counsel for Ms. Charece Griffin (the "*Investigation*") and answered questions from the Board."  *Id.*  The meeting also included a presentation on the SIRF Report and "Related Developments."  *Id.*  In particular, defendants Vandervoort and Gorevic and outside counsel "reviewed for the Board the recent published report regarding the Investigation and results thereof."  *Id.*  The agenda for the meeting notes the "responses and reactions" to the SIRF Report, as well as the "[o]rganizational impact." TELADOC-PICKETT00001436.

103.    Defendants Gorevic, Vandervoort, Hirschhorn, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith were thus well aware of the magnitude of harm the Company was now facing, not only for defendant Hirschhorn's wrongful conduct, but also for their failure to respond when they were initially made aware of his misconduct.  At some point, it was decided that defendant Hirschhorn would part ways with the Company.  The Individual Defendants, having forfeited the opportunity to terminate defendant Hirschhorn for cause upon the execution of the Amended Employment Agreement and now facing liability themselves, caused the Company to enter into a separation agreement that was unfair to

Teladoc and designed to protect their self-interests.  The minutes provide no indication that the Board discussed the terms under which defendant Hirschhorn would resign.  Unsurprisingly, the Company did not terminate defendant Hirschhorn for cause, as the Individual Defendants essentially forfeited the opportunity to terminate defendant Hirschhorn for cause upon the execution of the Amended Employment Agreement.  Defendant Hirschhorn's resignation could have been deemed by the Company as "without Good Reason," which would have provided him with the same compensation (or lack thereof) as if he were terminated for cause.  However, the Individual Defendants, without undertaking much conversation and now facing liability themselves, caused the Company to deem his resignation as for "Good Reason," and provide him with the most generous severance available.  This decision was against the Company's best interests and designed to line defendant Hirschhorn's pockets with unwarranted compensation while also protecting their self-interests.

104.    On December 16, 2018, Teladoc and defendant Hirschhorn entered into a "Separation and Release of Claims Agreement" with defendant Vandervoort signing on the Company's behalf (the "Separation Agreement").  Under the Separation Agreement, Teladoc agreed that defendant Hirschhorn "will be deemed to have resigned from his employment with [Teladoc] for 'Good Reason.'"  As a result, the Company was forced to pay defendant Hirschhorn a severance payment equal to his base salary of $425,500 in increments over the next twelve months, his bonus for 2018, as well as a discretionary bonus set at 100% achievement, all unvested equity awards, and continued life insurance and other benefits for the next twelve months.

105.    On December 17, 2018, Teladoc issued a press release announcing defendant Hirschhorn's resignation as the Company's COO and CFO, effective January 1, 2019.  Defendant

Gorevic is quoted in the press release stating that "[t]he Board and I appreciate [defendant Hirschhorn's] contributions, and we support his decision."

106.     However, none of the circumstances existed for the Company to deem defendant Hirschhorn's departure as a resignation for "Good Reason."    In particular, the Amended Employment Agreement states the following about the definition of "Good Reason":

> <u>Good Reason</u>.  For purposes of this Agreement, "Good Reason" shall mean one or more of the following, without Executive's consent: (A) there is a material reduction in Executive's Base Salary (except where there is a general reduction applicable to the management team generally); (B) there is a material reduction in Executive's overall responsibilities or authority, or scope of duties (except as described below in this Section d(iii)); (C) Executive is required by the Company to relocate his principal place of employment outside of outside of the New York City metropolitan area; or (D) any material breach by the Company of this Agreement. It is understood that Executive must assert any termination for Good Reason by written notice to the Company no later than forty-five (45) days following the date on which arises the event or events giving the Executive the right to assert such a termination, and the Company must have an opportunity within thirty (30) days following delivery of such notice to cure the Good Reason condition.  In no instance will a resignation by Executive be deemed to be for Good Reason if it is made more than twelve (12) months following the initial occurrence of any of the events that otherwise would constitute Good Reason hereunder.  The foregoing notwithstanding, in no event shall any change (including, for the avoidance of doubt, any reduction in Executive's responsibilities, duties and/or authority) or action or inaction incident to a future separation by the Company of the roles of Chief Operating Officer and Chief Financial Officer in which Executive retains one or other title and attendant responsibilities constitute "Good Reason" hereunder.

107.     The Separation Agreement also confirms Teladoc's obligation to indemnify defendant Hirschhorn for claims arising from his employment with the Company, including two that Teladoc was aware of at the time.  These claims included the Securities Class Action, as well as "the inquiry of the State of New York office of the Attorney General related to the subpoena *duces tecum* received by the [Company] on December 14, 2018."

108.     The Separation Agreement explicitly states that defendant Hirschhorn's post-termination payments and benefits are "[i]n consideration" for the waiver and release of claims

against the Company.  In particular, the Separation Agreement contains a mutual release clause in which Teladoc and defendant Hirschhorn "irrevocably and unconditionally" release one another "from any and all claims" "of any kind whatsoever, whether known or unknown."  However, defendant Hirschhorn had no claims against the Company, therefore this consideration is illusory.

109.    Rather, the Board is attempting to use the Separation Agreement to hide its own wrongdoing.   In particular, the Separation Agreement prohibits defendant Hirschhorn from disclosing the facts, circumstances, and Teladoc's response to his relationship with Griffin.   In particular, the Separation Agreement states that "'Confidential Information' includes the facts and circumstances leading up to and surrounding the Employee's separation from Employer, including, without limitation, the events and circumstances pertaining to the revelation and investigation of, and response to, the Employee's relationship with Ms. Charece Griffin[,] and any investigation conducted or initiated by the Employer Group involving Employee."  The inclusion stands out from the other proprietary Company information the Separation Agreement prohibits him from disclosing.

110.    Thus, the Separation Agreement allows defendant Hirschhorn to escape liability for his breaches of fiduciary duty while also favorably compensating him despite his breaches and wrongdoing.  Rather than terminating defendant Hirschhorn for cause, or stating his resignation was without good reason, the Individual Defendants instead forced Teladoc to take on the costs of his wrongdoing by releasing valuable claims against him, indemnifying him from others' claims, and causing Teladoc to pay unjustified severance and benefits payments to him as if he resigned for "Good Reason."  In return, the Individual Defendants protected themselves by preventing him from disclosing their failed response to his affair with Griffin.  The Separation Agreement, and its accompanying releases, are therefore self-dealing, unfair to the Company, and invalid.

**Teladoc Employees Confirm the Board's Oversight Failures and Abdication of Duties**

111.    Although the Board was alerted that its internal controls were inadequate when the allegations of defendant Hirschhorn's affair were confirmed, it chose to do nothing about those deficiencies and continued to defer to management.  Commentary by Teladoc employees and court filings reveal that, as a result, the Board allowed management to create a culture at Teladoc that was antithetical to the Code and characterized by fraud, dishonesty, harassment, and retaliation.

112.    On July 11, 2019, Monika Roots, M.D., ("Dr. Roots"), filed an action against Teladoc for breach of contract, conversion, and tortious and intentional interference with the physician-patient relationship.[6]  Dr. Roots was the Company's Vice President of Health Services and Behavioral Health from December 2016 to June 2018 and was an independent contract physician at the Company from December 2014 until her abrupt termination in April 2019.

113.    Dr. Roots alleges that despite strong performance at the Company, she was subjected to gender-based harassment, marginalization, and unfair treatment in her executive role as Vice President, consistent with Teladoc's culture of cultivating and tolerating belittling conduct and communication towards women.  According to Dr. Roots, Company executives referred to a new service they were considering as a "dumb blonde," which they explained meant it would start out, "simple, like a dumb blonde," but would "get smarter and more involved over time."  She further alleges she was retaliated against for raising concerns to Human Resources, which resulted in a demotion and 90% reduction in the scope of her position.  In June 2018, she and Teladoc entered into a settlement agreement, but she maintained her position as a contract physician.

114.    In April 2019, Teladoc sent a letter to Dr. Roots making the baseless claim that she had breached the settlement agreement by sharing "material, confidential information about

---

[6] *Roots v. Teladoc Health, Inc.*, No. 3:19-cv-00567-wmc (W.D. Wis.).

Teladoc," threatened to report her to the SEC, terminated her contract physician position for "cause," and unlawfully seized her vested stock options.  Thereafter, defendant Vandervoort made disparaging comments about Dr. Roots to other Teladoc employees, including her husband.  In particular, Dr. Roots alleges that defendant Vandervoort falsely claimed she had "engaged in misconduct" and that Teladoc was taking "certain steps" as a result.

115.    Dr. Roots' lawsuit revealed that Teladoc has been operating entities under her name and signing corporate records on her behalf without her knowledge or consent.  At Teladoc's request, Dr. Roots served as the president of entities created on Teladoc's behalf as a mechanism to contract with physicians.  She had been working with Teladoc to remove her name as the listed officer or dissolve the entity since June 2018, but after April 2019, Teladoc ignored Dr. Roots and refused to unname her or provide her with records she is entitled to as the named officer.  Instead, Teladoc has been actively operating these entities for its own benefit and fraudulently filing required corporate documents, such as annual reports, using her name and signature.  On June 24, 2019, for example, Teladoc filed an Annual Report with the Arizona Corporation Commission for Teladoc Behavioral Health Arizona, P.C.  The Annual Report listed Dr. Roots as the sole Director, President, and Shareholder.  Under "SIGNATURE," the form states "President: Monika Roots – 06/24/2019."  Teladoc has made similar fraudulent filings in other states, including Rhode Island and Massachusetts.

116.    In January 2019, a Teladoc employee located in Lewisville, Texas, wrote a review about the Company on Glassdoor.com, emphasizing that it was a "Disgrace to Healthcare" and that reporting that management was unethical and incompetent, stating that, "[t]he blind is leading the blind and doing unethical things to cover up their incompetence and their friends incompetence."   In April 2019, another Lewisville, Texas, employee wrote a review on

Glassdoor.com, also noting an incompetent leadership and highlighting retaliation and safety concerns.  In particular, the employee stated:

> Incompetent leadership worried more about raising share prices in order to sell. Termination for any reason without any validation.  Safety concerns with local police almost weekly.

117.   In September 2019, a Lewisville, Texas, employee who had been working at Teladoc full-time for more than five years wrote a telling review on Glassdoor.com remarking on a culture of dishonesty and harassment, stating the environment "starts with the leaders." Specifically, the employee stated:

> **Pros**
> Bullet Proof Glass and Armed Security Guards
>
> **Cons**
> C Suite, VPs . We have had so much turnover it's pathetic. We have been bullied to keep our mouth shut and threatened. It should be called TelaRetaliation because if you tell, your are eliminated, forced out. Environment is built on dishonesty and it starts with the leaders.
>
> **Advice to Management**
> Watch you tube on what harassment entails. Watch more YouTube and find out what happens when you continue to harass people. Watch more YouTube videos on how to improve culture.

**The Individual Defendants' Breaches of Duty Exacerbate Harm to the Company**

118.   In addition to allowing a hostile and retaliatory culture at Teladoc, the Board's failure to enhance their internal controls and abdication of their roles to management turned talented employees away and caused the Company to lose its accreditation status.  According to the SIRF Report, McKay further brought her concerns to Teladoc's Human Resources and Legal departments after learning about the Individual Defendants' decision to effectively take no action against defendant Hirschhorn.  In response, the Company's management fired McKay.  McKay's termination, in turn, caused 20% of her unit to resign within two weeks, and as much as 30%

ultimately departed.  The loss of these employees, and the overall unethical culture that prevailed at Teladoc, would ultimately cause Teladoc to lose an important healthcare accreditation.

119.    The NCQA is a nonprofit healthcare accreditation organization that verifies adherence to national healthcare standards and physician credentialing processes.  The Company's Annual Reports filed in previous years touted its accreditation status with the NCQA as one of its "Competitive Strengths."  In particular, Teladoc stated:

> High Quality Provider Network. We were the first to deliver nationwide access to board certified physicians 24 hours a day, seven days a week, 365 days a year and establish over 100 proprietary Evidence Based clinical guidelines specifically designed for telehealth. In addition, we are the first and only telehealth company that has received certification by the NCQA, an independent, not for profit, healthcare oriented organization founded in 1990 dedicated to improving healthcare quality and verifying adherence to national standards of excellence in the provision of healthcare for our physician credentialing processes. We have implemented the highest credentialing requirements, ensuring quality interactions and reliable resolutions. The NCQA is funded by corporations and foundations who share its goals as well as its sponsors who, in turn, are eligible to receive NCQA progress reports and access to educational seminars. As a not for profit organization, the NCQA relies on these contributions to foster its accreditation and performance measurement initiatives. The NCQA states that it accepts funds from sponsors only for programs or activities that are consistent with NCQA's mission and in a manner consistent with presenting the credibility and objectivity of its information, priorities, programs and decisions.

120.    The Company's 2018 Annual Report on Form 10-K filed with the SEC on February 27, 2019 (the "2018 Form 10-K") omitted certain language concerning its accreditation status with the NCQA.

121.    On April 10, 2019, Seeking Alpha published an article titled "Teladoc's Credentialing Issues Highlight Broader Internal Control Questions" noting Teladoc's sudden removal of language concerning its NCQA accreditation in the 2018 Form 10-K.  In particular, the article stated:

> When companies make drastic changes to the language in their securities filings without explanation, investors should take notice. For example, in December 2016

Teladoc quietly amended its former CFO's employment agreement. Two years later, the market discovered these subtle amendments were likely tied to his improper workplace conduct. The latest change in Teladoc's financial disclosures that has gone unnoticed - and that could have even more draconian consequences for Teladoc - pertains to the company's NCQA credential - a status that has significant reputational significance to Teladoc.

Notably missing from Teladoc's most recent 10-K was a bullet point on page 6 of the prior year 10-K under Our Competitive Strengths, titled "High Quality Provider Network". In fact, you will not even find that term if you search through the FY18 Teladoc 10-K. The NCQA is a non-profit that is a well-established and regarded body that provides quality assessments for healthcare related organizations. According to NCQA (p8), plans certified by their organization cover ~70% of Americans enrolled in healthcare plans.

122.    The article commented that defendant Hirschhorn's misconduct is "***highly relevant*** to the [C]ompany's NCQA credential."  In particular, Teladoc's Clinical Director role is responsible for overseeing credentialing and was formerly served by McKay until her termination that caused 20-30% of her department to resign in protest.  The article goes on to suspect that defendant Hirschhorn's workplace misconduct adversely impacted Teladoc's credentialing division.

123.    According to the SIRF Report, "[a]fter spending months 'bitterly complaining and arguing with the HR and Legal departments over the [Mark Hirschhorn] decision,' according to two of her former colleagues who talked regularly with her during this period about these conversations, McKay was fired late one morning in October, 2017."  Meanwhile, Griffin resigned quietly in late 2017.  As the SIRF Report noted, defendant Hirschhorn, however, "stayed [in his position] with nearly nary a consequence...."

124.    Defendant Hirschhorn's improper relationship with Griffin caused major disruptions in Teladoc's credentialing unit, where Griffin worked and at which McKay oversaw credentialing before being terminated, which in turn led to material consequences for the Company.

125.    Defendants considered NCQA accreditation to be a significant selling point to payors and investors, as demonstrated by the fact that Teladoc's Forms 10-K filed before 2019 touted the Company's accreditation.   Indeed, the Company represented that it was the first telehealth company to achieve NCQA certification.

126.    Without NCQA accreditation, Teladoc was at risk of losing contracts with health insurance companies, and, in turn, losing doctors.

127.    On May 15, 2019, the NCQA placed the Company "Under Corrective Action" as a result of its audit into Teladoc's credentialing activities.   NCQA defined "under corrective action" as "a temporary accreditation status notation pending an NCQA review."   Without accreditation status from the NCQA, the Company faces the loss of contracts with health insurance companies, as well the medical professionals the Company employs and credentials.   The Company's next NCQA review was November 18, 2019.   However, the under corrective action modified was not removed from the Company's NCQA accreditation until February 4, 2020.   Thus, from May 15, 2019 to February 4, 2020, the Company had to compete against other telehealth competitors that were fully certified, for example, Doctors on Demand and MD Live, which are and were accredited without qualification.

128.    After the SIRF Report was published on December 5, 2018, defendant Gorevic made false and misleading statements to analyst firms covering Teladoc, including Credit Suisse and Leerink Partners.   Among other things, defendant Gorevic misrepresented that: (i) Teladoc was not aware of defendant Hirschhorn's improper relationship with a subordinate at the time of his promotion to COO; and (ii) McKay was not terminated for reporting the relationship and left voluntarily because she did not want to relocate to Boston following a restructuring.

129.    Moreover, the police report filed by McKay, along with her ouster, belie defendant Gorevic's representation that McKay left voluntarily.

130.    In addition, the Seeking Alpha article also points out that certain of Teladoc's entity filings are suspiciously signed by Dr. Roots even though she was no longer with the Company. Seeking Alpha contacted Teladoc asking for an explanation, to which the Company responded, "[t]he professional corporations for which she served as an officer have been defunct since prior to her departure; these are all in the process of being statutorily dissolved." However, as the article points out, at least one of those entities is still listed as active and there has been no filing of an article of voluntary dissolution. The article comments that "it is a sign of significant internal control problems when a former employee – [approximately] 9 months removed – is still signing off on entities tied to her former employer." Seeking Alpha contacted Dr. Roots as well, however she did not respond. Teladoc's termination of Dr. Roots on April 9, 2019, in which the Company accuses her of breaching her confidentiality agreement, was therefore in retaliation for the article even though she never provided Seeking Alpha with any information.

### THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTIES RESULT IN A SERIES OF IMPROPER STATEMENTS

131.    While protecting defendant Hirschhorn at the Company's expense and concealing his wrongdoing, the Individual Defendants issued a series of improper statements. In particular, from March 3, 2016 to December 5, 2018, these fiduciaries purported that Teladoc embodies "the highest standards of integrity and ethics in the way it conducts business." The Individual Defendants also highlighted Teladoc's adoption of the Code, conveying it applied to all employees, officers, and directors while failing to disclose defendant Hirschhorn's various violations of its provisions.

132.    On March 3, 2016, Teladoc filed its Annual Report on Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K") with the SEC.  The 2015 Form 10-K was signed by defendants Gorevic, Hirschhorn, Snow, Multani, McKinley, Frist, Goldstein, Outland, Felsenthal, Mead, and Mawhinney.

133.    Defendants Snow, Goldstein, and Outland reviewed and discussed the 2015 Form 10-K in connection with the Audit Committee meeting held on February 25, 2016, commencing at 4:00 p.m.  TELADOC-PICKETT00000277.  The meeting was also attended by defendants Vandervoort and Hirschhorn.  *Id.*  During the meeting, the Committee "discussed with management: (i) the Financial Statements [contained in the 2015 Form 10-K]; (ii) management's assessment of the effectiveness of the Company's internal control over financial reporting; and (iii) the [2015] Form 10-K, including the [Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")] section."  TELADOC-PICKETT00000279. Following the discussion, the Audit Committee "voted unanimously" to approve the 2015 Form 10-K and recommend to the Board to approve the 2015 Form 10-K.  TELADOC-PICKETT00000277; TELADOC-PICKETT00000279.  The Audit Committee then met with representatives of the Company's independent auditor and adjourned the meeting at 5:30 p.m. TELADOC-PICKETT00000278.

134.    On February 26, 2016, the Board held a regularly scheduled meeting attended by defendants Gorevic, Hirschhorn, Vandervoort, Snow, Multani, McKinley, Frist, Goldstein, Outland, Felsenthal, Mead, and Mawhinney.  TELADOC-PICKETT00000281.  In connection with the meeting, the Board received a draft of the 2015 Form 10-K.  TELADOC-PICKETT00000432.  During the meeting, the Board voted unanimously to approve the 2015 Form 10-K.  TELADOC-PICKETT00000282-83.

135.   In the 2015 Form 10-K, the Individual Defendants highlighted Teladoc's highly skilled and reliable key executives while warning that loss of the qualified personnel could have a material adverse impact on the Company's business.  In particular, the 2015 Form 10-K stated:

> ***We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business.***
>
> Our success depends largely upon the continued services of our key executive officers. These executive officers are at-will employees and therefore they may terminate employment with us at any time with no advance notice. We maintain "key person" insurance in the amount of $4.0 million for Jason Gorevic, our Chief Executive Officer, but not for any of our other executive officers or any of our other key employees. We also rely on our leadership team in the areas of research and development, marketing, services and general and administrative functions. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.
>
> To continue to execute our growth strategy, we also must attract and retain highly skilled personnel. Competition is intense for qualified professionals. We may not be successful in continuing to attract and retain qualified personnel. We have from time to time in the past experienced, and we expect to continue to experience in the future, difficulty in hiring and retaining highly skilled personnel with appropriate qualifications. The pool of qualified personnel with experience working in the healthcare market is limited overall. In addition, many of the companies with which we compete for experienced personnel have greater resources than we have.
>
> In addition, in making employment decisions, particularly in high-technology industries, job candidates often consider the value of the stock options or other equity instruments they are to receive in connection with their employment. Volatility in the price of our stock may, therefore, adversely affect our ability to attract or retain highly skilled personnel. Further, the requirement to expense stock options and other equity instruments may discourage us from granting the size or type of stock option or equity awards that job candidates require to join our company. Failure to attract new personnel or failure to retain and motivate our current personnel, could have a material adverse effect on our business, financial condition and results of operations.

136.   The Individual Defendants also acknowledged in the 2015 Form 10-K the importance of executives maintaining high morals and ethical conduct while disclosing that

employment claims "may result in substantial costs and may divert management's attention and resources."  Specifically, the 2015 Form 10-K stated:

> [E]mployment claims made by our current or former associates ... may result in substantial costs and may divert management's attention and resources, which may substantially harm our business, financial condition and results of operations. Insurance may not cover such claims, may not provide sufficient payments to cover all of the costs to resolve one or more such claims and may not continue to be available on terms acceptable to us. A claim brought against us that is uninsured or underinsured could result in unanticipated costs, thereby reducing our revenue and leading analysts or potential investors to reduce their expectations of our performance, which could reduce the market price of our stock.

137.    On April 15, 2016, Teladoc filed its Proxy Statement on Schedule 14A (the "2016 Proxy") with the SEC.  The 2016 Proxy emphasized that "***Teladoc is committed to the highest standards of integrity and ethics in the way it conducts business***."  In furtherance of this commitment, the 2016 Proxy touted that "[d]uring 2015, the board adopted a Code of Business Conduct and Ethics."  The 2016 Proxy added that the Code "establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."  In addition, the 2016 Proxy stated that "each of our directors and employees is required to report suspected or actual violations" of the Code and assured that "[w]e intend to post any amendment to, or waiver from, [the Code] (to the extent applicable to our chief executive officer, principal financial officer or principal accounting officer) on our website."

138.    On March 1, 2017, Teladoc filed its Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K") with the SEC.  The 2016 Form 10-K was signed by defendants Gorevic, Hirschhorn, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, and Outland.

139.     Defendants Snow, Goldstein, Shedlarz, and Outland reviewed and discussed the 2016 Form 10-K in connection with the Audit Committee meeting held on February 23, 2017, commencing at 3:30 p.m.  TELADOC-PICKETT00000285.  The meeting was also attended by defendants Vandervoort and Hirschhorn.  *Id.*  During the meeting, the committee "discussed with management: (i) the Financial Statements [contained in the 2016 Form 10-K]; (ii) management's assessment of the effectiveness of the Company's internal control over financial reporting; and (iii) the [2016] Form 10-K, including the MD&A section."  TELADOC-PICKETT00000287.  Following the discussion, the Audit Committee "voted unanimously" to approve the 2016 Form 10-K and recommend to the Board to approve the 2016 Form 10-K.  TELADOC-PICKETT00000286-87.  The Audit Committee then met with representatives of the Company's independent auditor and adjourned the meeting at 5:00 p.m.  TELADOC-PICKETT00000286.

140.     On February 24, 2017, the Board held a regularly scheduled meeting attended by defendants Gorevic, Hirschhorn, Vandervoort, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, Outland and Felsenthal.  TELADOC-PICKETT00000158.  In connection with the meeting, the Board received a draft of the 2016 Form 10-K.  TELADOC-PICKETT00000538.  During the meeting, the Board voted to approve the 2016 Form 10-K. TELADOC-PICKETT00000537.

141.     In the 2016 Form 10-K, the Individual Defendants continued to highlight Teladoc's highly skilled and reliable key executives while warning that loss of the qualified personnel could have a material adverse impact on the Company's business.  In particular, the 2016 Form 10-K stated:

> *We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business.*

Our success depends largely upon the continued services of our key executive officers. These executive officers are at-will employees and therefore they may terminate employment with us at any time with no advance notice. We maintain "key person" insurance in the amount of $4.0 million for Jason Gorevic, our Chief Executive Officer, but not for any of our other executive officers or any of our other key employees. We also rely on our leadership team in the areas of research and development, marketing, services and general and administrative functions. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.

To continue to execute our growth strategy, we also must attract and retain highly skilled personnel. Competition is intense for qualified professionals. We may not be successful in continuing to attract and retain qualified personnel. We have from time to time in the past experienced, and we expect to continue to experience in the future, difficulty in hiring and retaining highly skilled personnel with appropriate qualifications. The pool of qualified personnel with experience working in the healthcare market is limited overall. In addition, many of the companies with which we compete for experienced personnel have greater resources than we have.

In addition, in making employment decisions, particularly in high-technology industries, job candidates often consider the value of the stock options or other equity instruments they are to receive in connection with their employment. Volatility in the price of our stock may, therefore, adversely affect our ability to attract or retain highly skilled personnel. Further, the requirement to expense stock options and other equity instruments may discourage us from granting the size or type of stock option or equity awards that job candidates require to join our company. Failure to attract new personnel or failure to retain and motivate our current personnel, could have a material adverse effect on our business, financial condition and results of operations.

142.    The Individual Defendants also acknowledged in the 2016 Form 10-K the importance of executives maintaining high morals and ethical conduct while disclosing that employment claims "may result in substantial costs and may divert management's attention and resources."  Specifically, the 2016 Form 10-K stated:

[E]mployment claims made by our current or former associates ... may result in substantial costs and may divert management's attention and resources, which may substantially harm our business, financial condition and results of operations. Insurance may not cover such claims, may not provide sufficient payments to cover all of the costs to resolve one or more such claims and may not continue to be

available on terms acceptable to us. A claim brought against us that is uninsured or underinsured could result in unanticipated costs, thereby reducing our revenue and leading analysts or potential investors to reduce their expectations of our performance, which could reduce the market price of our stock.

143.    On April 6, 2017, Teladoc filed its Proxy Statement on Schedule 14A (the "2017 Proxy") with the SEC.  The Board received a draft of the 2017 Proxy dated March 20, 2017.  TELADOC-PICKETT00001376.  On March 21, 2017, the Board acted by unanimous written consent to approve the draft of the 2017 Proxy.  TELADOC-PICKETT0000292.  Defendants Gorevic, Snow, Darling, Felsenthal, Frist, Goldstein, Mawhinney, McKinley, Multani, Outland, Paulus, and Shedlarz each made signatures executing the written consent.  TELADOC-PICKETT0000294-305.  As discussed above, the Board charged defendant Hirschhorn with the responsibility of preparing the 2017 Proxy less than two weeks after it became aware of his violations of the Code and lack of ethics.  TELADOC-PICKETT00000269-70.  Unsurprisingly, the 2017 Proxy contained improper statements.

144.    The 2017 Proxy touted the Board's adoption of the Code "***to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics***."  The 2017 Proxy added that the Code "establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."  The 2017 Proxy included a link to the Company's website on which stockholders could locate the Code.  In addition, the 2017 Proxy stated that, "[w]e intend to satisfy the disclosure requirements under [the Exchange Act] regarding any amendment to, or waiver from a material provision of our [Code] involving our principal executive, financial or accounting officer or controller by posting such information on our website."

145.    On February 27, 2018, Teladoc filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  The 2017 Form 10-K was signed by defendants Gorevic, Hirschhorn, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Mawhinney.

146.    Defendants Multani, Goldstein, Shedlarz, and McAndrews reviewed and discussed the 2017 Form 10-K in connection with the Audit Committee meeting held on February 22, 2018. TELADOC-PICKETT00000954.  The meeting was also attended by defendants Vandervoort and Hirschhorn.  *Id.*  During the meeting, the Committee "discussed with management: (i) the Financial Statements [contained in the 2017 Form 10-K]; (ii) management's assessment of the effectiveness of the Company's internal control over financial reporting; [and] (iii) the [2017] Form 10-K[, including the MD&A section]."  TELADOC-PICKETT00000957.  Following the discussion, the Audit Committee "voted unanimously" to approve the 2017 Form 10-K and recommend to the Board to approve the 2017 Form 10-K.    TELADOC-PICKETT00000955;  TELADOC-PICKETT00000957.

147.    On February 23, 2018, the Board held a regularly scheduled meeting attended by defendants Gorevic, Hirschhorn, Vandervoort, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews.  TELADOC-PICKETT00000365.  In connection with the meeting, the Board received a draft of the 2017 Form 10-K.  TELADOC-PICKETT00001187.

148.    In the 2017 Form 10-K, the Individual Defendants continued to highlight Teladoc's highly skilled and reliable key executives while warning that loss of the qualified personnel could have a material adverse impact on the Company's business.  In particular, the 2017 Form 10-K stated:

***We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled employees could adversely affect our business.***

Our success depends largely upon the continued services of our key executive officers. These executive officers are at-will employees and therefore they may terminate employment with us at any time with no advance notice. We also rely on our leadership team in the areas of research and development, marketing, services and general and administrative functions. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.

To continue to execute our growth strategy, we also must attract and retain highly skilled personnel. Competition is intense for qualified professionals. We may not be successful in continuing to attract and retain qualified personnel. We have from time to time in the past experienced, and we expect to continue to experience in the future, difficulty in hiring and retaining highly skilled personnel with appropriate qualifications. The pool of qualified personnel with experience working in the healthcare market is limited overall. In addition, many of the companies with which we compete for experienced personnel have greater resources than we have.

In addition, in making employment decisions, particularly in high-technology industries, job candidates often consider the value of the stock options or other equity instruments they are to receive in connection with their employment. Volatility in the price of our stock may, therefore, adversely affect our ability to attract or retain highly skilled personnel. Further, the requirement to expense stock options and other equity instruments may discourage us from granting the size or type of stock option or equity awards that job candidates require to join our company. Failure to attract new personnel or failure to retain and motivate our current personnel, could have a material adverse effect on our business, financial condition and results of operations.

149.    The Individual Defendants also acknowledged in the 2017 Form 10-K the importance of executives maintaining high morals and ethical conduct while disclosing that employment claims "may result in substantial costs and may divert management's attention and resources."  Specifically, the 2017 Form 10-K stated:

[E]mployment claims made by our current or former associates ... may result in substantial costs and may divert management's attention and resources, which may substantially harm our business, financial condition and results of operations.

Insurance may not cover such claims, may not provide sufficient payments to cover all of the costs to resolve one or more such claims and may not continue to be available on terms acceptable to us. A claim brought against us that is uninsured or underinsured could result in unanticipated costs, thereby reducing our revenue and leading analysts or potential investors to reduce their expectations of our performance, which could reduce the market price of our stock.

150.    On April 20, 2018, Teladoc filed its Proxy Statement on Schedule 14A (the "2018 Proxy") with the SEC.[7]   The 2018 Proxy touted the Board's adoption of the Code "*to promote honest and ethical conduct for conducting the business of the Company consistent with the highest standards of business ethics*."   The 2018 Proxy added that the Code "establishes our policies and expectations with respect to a wide range of business conduct, including the preparation and maintenance of our financial and accounting information, our compliance with laws and possible conflicts of interest."   The 2018 Proxy included a link to the Company's website on which stockholders could locate the Code.  In addition, the 2018 Proxy stated that, "[w]e intend to satisfy the disclosure requirements under [the Exchange Act] regarding any amendment to, or waiver from a material provision of our [Code] involving our principal executive, financial or accounting officer or controller by posting such information on our website."

151.    The 2018 Proxy also emphasized that the Company maintained an "Insider Trading Compliance Policy" prohibiting the Individual Defendants from "engaging in hedging transactions, including purchasing Teladoc stock on margin or engaging in transactions in puts, calls or other derivative securities designed to hedge or offset any decrease in the market value of Teladoc's equity securities."

---

[7] Absent from the Section 220 Documents are any Board minutes or materials relating to the review and approval of the 2018 Proxy, indicating that the Board never received, reviewed, or approved the 2018 Proxy.

**REASONS THE STATEMENTS WERE IMPROPER**

152.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company was not acting ethically;

(b)    defendant Hirschhorn violated the Code by engaging in an affair with a subordinate, Griffin;

(c)    defendant Hirschhorn and Griffin engaged in insider trading;

(d)    defendant Hirschhorn negatively impacted the Company's business operations by causing Griffin to receive promotions she was not qualified for and by causing Teladoc to pay a settlement to Griffin as a result of his misconduct;

(e)    the Board was failing in its oversight duties and not enforcing the Code;

(f)    the Company failed to disclose the waiver of the Code for defendant Hirschhorn against the requirements of Item 406 of SEC Regulation S-K;

(g)    Teladoc was permitting retaliation against whistleblowers; and

(h)    as a result of the foregoing, Teladoc's representations concerning its management, business operations, and future prospects were improper.

**THE TRUTH EMERGES**

153.    On December 5, 2018, the SIRF Report revealed that defendant Hirschhorn had an affair with a subordinate, Griffin, and that the Individual Defendants were well aware of his wrongful conduct but essentially did nothing about it.

154.    The SIRF Report highlighted the "unique optics" and troubling "power dynamics" of the relationship while revealing that during the affair "Griffin received a series of promotions

over colleague with either more industry experience or better credentials that stunned her former

colleagues.  Specifically, the SIRF Report stated:

> Let's start with this relationship's unique optics, which appear designed to give a
> corporate lawyer a heart attack: While Griffin was not initially a direct subordinate
> of Hirschhorn, when he was given the additional title of chief operating officer in
> September 2016, that distinction was all but erased. Moreover, during their
> relationship, Griffin received a series of promotions over colleagues with either
> more industry experience or better credentials that stunned her former colleagues.
> She did well enough, records indicate, that she was able to trade out of a 7-year-old
> Kia and buy a late model Mercedes in February 2017.
>
> *   *   *
>
> From the perspective of power dynamics, it looks even worse.
>
> Hirschhorn, a resident of tony Larchmont, New York, has been married since 1993,
> and along with his other duties, is responsible for managing the crucial relationships
> with investors, bankers and brokerage firm research analysts that have helped
> Teladoc Health raise nearly $1.3 billion in capital since March 2015. In turn, that
> money has enabled almost $625 million worth of recent acquisitions, which is
> driving the rapid revenue growth so beloved by money managers.
>
> Accordingly, Hirschhorn has been well paid. (Hirschhorn did not reply to several
> voice messages left at his residence, nor to a pair of emails.)
>
> Griffin, in a blunt contrast, is a single mother of two children who didn't attend
> college and joined the company in May 2014 when Teladoc Health purchased
> Ameridoc. Working out of the Lewisville, Texas, office, she was in the unit that
> identified and enrolled doctors and nurses for its provider network. Former
> colleagues pegged her income as topping out at about $125,000.

155.    The SIRF Report went on to discuss details of the relationship, including that

defendant Hirschhorn would provide Griffin with insider trading tips.  In particular, the SIRF

Report stated:

> Griffin, according to her former colleagues, openly discussed her relationship with
> Hirschhorn. And if those coworkers initially harbored doubts about whether their
> CFO was really rendezvousing with Griffin, they were put to rest when Hirschhorn
> sent flowers to her desk after some of his Lewisville visits.

(Lewisville, about 25 miles north of Dallas, is where Teladoc Health's non-executive operations are located, and thus given Hirschhorn's dual COO/CFO role, he visited frequently.)

It appeared to have been a standard office romance — as familiar to many in real life as it is on TV — with them emailing each other, talking on the phone, going to dinner when Hirschhorn was in town; he even took her to Las Vegas for a few days. Except this was between perhaps the most important man in the company and a woman who, at least at the beginning of their relationship, was barely a mid-level employee.

There was one other aspect to their relationship that struck Griffin's ex-colleagues as unusual, with very good cause: Griffin told them she and Hirschhorn liked to trade Teladoc Health's stock together. More accurately, after Griffin received a stock grant, Hirschhorn would tell her when he thought there were good opportunities to sell some shares. His track record, she proudly told colleagues, was pretty good.

156.     The improper workplace relationship and stock trading, the SIRF Report revealed, were reported by McKay to Teladoc's Human Resources and Legal departments, with outside counsel ultimately confirming certain allegations.  In particular, the SIRF Report stated:

Unsurprisingly, this struck many of Griffin's then-colleagues as massively unfair. As such, one after another they marched into the office of Amy McKay (she was Teladoc Health's ninth employee) and the executive who was the Clinical Director and vice-president of the Payor Relations unit — as well as Griffin's ultimate boss — and loudly complained.

Long aware of the relationship, and shocked at the risk Hirschhorn had incurred as a married man with kids in college, McKay told these colleagues that trading your employer's stock based on tips from your boyfriend — and the company's CFO — was the last straw in a situation that in her assessment had become toxic. So in October 2016, McKay drafted an eight-page document that was a timeline of the relationship — and an enumeration of the things that she and her subordinates felt were most problematic about it — and submitted it to both the Legal and Human Resource departments.

McKay, per three of her former subordinates, was pleasantly surprised when Teladoc Health's legal department told her they had hired an outside law firm to conduct an independent review of her claims. After its conclusion roughly a month later, word got down to McKay that the law firm had substantiated her assertions, and that swift action would be taken to address it.

157.    The SIRF Report further exposed the Individual Defendants' failures to enforce the

Code and protect whistleblowers, explaining the inadequate response of the Amended

Employment Agreement and the retaliation McKay faced.  Specifically, the SIRF Report stated:

> It's not hard to imagine McKay's shock when the promised action arrived on
> December 27, 2016, in the form of an amended employment contract for
> Hirschhorn, bearing two new features that he was required to abide: A prohibition
> from violating the employee handbook, and for a period of one year, a suspension
> of the scheduled share vesting awarded to him as compensation.

*    *    *

> After spending months "bitterly complaining and arguing with the HR and Legal
> departments over the [Mark Hirschhorn] decision," according to two of her former
> colleagues who talked regularly with her during this period about these
> conversations, McKay was fired late one morning in October 2017. She said to her
> former colleagues that all she was told was, "It was a business decision." The
> termination came nearly a year from the day she filed her eight-page document, and
> adding insult to injury, corporate security escorted her immediately from the office.
> (Within the following two weeks, nearly 20 percent of her unit would resign; three
> ex-colleagues of McKay put the total as high as 30 percent.)

158.    On this news, Teladoc's market capitalization plunged more than 12%, or $7.47 per

share, on December 10, 2018, to close at $52.34 per share compared to closing at $59.81 per share

on December 14, 2018, erasing $532.6 million in market capitalization.

159.    On December 5, 2018, the Company issued a press release titled "Teladoc Health

Refutes SIRF Report Claims."  Teladoc defended that the SIRF Report "contain[ed] several factual

inaccuracies," however did not explain what those factual inaccuracies were.

160.    Teladoc also claimed in the December 5, 2018 press release that, "[w]hen we were

made aware of the allegations against [defendant] Hirschhorn in 2016, we engaged an outside law

firm to investigate the claims."  However, the Company did not engage outside counsel to

investigate defendant Hirschhorn or the Lewisville Report, as Teladoc suggests.  Instead, the

Officer Defendants engaged outside counsel to respond to Griffin's claims against the Company

and strategize a potential defense against those claims, which incidentally included investigating the alleged affair. "That investigation," the Company purported, "found violations solely of our workplace relationship policy, and [the Board] took swift and appropriate disciplinary action to address the violations." Moreover, this so-called "investigation" was limited to Griffin's claims against the Company, and there is no evidence it extended to insider trading allegations or anything else beyond the existence of the affair. Moreover, rather than taking "swift and appropriate disciplinary action," the Board effectively did nothing and instead continued to defer to the Officer Defendants.

161. Finally, the Individual Defendants assured in the December 5, 2018 press release that "[w]e take workplace conduct matters very seriously" and "are deeply committed to ensuring a safe, respectful work environment where all individuals are treated fairly and equally." However, commentary by Teladoc employees and court filings, including Dr. Roots' lawsuit against the Company, demonstrate the opposite. As detailed above, these employees reveal that the Board allowed the Officer Defendants to create a culture at Teladoc that was characterized by fraud, dishonesty, harassment, and retaliation.

162. Defendant Gorevic continued to mischaracterize the supposed 2016 "investigation" in conversations with analysts, emphasizing that outside counsel did not find evidence of certain allegations in the SIRF Report even though outside counsel was never looking for evidence of those allegations. On December 6, 2018, for example, Credit Suisse issued a report based on a conversation with defendant Gorevic in which he purported that the investigation "did not find any evidence of insider trading" or "undue promotion, compensation, or discrimination." Defendant Gorevic also claimed that defendant Hirschhorn was also given the title COO prior to the

allegations surfacing even though the timeline of the police reports demonstrate otherwise.  In particular, Credit Suisse reported:

> **CEO Highlights that the Investigation Found No Evidence of Insider Trading**. Mr. Gorevic notes that the company engaged an outside law firm to investigate the allegations raised in 2016. While the investigation found violations of the workplace relationship policy, it did not find any evidence of insider trading as indicated in the SIRF article. The investigation also did not find any evidence of undue promotion, compensation, or discrimination.

> **CEO Claims that the SIRF Article Mischaracterizes the Penalty on Mr. Hirschhorn**. Mr. Gorevic also notes that the article mischaracterizes the magnitude of penalty levied on Mr. Hirschhorn. For instance, in addition to the delaying vesting of shares by a year, Mr. Hirschhorn also forfeited his entire bonus for 2016 (a combined value of $4.4 mln). Mr. Gorevic also dismisses the allegation that the employment of Amy McKay, Ms. Griffin's supervisor, was terminated for objecting to Mr. Hirschhorn's relationship with Ms. Griffin. According to Mr. Gorevic, Ms. McKay voluntarily left the firm as the company was undergoing a restructuring process which required its employees (including Ms. McKay) in Dallas to relocate to Boston. Finally, TDOC's CEO notes that Mr. Hirschhorn was given the COO title prior to the allegations surfacing and not after as the article suggests.

163.    Similarly, on December 6, 2018, Leerink Partners published an analyst report titled "CEO Convo On SIRF Article; No Insider Trading; Right Steps Taken; Reiterate OP."  Leerink Partners also relayed defendant Gorevic's claims about outside counsel "only f[inding] a violation of the workplace relationship policy at Teladoc Health with no evidence of the SIRF allegations on insider trading."  Specifically, Leerink Partners wrote:

> The CEO confirmed that the company was made aware of the workplace affair by COO and CFO Mark Hirschhorn in 2016, and took swift action toward resolution after engaging multiple external law firms to investigate the situation. These firms only found a violation of the workplace relationship policy at Teladoc Health with no evidence of the SIRF allegations on insider trading. Mark Hirschhorn forfeited a very meaningful $4.4 MM across his entire 2016 bonus and unvested stock as a result of the incident. Mr. Hirschhorn also was given the title of COO, in addition to his CFO role before the incident, not after the incident as purported by SIRF. Finally, the supervisor Amy McKay voluntarily left the company in 2016 on amicable terms given her desire not to relocate from Dallas to Boston, and was not forced out of the company, as alleged by SIRF.

164.   The Section 220 Documents reveal the limited nature of outside counsel's inquiry and the Individual Defendants' attempt to mischaracterize this as investigation after the fact.  As detailed above, during the December 11, 2018 Board meeting, "*[defendant] Vandervoort and outside counsel reviewed the 2016 investigation of allegations made by counsel for Ms. Charece Griffin* (the "*Investigation*") and answered questions from the Board."   TELADOC-PICKETT00000003.   The investigation thus was limited to Griffin's allegations, and did not include the Lewisville Report.

165.   The following day, on December 12, 2018, investors filed the Securities Class Action.  Teladoc's statements to the media in response to the filing of the Securities Class Action further demonstrate the Individual Defendants' efforts to distort the supposed investigation and its findings.  In particular, the Company claimed that: "When we were made aware of the allegations against [defendant] Hirschhorn in 2016, we engaged an outside law firm to investigate the claims. The investigation found no evidence of securities law or any other legal violations."   However, there was never a meaningful investigation in 2016 and to the extent there was, allegations of securities law violations were not part of its scope.

**CERTAIN DIRECTOR DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN THE COMPANY'S PROXY STATEMENTS**

166.   Plaintiffs' allegations with respect to the misleading statements in both the 2017 Proxy and 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**The 2017 Proxy**

167.    On April 6, 2017, Teladoc filed its 2017 Proxy for the 2017 Annual Meeting of Stockholders.  The Company held the meeting on May 25, 2017.  In the 2017 Proxy, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, Outland, Felsenthal, and Mawhinney solicited stockholder votes to, among other things: (i) reelect defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and Mawhinney to the Board; and (ii) approve an amendment and restatement of the 2015 Incentive Award Plan (the "Restated Plan").  The Restated Plan, if approved, would increase the number of shares available for issuance under the Incentive Award Plan by 800,000 and also automatically refresh the number of shares available for issuance each year by a number of shares equal to the lesser of: (i) 5% of the Company's outstanding common stock; or (ii) a smaller number of shares as determined by the Board.

168.    Defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, Outland, Felsenthal, and Mawhinney negligently issued misleading statements with respect to the solicited votes to reelect defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and Mawhinney to the Board and approve the Restated Plan.

169.    The 2017 Proxy emphasized that the Board "oversees the management of the Company and its business for the benefit of our stockholders in order to enhance stockholder value over the long term."  In addition, the 2017 Proxy touted the Board's adoption of the Code "that applies to all directors, officers and employees."  The purpose of the Code, the 2017 Proxy stated, "is to promote honest and ethical conduct for conducting the business of the Company consistent with *the highest standards of business ethics*."  The 2017 Proxy also represented that Teladoc will "satisfy the disclosure requirements under the [Exchange Act] regarding any amendment to, or

waiver from a material provision of [the Code] involving [the] principal executive, financial or accounting officer or controller by posting such information on [its] website."

170.    The 2017 Proxy thus misleadingly represented that the Board actively oversaw Teladoc's management and enforced the Code when, in reality, it was utterly failing in its oversight duties, abdicating its responsibilities to the Officer Defendants, and refusing to enforce the Code against them.  The 2017 Proxy also left stockholders with the impression that Teladoc and the Individual Defendants conduct themselves with "the highest standards of business ethics."  This statement was misleading because it failed to disclose that defendant Hirschhorn had acted unethically and violated the Code by engaging in an inappropriate sexual relationship with a subordinate.  Moreover, the Company had not, and would not, disclose the waiver from the Code it provided to defendant Hirschhorn, contrary to the claims in the 2017 Proxy and in violation of Item 406 of SEC Regulation S-K.

171.    As a result of the misleading statements and omissions in the 2017 Proxy, Teladoc's stockholders voted via an uninformed stockholder vote to reelect defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and Mawhinney to the Board and approve the Restated Plan.  The 2017 Proxy harmed Teladoc by overcompensating the Individual Defendants under the Restated Plan.  The 2017 Proxy also harmed Teladoc by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.

**The 2018 Proxy**

172.    On April 20, 2018, Teladoc filed its 2018 Proxy for the 2018 Annual Meeting of Stockholders.  The Company held the meeting on May 31, 2018.  In the 2018 Proxy, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and

Mawhinney solicited stockholder votes to, among other things reelect defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews to the Board.

173.    The 2018 Proxy emphasized that the Board "oversees the management of the Company and its business for the benefit of our stockholders in order to enhance stockholder value over the long term."  In addition, the 2018 Proxy touted the Board's adoption of the Code "that applies to all directors, officers and employees."  The purpose of the Code, the 2018 Proxy stated, "is to promote honest and ethical conduct for conducting the business of the Company consistent with *the highest standards of business ethics*."  The 2018 Proxy also represented that Teladoc will "satisfy the disclosure requirements under the [Exchange Act] regarding any amendment to, or waiver from a material provision of [the Code] involving [the] principal executive, financial or accounting officer or controller by posting such information on [its] website."

174.    The 2018 Proxy thus misleadingly represented that the Board actively oversaw Teladoc's management and enforced the Code when, in reality, it was utterly failing in its oversight duties, abdicating its responsibilities to the Officer Defendants, and refusing to enforce the Code against them.  The 2018 Proxy also left stockholders with the impression that Teladoc and the Individual Defendants conduct themselves with "the highest standards of business ethics."  This statement was misleading because it failed to disclose that defendant Hirschhorn had acted unethically and violated the Code by engaging in an inappropriate sexual relationship with a subordinate.  Moreover, the Company had not, and would not, disclose the waiver from the Code it provided to defendant Hirschhorn, contrary to the claims in the 2018 Proxy and in violation of Item 406 of SEC Regulation S-K.

175.    As a result of the misleading statements and omissions in the 2018 Proxy, Teladoc's stockholders voted via an uninformed stockholder vote to reelect defendants Gorevic, Snow,

Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews to the Board and approve the Restated Plan. The 2018 Proxy harmed Teladoc by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.

### INSIDER SALES BY DEFENDANTS HIRSCHHORN, GOREVIC, VANDERVOORT, GOLDSTEIN, AND MULTANI

176. Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Teladoc's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Teladoc, defendants were privy to material, nonpublic information about the Company's true risks and business health, information they improperly capitalized upon before the truth was revealed to the public.

177. While in possession of this knowledge, defendant Hirschhorn sold 615,000 shares of his personally held Teladoc stock for proceeds of $22.8 million. Defendant Hirschhorn's sales were timed to maximize profit from Teladoc's then artificially inflated stock price. Suspiciously, in November 2016, while outside counsel was purportedly investigating his conduct, defendant Hirschhorn sold approximately 10,000 shares of his Teladoc holdings. These sales, unlike most of his other sales, were not conducted pursuant to any Rule 10b5-1 trading plan. Defendant Hirschhorn's sales are further suspect given that they represented almost 100% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 250,866 |
| Shares Sold During Sales Period ("SP") | 615,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 617,657 |
| Shares Remaining SP | 2,657 |
| **Total Proceeds from Sales** | **$22,873,284.00** |
| **% of Total Ownership Sold During SP** | **99.57%** |

178.    While in possession of material, non-public information, defendant Gorevic sold 594,991 shares of his personally held Teladoc stock for proceeds of $23.1 million.  Defendant Gorevic's sales were timed to maximize profit from Teladoc's then artificially inflated stock price. Suspiciously, defendant Gorevic's stock sales represented approximately 53% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 927,258 |
|---|---|
| Shares Sold During SP | 594,991 |
| Shares Disposed (Other) During SP | 13,574 |
| Total Shares Held During SP | 1,114,749 |
| Shares Remaining SP | 506,184 |
| **Total Proceeds from Sales** | **$23,142,987.97** |
| **% of Total Ownership Sold During SP** | **53.37%** |

179.    While in possession of material, non-public information, defendant Vandervoort sold 200,243 shares of his personally held Teladoc stock for proceeds of $7.5 million.  Defendant Vandervoort's sales were timed to maximize profit from Teladoc's then artificially inflated stock price.  Defendant Vandervoort's sales are suspect given that they represented nearly all of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 200 |
|---|---|
| Shares Sold During SP | 200,243 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 200,443 |
| Shares Remaining SP | 200 |
| **Total Proceeds from Sales** | **$7,543,955.14** |
| **% of Total Ownership Sold During SP** | **99.90%** |

180.    While in possession of material, non-public information, defendant Goldstein sold 66,574 shares of his personally held Teladoc stock for proceeds of $2.6 million.  Defendant Goldstein's sales were timed to maximize profit from Teladoc's then artificially inflated stock price.  Defendant Goldstein's sales are suspicious given that his stock sales represented over 98% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 66,574 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 67,492 |
| Shares Remaining SP | 918 |
| **Total Proceeds from Sales** | **$2,644,319.28** |
| **% of Total Ownership Sold During SP** | **98.64%** |

181.  While in possession of material, non-public information, Trident Capital Management-VI, L.L.C. ("Trident"), a venture capital firm, sold 250,000 shares of its Teladoc holdings for proceeds of $3.9 million. Defendant Multani is the Managing Director of Trident, and has been since 2002. Defendant Multani has dispositive power of Trident's Teladoc holdings, and effectuated these stock sales in a manner that was timed maximize profit from Teladoc's then artificially inflated stock price.

182.  In sum, defendants Hirschhorn, Gorevic, Vandervoort, Goldstein, and Multani (via Trident) sold over $60 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Seller | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **GOREVIC** | 6/29/2016 | 5,000 | $15.01 | $75,050.00 |
| | 7/15/2016 | 5,000 | $15.45 | $77,250.00 |
| | 8/16/2016 | 40,000 | $17.92 | $716,800.00 |
| | 1/24/2017 | 100,000 | $15.79 | $1,579,000.00 |
| | 5/8/2017 | 15,000 | $23.11 | $346,650.00 |
| | 5/22/2017 | 4,700 | $29.58 | $139,026.00 |
| | 5/23/2017 | 9,700 | $29.56 | $286,732.00 |
| | 5/25/2017 | 5,600 | $29.57 | $165,592.00 |
| | 6/5/2017 | 13,389 | $32.89 | $440,364.21 |
| | 6/6/2017 | 6,602 | $32.88 | $217,073.76 |
| | 10/2/2017 | 20,000 | $33.47 | $669,400.00 |
| | 11/2/2017 | 20,000 | $32.10 | $642,000.00 |
| | 12/4/2017 | 100,000 | $32.99 | $3,299,000.00 |
| | 3/12/2018 | 40,000 | $43.27 | $1,730,800.00 |
| | 4/16/2018 | 25,000 | $41.36 | $1,034,000.00 |
| | 5/15/2018 | 25,000 | $48.93 | $1,223,250.00 |
| | 6/15/2018 | 25,000 | $60.21 | $1,505,250.00 |
| | 7/16/2018 | 25,000 | $66.11 | $1,652,750.00 |
| | 8/16/2018 | 25,000 | $71.66 | $1,791,500.00 |
| | 9/17/2018 | 25,000 | $75.05 | $1,876,250.00 |

| | 10/17/2018 | 25,000 | $70.29 | $1,757,250.00 |
| | 11/19/2018 | 35,000 | $54.80 | $1,918,000.00 |
| | **Total Sales** | **594,991** | **Total Proceeds** | **$23,142,987.97** |
| | | | | |
| **HIRSCHHORN** | 8/15/2016 | 30,000 | $17.83 | $534,900.00 |
| | 10/17/2016 | 5,000 | $15.52 | $77,600.00 |
| | 11/8/2016 | 700 | $17.50 | $12,250.00 |
| | 11/10/2016 | 4,300 | $17.50 | $75,250.00 |
| | 11/15/2016 | 5,000 | $16.82 | $84,100.00 |
| | 11/16/2016 | 5,000 | $17.55 | $87,750.00 |
| | 12/15/2016 | 5,000 | $16.60 | $83,000.00 |
| | 1/9/2017 | 5,000 | $17.50 | $87,500.00 |
| | 1/17/2017 | 10,000 | $17.84 | $178,400.00 |
| | 1/26/2017 | 900 | $20.00 | $18,000.00 |
| | 4/19/2017 | 59,100 | $25.46 | $1,504,686.00 |
| | 5/17/2017 | 100,000 | $27.70 | $2,770,000.00 |
| | 9/21/2017 | 15,900 | $31.46 | $500,214.00 |
| | 9/22/2017 | 9,100 | $32.74 | $297,934.00 |
| | 10/2/2017 | 10,000 | $34.04 | $340,400.00 |
| | 10/16/2017 | 25,000 | $32.37 | $809,250.00 |
| | 10/17/2017 | 10,000 | $34.03 | $340,300.00 |
| | 11/15/2017 | 10,000 | $27.96 | $279,600.00 |
| | 12/4/2017 | 30,000 | $32.99 | $989,700.00 |
| | 2/28/2018 | 100,000 | $39.60 | $3,960,000.00 |
| | 5/1/2018 | 40,000 | $42.67 | $1,706,800.00 |
| | 5/2/2018 | 29,460 | $45.17 | $1,330,708.20 |
| | 5/2/2018 | 30,540 | $45.17 | $1,379,491.80 |
| | 7/10/2018 | 20,000 | $63.00 | $1,260,000.00 |
| | 9/25/2018 | 25,000 | $80.45 | $2,011,250.00 |
| | 9/25/2018 | 5,000 | $80.34 | $401,700.00 |
| | 9/25/2018 | 5,000 | $80.32 | $401,600.00 |
| | 11/2/2018 | 10,000 | $70.13 | $701,300.00 |
| | 12/4/2018 | 10,000 | $64.96 | $649,600.00 |
| | **Total Sales** | **615,000** | **Total Proceeds** | **$22,873,284.00** |
| | | | | |
| **VANDERVOORT** | 8/8/2016 | 52,865 | $16.64 | $879,673.60 |
| | 8/7/2017 | 53,806 | $30.92 | $1,663,681.52 |
| | 3/2/2018 | 27,809 | $38.62 | $1,073,983.58 |
| | 3/5/2018 | 17,361 | $40.28 | $699,301.08 |
| | 3/5/2018 | 1,953 | $41.82 | $81,674.46 |
| | 7/9/2018 | 24,250 | $64.28 | $1,558,790.00 |
| | 8/8/2018 | 5,549 | $67.25 | $373,170.25 |
| | 9/10/2018 | 5,550 | $77.67 | $431,068.50 |
| | 10/8/2018 | 5,551 | $73.83 | $409,830.33 |
| | 11/8/2018 | 5,549 | $67.18 | $372,781.82 |
| | **Total Sales** | **200,243** | **Total Proceeds** | **$7,543,955.14** |
| | | | | |
| **GOLDSTEIN** | 3/2/2018 | 66,574 | $39.72 | $2,644,319.28 |

| | | Total Sales | 66,574 | Total Proceeds | $2,644,319.28 |
|---|---|---|---|---|---|
| | | | | | |
| TRIDENT | | 1/24/2017 | 240,666 | $15.79 | $3,800,116.14 |
| | | 1/24/2017 | 9,334 | $15.79 | $147,383.86 |
| | | Total Sales | 250,000 | Total Proceeds | $3,947,500.00 |
| | | | | | |
| | | | | | |
| | | TOTAL SALES | 1,726,808 | TOTAL PROCEEDS | $60,152,046.39 |

### DAMAGES TO TELADOC

183.   As a result of the Individual Defendants' improprieties, the Company was forced to pay a settlement to Griffin and, later, millions more under the Separation Agreement to defendant Hirschhorn than he would have received if he had been terminated for cause.  As detailed above, there is the potential for additional settlements as at least one lawsuit, Dr. Roots' lawsuit, is pending, and the culture of fraud, dishonesty, harassment, and retaliation continues at Teladoc. This hostile culture has caused the Company to lose talented employees, including McKay, and likewise turned talented employees who would have worked at Teladoc away.

184.   The Board's failure to act in the face of red flags indicating internal control failures has also placed the Company's accreditation status with the NCQA in jeopardy, and, at least for some time, while its accreditation status was "Under Corrective Action," the loss of contracts and customers to competitors with unqualified accreditation status.

185.   As a result of the Individual Defendants' improprieties, Teladoc disseminated improper, public statements concerning the Company's management and the Individual Defendants' ethics and compliance with the Code.  These improper statements have damaged Teladoc's credibility as reflected by the Company's almost $523.6 million, or 12%, market capitalization loss in the wake of the SIRF Report.

186.   Further, Teladoc's business, goodwill, and reputation have been, and will continue to be, damaged by the Individual Defendants' decision to allow and/or failure to prevent unethical

conduct by its fiduciaries and harassment and retaliation against its employees. Customers and business value companies that respect their employees and live up to the ethical standards they espouse. Potential customers and business partners are less likely to choose to voluntarily associate with Teladoc knowing it was responsible for covering up an inappropriate affair between its CFO and subordinate and for permitting retaliation, discrimination, and harassment of its employees. Accordingly, the Company stands to lose business and consumer opportunities as a result of the actions of Teladoc fiduciaries.

187. Teladoc's ability to attract investors is also impaired. In addition to price, Teladoc's current and potential investors consider a company's trustworthiness, stability, and commitment to corporate responsibility. Investors are less likely to invest in companies that fail to comply with their own internal protocols and condone or allow unethical conduct, retaliation and discrimination. Teladoc's ability to raise equity capital or debt on favorable terms in the future is also now impaired. The Company stands to incur higher marginal costs of capital and debt because the improprieties detailed herein have materially increased the perceived risks of investing in and lending money to the Company.

188. Further, as a direct and proximate result of the Individual Defendants' actions, Teladoc has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the Securities Class Action;

(b)     costs incurred from retaining outside counsel and paying a settlement to Griffin due to defendant Hirschhorn's misconduct;

(c)     costs incurred in connection with defendant Hirschhorn's severance;

(d)     costs incurred in defending, settling, or paying any potential adverse judgment in any legal action pertaining to discrimination or retaliation of Company employees, including Dr. Roots' lawsuit; and

(e)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Teladoc.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

189.    Plaintiffs bring this action derivatively in the right and for the benefit of Teladoc to redress injuries suffered, and to be suffered, by Teladoc as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Teladoc is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

190.    Plaintiffs will adequately and fairly represent the interests of Teladoc in enforcing and prosecuting its rights.

191.    Plaintiffs were stockholders of Teladoc at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current Teladoc stockholders.

192.    The current Board of Teladoc consists of the following twelve individuals: defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith, and nondefendant Catherine A. Jacobson ("Jacobson").  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith Face a Substantial Likelihood of Liability for Their Misconduct**

193.    As alleged above, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith breached their fiduciary duties by failing to exercise independent oversight, abdicating their responsibilities to the Officer Defendants, and knowingly allowing the Company to operate with inadequate internal controls.  As detailed above, these fiduciaries knew that defendant Hirschhorn had violated the Code by engaging in an inappropriate sexual relationship with Griffin.  This was a warning that their internal controls were inadequate and should have triggered a broader investigation into defendant Hirschhorn's conduct. However, the Board never undertook a full investigation into defendant Hirschhorn's conduct and failed to take any steps to enhance their internal controls.  In addition, despite knowledge of his unethical conduct, the Board decided to leave defendant Hirschhorn in power, protect him over the Company, and conceal his wrongdoing from stockholders in violation of the Code and Item 406 of SEC Regulation S-K.  As a result, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith face a substantial likelihood of liability for consciously failing to exercise independent oversight, ignoring red flags of internal control failures, and acting against the Company's best interests.

194.    As alleged above, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews breached their fiduciary duties of loyalty by negligently issuing the materially false and misleading 2017 Proxy and 2018 Proxy soliciting the reelection of certain directors to the Board and the approval of the Restated Plan.  Specifically, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews misrepresented or omitted: (i) the Board's oversight over the Company's management; (ii) the Individual Defendants' ethical standards and conduct; (iii) the Board's refusal to enforce

the Code against the Officer Defendants, including defendant Hirschhorn; (iv) defendant Hirschhorn's violations of the Code and inappropriate sexual relationship with a subordinate; and (v) that the Company had not, and would not, disclose the waiver from the Code it provided to defendant Hirschhorn, contrary to the claims in the 2017 Proxy and 2018 Proxy and in violation of Item 406 of SEC Regulation S-K.  Accordingly, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews face a substantial likelihood of liability for negligently issuing the 2017 Proxy and 2018 Proxy and therefore any demand upon these defendants is futile.

195.    As alleged above, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings concerning Teladoc's management and the Individual Defendants' ethics and compliance with the Code.  These fiduciaries were well aware that defendant Hirschhorn had acted unethically and violated the Code by engaging in an affair with Griffin.  Yet, they concealed his wrongdoing from stockholders in violation of Item 406 of SEC Regulation S-K and misleadingly touted that Teladoc embodies "the highest standards of integrity and ethics in the way it conducts business."  In addition, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews each signed at least one, if not all, of the Company's Forms 10-K filed between 2016 and 2018, and thus personally made the improper statements contained in those Forms 10-K and described herein.  Defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews also negligently made misleading statements in the 2017 Proxy and the 2018 Proxy.  Accordingly, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein,

Darling, Shedlarz, Paulus, McAndrews, and Smith face a substantial likelihood of liability for their breaches of duty, making any demand upon them futile.

196.    Defendants Snow, Multani, Goldstein, Shedlarz, and McAndrews, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Snow, Multani, Goldstein, Shedlarz, and McAndrews face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

197.    Defendants Gorevic, Multani, and Goldstein sold Teladoc stock under highly suspicious circumstances.  Defendants Gorevic, Multani, and Goldstein possessed material, nonpublic Company information and used that information to benefit themselves.  Defendants Gorevic, Multani, and Goldstein sold stock based on this knowledge of material, nonpublic Company information regarding the Company's lack of ethics and internal controls failures and the impending decrease in the value of their holdings of Teladoc.  Accordingly, defendants Gorevic, Multani, and Goldstein face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon defendants Gorevic, Multani, and Goldstein is futile.

198.     Any suit by the current directors of Teladoc to remedy these wrongs would expose defendants Gorevic and Hirschhorn, and Teladoc to liability for violations of the federal securities laws in the pending consolidated Securities Class Action, and would result in civil actions being filed against one or more of the other Individual Defendants.  The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendants Gorevic and Hirschhorn in this action, then Teladoc's efforts would compromise its defense of the Securities Class Action.  Accordingly, demand on the Board is excused.

199.     Demand is further excused because the Board was already presented with substantial evidence of wrongdoing and decided not to act and have demonstrated an inability to validly exercise business judgment with respect to defendant Hirschhorn.  As discussed above, the Board knew in 2016 that defendant Hirschhorn had engaged in an inappropriate relationship in violation of the Code.  They therefore also knew that defendant Hirschhorn was untrustworthy and presented a risk to the Company's reputation.  Despite this knowledge, the Board took no action against defendant Hirschhorn and decided to protect to him over Teladoc, all which continuing to abdicate their responsibilities to him.  Defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith therefore cannot properly consider a demand.

**Defendants Gorevic, Multani, McKinley, and Snow Lack Independence**

200.     Demand is further excused on defendants Gorevic, Multani, McKinley, and Snow because they cannot impartially consider a demand for the reasons described below.

201.     The principal professional occupation of defendant Gorevic is his employment with Teladoc, pursuant to which he has received and continues to receive substantial monetary

compensation and other benefits as alleged above.   Accordingly, defendant Gorevic lacks independence from defendant Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Smith due to his interest in maintaining his executive position at Teladoc. This lack of independence renders defendant Gorevic incapable of impartially considering a demand to commence and vigorously prosecute this action.   Teladoc paid defendant Gorevic the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $511,250 | $3,071,818 | $3,080,863 | $643,750 | $21,641 | $7,329,322 |
| 2017 | $500,000 | $1,525,000 | $4,293,406 | $750,000 | $36,036 | $7,104,442 |
| 2016 | $500,000 | - | $2,668,669 | $400,000 | $37,902 | $3,606,571 |

Accordingly, defendant Gorevic is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Gorevic.

202.   Defendants Multani and McKinley are affiliated with venture capital firms that have a history of investing in Teladoc, as described below.  Their venture capital firms have made significant returns from their Teladoc investments.

203.   Defendant Multani is the Managing Director of Trident and has been since 2002. Trident is a venture capital firm focused on information, business services, cybersecurity, marketing and internet services, and cloud companies.  Trident initially invested in Teladoc in its Series B funding round in May 2008.  In 2015, Trident formed Sunstone Partners ("Sunstone"). Sunstone is a growth equity firm focused on technology-enabled business services.  Defendant Multani has served as the Managing Director of Sunstone since January 2016.  Sunstone investing in Teladoc in at least July 2015.

204.   Defendant McKinley is the General Partner of Cardinal Partners ("Cardinal") and has been since 2008.   Cardinal is a venture capital firm focused on disruptive healthcare technology-enabled services and life sciences companies.   Cardinal initially invested in Teladoc in November 2009, during its Series C funding round, and also invested in Teladoc during its Series F funding round in September 2014.

205.   Defendants Multani and McKinley will not vote to initiate litigation against defendants Hirschhorn and Gorevic due to the substantial amount of money defendants Hirschhorn and Gorevic made for their venture capital firms when they took the Company public.

206.   Defendants Felsenthal, Mawhinney, Mead, and Outland also are also affiliated with venture capital firms that have a history of investing in Teladoc.   The venture capital firms defendants Multani, McKinley, Felsenthal, Mawhinney, Mead, and Outland are affiliated with have a history of coinvesting in other companies beyond Teladoc as well.   The following table displays coinvestments in at least the following companies:

| Company Name | Investment Dates | Venture Capital Firms | Affiliated Defendant |
|---|---|---|---|
| Amprius, Inc. | January 2014 (Series C) | Kleiner Perkins | Mead, Dana |
| | | Trident Capital | Multani, Arneek |
| | March 2011 (Series B) | Kleiner Perkins | Mead, Dana |
| | | Trident Capital | Multani, Arneek |
| ArroHealth | 2013 (Acquired Majority Interest) | HLM Venture Partners | Felsenthal, Martin |
| | | Trident Capital | Multani, Arneek |
| Awarepoint | February 2010 (Series E) | Cardinal Partners | McKinley, Thomas |
| | | Icon Ventures | Mawhinney, Thomas |
| | August 2011 (Series F) | Cardinal Partners | McKinley, Thomas |
| | | Icon Ventures | Mawhinney, Thomas |
| | | Kleiner Perkins | Mead, Dana |
| | June 2012 (Series G) | Cardinal Partners | McKinley, Thomas |
| | | Icon Ventures | Mawhinney, Thomas |

| | | Kleiner Perkins | Mead, Dana |
|---|---|---|---|
| | | Cardinal Partners | McKinley, Thomas |
| | | Icon Ventures | Mawhinney, Thomas |
| | December 2014 (Series G-II) | Kleiner Perkins | Mead, Dana |
| **CloudPhysics, Inc.** | | Icon Ventures | Mawhinney, Thomas |
| | June 2014 (Series C) | Kleiner Perkins | Mead, Dana |
| **Devicescape Software, Inc.** | | Icon Ventures | Mawhinney, Thomas |
| | January 2005 (Series B) | Kleiner Perkins | Mead, Dana |
| | | Icon Ventures | Mawhinney, Thomas |
| | October 2010 | Kleiner Perkins | Mead, Dana |
| | | Icon Ventures | Mawhinney, Thomas |
| | February 2012 (Series C) | Kleiner Perkins | Mead, Dana |
| **Hara Software, Inc.** | | Icon Ventures | Mawhinney, Thomas |
| | September 2009 (Series B) | Kleiner Perkins | Mead, Dana |
| | | Icon Ventures | Mawhinney, Thomas |
| | May 2011 (Series C) | Kleiner Perkins | Mead, Dana |
| **Imagine Health, Inc.** | | Trident Capital | Multani, Arneek |
| | July 2014 (Series A) | HLM Venture Partners | Felsenthal, Martin |
| **Teladoc Health, Inc.** | May 2008 (Series B) | Trident Capital | Multani, Arneek |
| | | Cardinal Partners | McKinley, Thomas |
| | | Trident Capital | Multani, Arneek |
| | November 2009 (Series C) | HLM Venture Partners | Felsenthal, Martin |
| | | Cardinal Partners | McKinley, Thomas |
| | | Trident Capital | Multani, Arneek |
| | January 2011 (Series D) | HLM Venture Partners | Felsenthal, Martin |
| | | Kleiner Perkins | Mead, Dana |
| | | New Capital Partners | Outland, James |
| | | Trident Capital | Multani, Arneek |
| | September 2011 (Series E) | HLM Venture Partners | Felsenthal, Martin |
| | | Icon Ventures | Mawhinney, Thomas |
| | | Kleiner Perkins | Mead, Dana |
| | | Cardinal Partners | McKinley, Thomas |
| | | New Capital Partners | Outland, James |
| | September 2014 (Series F) | | |

| | | Trident Capital | Multani, Arneek |
|---|---|---|---|
| | | HLM Venture Partners | Felsenthal, Martin |
| | At least July 2015 | Sunstone Partners | Multani, Arneek |
| | At least July 2017 | Health Velocity Capital | Felsenthal, Martin |
| **The 41st Parameter** | August 2007 (Series C) | Icon Ventures | Mawhinney, Thomas |
| | | Kleiner Perkins | Mead, Dana |
| | December 2009 (Series C-II) | Icon Ventures | Mawhinney, Thomas |
| | | Kleiner Perkins | Mead, Dana |
| | April 2012 (Series D) | Icon Ventures | Mawhinney, Thomas |
| | | Kleiner Perkins | Mead, Dana |
| **Voltage Security** | May 2005 (Series C) | Icon Ventures | Mawhinney, Thomas |
| | | Trident Capital | Multani, Arneek |
| | September 2007 (Series D) | Icon Ventures | Mawhinney, Thomas |
| | | Trident Capital | Multani, Arneek |

207.    In addition to coinvesting together in Awarepoint, defendants McKinley, Mead, and Mawhinney also served together as directors of Awarepoint.  Awarepoint delivered a cloud-based, real-time location system on a single platform of integrated technology, prior to its assets being transferred to Clinica Patents LLC.  Defendants McKinley and Mawhinney concurrently served as directors at Awarepoint in at least January 2018 and concurrently invested in Awarepoint via Cardinal and Icon Ventures, respectively, from at least 2008 to the present.  Defendants McKinley and Mead concurrently served as directors at Awarepoint in at least January 2018. Defendants McKinley and Mead concurrently invested in Awarepoint via Cardinal and Kleiner Perkins, respectively, from August 2011 to the present.

208.    Venture capital firms have to compete in order to be allowed to invest in companies before they go public. Defendants Multani and McKinley will not vote to initiate litigation against each other, or against defendants Felsenthal Mawhinney, Mead, or Outland, due to the risk of their venture capital firms being cut out of future investment opportunities in retaliation.

209.   Defendant Snow has a long-standing business relationship with defendant Gorevic that renders him incapable of being able to impartially consider bringing litigation against defendant Gorevic.  Their relationship dates back to the 1990s.  Oxford Health Plans LLC ("Oxford Health") provides health benefit plans and is associated with UnitedHealthcare.  Defendants Gorevic and Snow concurrently served at Oxford Health as Director of Service Strategy and Executive Vice President, respectively, from 1993 to 1998.  Empire BlueCross BlueShield ("Empire") is an insurance company serving residents and businesses in New York.  Defendants Gorevic and Snow concurrently served at Empire as Chief Sales and Marketing Officer, and President and Chief Operating Officer, respectively, from February 2002 to 2003.  Due to their long-standing relationship, defendant Snow will not elect to bring litigation against defendant Gorevic.  Accordingly, demand on defendant Snow is excused for this additional reason.

210.   Plaintiffs have not made any demand on the other stockholders of Teladoc  to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Teladoc is a publicly held company with 74.4 million shares outstanding and thousands of stockholders as of April 27, 2020;

(b)   making demand on such a number of stockholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)   making demand on all stockholders would force plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, Outland, Felsenthal, and Mawhinney for Violation of Section 14(a) of the Exchange Act**

211.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

212.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims detained herein do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

213.   Defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, Outland, Felsenthal, and Mawhinney negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2017 Proxy.  Defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, and Mawhinney negligently issued, caused to be issued and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy.  In the 2017 Proxy, the Board solicited stockholder votes to reelect directors to the Board and approve the Restated Plan.  In the 2018 Proxy, the Board also solicited stockholder votes to reelect directors to the Board.  Both the 2017 Proxy and the 2018 Proxy, however, misrepresented the Board's oversight over the Company, the Individual Defendants compliance with the Code, and the waiver of the Code provided to defendant Hirschhorn.

214.    By reasons of the conduct alleged herein, defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, McAndrews, Outland, Felsenthal, and Mawhinney violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Teladoc misled and deceived its stockholders by making statements that were essential links in the stockholders heeding to the Company's recommendation to reelect the directors and approve the Restated Plan.

215.    The misleading information contained in the 2017 Proxy and 2018 Proxy was material to Teladoc's stockholders in determining whether or not to approve the Restated Plan and reelect the directors.  The proxy solicitation process was an essential link in approving the Restated Plan and reelecting the directors.

216.    Plaintiffs, on behalf of Teladoc, hereby seek relief for damages inflicted upon the Company based upon the misleading 2017 Proxy and 2018 Proxy.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

217.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

218.    The Individual Defendants owed and owe Teladoc fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Teladoc the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of Teladoc's compliance with and the duty to conduct good faith investigations into known violations of laws, regulations, and internal policies concerning inappropriate behavior.

219.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Teladoc, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

220.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants breached their fiduciary duties by knowingly, recklessly, or with gross negligence: (i) failing to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) allowing excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iii) making or allowing the Company to make improper statements in its public filings, including its Proxy Statements; and (iv) violating the Code and other Company policies.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

221.   The Director Defendants, as directors of the Company, owed Teladoc the highest duty of loyalty.  The Director Defendants breached their duty of loyalty by knowingly or recklessly: (i) failing to ensure that Teladoc had adequate internal controls, risk management procedures, and other policies to ensure its fiduciaries were complying with the Code and prevent misconduct and retaliation in the workplace; (ii) failing to adequately investigate defendant Hirschhorn's misconduct, despite knowledge thereof; (iii) allowing excessive compensation to be awarded to defendant Hirschhorn notwithstanding the damage he had caused to the Company; (iv) making or allowing the Company to make improper statements in its public filings, including its

Proxy Statements; and (v) violating the Code and other Company policies.   Accordingly, these defendants breached their duty of loyalty to the Company.

222.   The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

223.   Insider Selling Defendants breached their duty of loyalty by selling Teladoc stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.   The information described above was material, nonpublic information concerning the Company's future business prospects.   It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Teladoc common stock.

224.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Teladoc has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

225.   Plaintiffs, on behalf of Teladoc, have no adequate remedy at law.

<u>**COUNT III**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

226.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

227.     As a result of the decision to allow the Company to operate with inadequate internal controls and by failing to conduct proper supervision, the Individual Defendants have caused Teladoc to waste its assets by hiring outside counsel to defend the Company against Griffin and ultimately pay a settlement to Griffin due to defendant Hirschhorn's misconduct.

228.     As a result of the Individual Defendants' failure to implement adequate controls to ensure that the Company's SEC filings were accurate, Teladoc is subject to the Securities Class Action.  The Individual Defendants have caused Teladoc to waste its assets and incur substantial costs by defending itself in the ongoing action, in addition to ensuring costs from a potential settlement or adverse judgment.

229.     As a result of the Individual Defendants' failure to conduct proper supervision, the Individual Defendants have caused Teladoc to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty, including but not limited to defendant Hirschhorn under the Separation Agreement.

230.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

231.     Plaintiffs, on behalf of Teladoc, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

232.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

233.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Teladoc.  The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Teladoc.

234.    As alleged herein, defendant Hirschhorn engaged in misconduct, and yet received handsome compensation, including the payments he received under the Separation Agreement. Accordingly, defendant Hirschhorn received improper remuneration despite his misconduct. Defendant Hirschhorn was thereby unjustly enriched.

235.    The Insider Selling Defendants sold Teladoc stock while in possession of material, nonpublic information that artificially inflated the price of Teladoc stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

236.    Plaintiffs, as stockholders and representatives of Teladoc, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

237.    Plaintiffs, on behalf of Teladoc, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of Teladoc, demand judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Teladoc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Teladoc and its stockholders from a repeat of the damaging events described herein, including, but not limited to,

putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's internal controls and Board oversight concerning Code compliance and inappropriate conduct;

2.      a proposal to strengthen the Company's internal controls over financial reporting and oversight of its disclosure procedures;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a provision to control insider selling; and

5.      a provision to permit the stockholders of Teladoc to nominate at least three candidates for election to the Board;

C.      Equitable and/or injunctive relief invalidating: (i) the approval of the Restated Plan; and (ii) the election of defendants Gorevic, Snow, Multani, McKinley, Frist, Goldstein, Darling, Shedlarz, Paulus, and McAndrews to the Board;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Teladoc have an effective remedy;

E.      Awarding to Teladoc restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from the Insider Selling Defendants;

F.      Awarding to plaintiffs the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: June 3, 2020                          THE BROWN LAW FIRM, P.C.


                                             /s/  Timothy Brown
                                             TIMOTHY BROWN

                                             SAADIA HASHMI
                                             240 Townsend Square
                                             Oyster Bay, NY 11771
                                             Telephone: (516) 922-5427
                                             Facsimile: (516) 344-6204
                                             Email: tbrown@thebrownlawfirm.net

                                             ROBBINS LLP
                                             BRIAN J. ROBBINS
                                             CRAIG W. SMITH
                                             SHANE P. SANDERS
                                             JONATHAN D. BOBAK
                                             5040 Shoreham Place
                                             San Diego, CA 92122
                                             Telephone: (619) 525-3990
                                             Facsimile: (619) 525-3991
                                             E-mail: brobbins@robbinsllp.com
                                                     csmith@robbinsllp.com
                                                     ssanders@robbinsllp.com
                                                     jbobak@robbinsllp.com

                                             LAW OFFICE OF THOMAS G. AMON
                                             THOMAS G. AMON
                                             420 Lexington Avenue, Suite 1402
                                             New York, New York 10170
                                             Telephone: (212) 810-2430
                                             E-mail: tamon@amonlaw.com

                                             Attorneys for Plaintiffs

1448206

## **VERIFICATION**

    I, Chantelle Kreutter, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of May, 2020.

Chantelle Kreutter

## VERIFICATION

I, Misty Pickett, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _May 26, 2030_____

_Misty Pickett_____
MISTY PICKETT